**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **IN RE: AFTERMARKET FILTERS ANTITRUST LITIGATION** _____ **This Document Relates to: All Direct Purchaser Actions** | **Master Docket No.: 08-cv-4883 MDL Docket No.: 1957** **Judge Robert W. Gettleman** |

## CONSOLIDATED AMENDED COMPLAINT

Central Warehouse Sales Corporation, Neptune Warehouse Distributors, Inc., Muralt's, Inc. and A&L Systems Inc. ("Plaintiffs"), individually and on behalf of those similarly situated, bring this action for treble damages, injunctive relief and costs of suit under the antitrust laws of the United States against Defendants (defined below) and allege as follows:

## SUMMARY OF CLAIMS

1.      This case involves a nationwide conspiracy among the largest manufacturers of light duty (*i.e.*, automotive and light truck) oil, air and fuel filters for sale in the aftermarket (*i.e.*, the market for replacement filters) (collectively, "Filters").  In violation of Section 1 of the Sherman Act, Defendants and their co-conspirators unlawfully agreed to eliminate competition among themselves and to fix, raise, maintain and/or stabilize prices and allocate customers for Filters in the United States beginning on or around March 1, 1999 and continuing to the present ("Class Period").  Defendants' anticompetitive conduct in furtherance of the conspiracy, as alleged herein, included, but was not limited to, in-person meetings, telephone calls, facsimiles and other communications.

2.      Numerous allegations contained herein, particularly with respect to the collusive meetings and communications between and among Defendants and their co-conspirators, are based upon the personal knowledge of William G. Burch, a former senior sales executive at Defendants Purolator Filters N.A. L.L.C. and Champion Laboratories, Inc. during most of the Class Period.  Additionally, certain of these allegations are further corroborated by (i) recorded conversations that took place between Mr. Burch and certain of Defendants' representatives who participated in and furthered the conspiracy, and (ii) statements made under oath by other individuals with personal knowledge of the conspiracy.

3.      Throughout the Class Period, because of Defendants' unlawful conduct, Plaintiffs and the Class (defined below) paid supra-competitive prices for Filters.  As a result, Plaintiffs and the Class suffered antitrust injury to their business or property.

4.      Plaintiffs bring this lawsuit as a class action on behalf of direct purchasers who, during the Class Period, purchased Filters in the United States from one or more Defendants or their co-conspirators.  This action is brought under Section 1 of the Sherman Act to enjoin Defendants' anticompetitive conduct and recover damages suffered by the Class.

## JURISDICTION AND VENUE

5.      Plaintiffs bring this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to prevent and restrain Defendants' violations of the antitrust laws and to recover treble damages and the costs of this suit, including reasonable attorneys' fees, pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1, for injuries sustained by Plaintiffs and the Class.

6.      This Court has jurisdiction over the claims alleged herein under 28 U.S.C. §§ 1331 and 1337.

7.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. §§ 15(a) and 22 because during the Class Period, Defendants resided, transacted business, were found, or had agents in this district, and because a substantial portion of the affected interstate trade and commerce described herein has been carried out in this district.

## INTERSTATE COMMERCE

8.     The activities of Defendants and their co-conspirators as described herein were within the flow of and substantially affected interstate commerce.

9.     During the Class Period, Defendants manufactured, sold and/or distributed substantial quantities of Filters in a continuous and uninterrupted flow of interstate commerce to customers located throughout the United States.

## THE PARTIES

10.     Plaintiff Central Warehouse Sales Corporation is a Pennsylvania corporation with its principal place of business at 1123 Capouse Avenue, Scranton, Pennsylvania 18509.  Central Warehouse Sales Corporation purchased Filters in the United States directly from one or more of the Defendants throughout the Class Period.

11.     Plaintiff Neptune Warehouse Distributors, Inc. is a business located in Chelsea, Massachusetts.  Neptune Warehouse Distributors, Inc. purchased Filters in the United States directly from one or more of the Defendants throughout the Class Period.

12.     Plaintiff Muralt's, Inc., d/b/a Muralt's Travel Plaza, is a small business corporation located at 8800 Truck Stop Road, Missoula, Montana 59808.  Muralt's, Inc. purchased Filters in the United States directly from one or more of the Defendants throughout the Class Period.

13.     Plaintiff A&L Systems Inc. is a Michigan corporation with its principal place of business located at 25415 Glendale Avenue, Redford, Michigan 48239.  A&L Systems Inc. purchased Filters in the United States directly from one or more of the Defendants throughout the Class Period.

14.     Defendant Champion Laboratories, Inc. ("Champion") is a corporation headquartered in Albion, Illinois, with a business address at 200 S. Fourth St., Albion, Illinois 62806.  Throughout the Class Period, Champion manufactured and sold Filters in the United States.

15.     Defendant Purolator Filters N.A. L.L.C. ("Purolator") is a limited liability company with its principal place of business in Fayetteville, North Carolina, and a business address at 3200 Natal St., Fayetteville, North Carolina 28306-2845.  Throughout the Class Period, Purolator manufactured and sold Filters in the United States.

16.     Defendant ArvinMeritor, Inc. ("ArvinMeritor") is a corporation headquartered in Troy, Michigan, with a business address at 2135 West Maple Road, Troy, Michigan 48084. From around March 1999 to April 2006, ArvinMeritor and/or its predecessor owned Purolator.

17.     Defendant Honeywell International ("Honeywell") is a corporation headquartered in Morristown, New Jersey, with a business address at 100 Columbia Road, Morristown, New Jersey 07962.  Honeywell International Consumer Products Group is a division of Honeywell located in Danbury, Connecticut, and is responsible for the manufacture and sale of Filters, principally under the FRAM® brand.  Throughout the Class Period, Honeywell manufactured and sold Filters in the United States.

18.     Defendant Wix Filtration Corp. LLC is a limited liability company headquartered in Gastonia, North Carolina, with a business address at One Wix Way, Gastonia, North Carolina

28054. Throughout the Class Period, Wix Filtration Corp. LLC manufactured and sold Filters in the United States.

19.     Defendant Affinia Group Inc. is a Delaware corporation located at 1101 Technology Drive, Ann Arbor, Michigan 48108. Affinia operates Wix Filtration Products through its Affinia Global Filtration Operating Group and Wix Filtration Corp. LLC, a wholly-owned subsidiary. Wix Filtration Corp. LLC and Affinia are collectively referred to herein as "Wix."

20.     Defendant Cummins Filtration Inc. ("Cummins"), a wholly-owned subsidiary of Cummins, Inc., is headquartered in Nashville, Tennessee, with a business address at 2931 Elm Hill Pike, Nashville, Tennessee 37214. Throughout the Class Period, Cummins manufactured and sold Filters in the United States.

21.     Defendant The Donaldson Company ("Donaldson") is a corporation headquartered in Minneapolis, Minnesota, with a business address at 1400 West 94th St., Minneapolis, Minnesota 55431. Throughout the Class Period, Donaldson manufactured and sold Filters in the United States.

22.     Defendant Baldwin Filters, Inc. ("Baldwin") is a corporation headquartered in Kearney, Nebraska, with a business address at 4400 E. Hwy. 30, Kearney, Nebraska 68848. Throughout the Class Period, Baldwin manufactured and sold Filters in the United States.

23.     Champion, Purolator, ArvinMeritor, Honeywell, Wix, Donaldson, Cummins and Baldwin are collectively referred to herein as "Defendants."

24.     Wherever in this Consolidated Amended Complaint ("Complaint") reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or

representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business affairs.

25.     The acts alleged in this Complaint engaged in by Defendants were performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of the Defendants' business affairs.

## CO-CONSPIRATORS

26.     Various other persons, firms and corporations not named as Defendants herein have participated as co-conspirators in the violations of law alleged herein, and have aided, abetted and performed acts and made statements in furtherance thereof.

## CLASS ACTION ALLEGATIONS

27.     Plaintiffs bring this action against Defendants under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following Class:

> All persons and entities (excluding Defendants, their predecessors, successors, parents, subsidiaries, affiliates and co-conspirators, original equipment manufacturers and government entities) who purchased Filters in the United States directly from one or more of the Defendants or any of their predecessors, successors, parents, subsidiaries, or affiliates, at any time during the period from March 1, 1999 to the present.

28.     Plaintiffs do not know the exact number of Class members because such information is in the exclusive control of the Defendants or their co-conspirators due to the nature of the trade and commerce involved; however, Plaintiffs believe that Class members are sufficiently numerous and geographically dispersed so that joinder of all Class members is impracticable.

29.     Plaintiffs are all members of the Class.  Plaintiffs' claims are typical of the claims of the Class members and Plaintiffs will fairly and adequately protect the interests of the Class.

Plaintiffs are all direct purchasers of Filters and their interests are consistent with, and not antagonistic to, those of the other members of the Class.

30.     There are a number of questions of law or fact common to the Class, including, but not limited to, the following:

(a)     Whether Defendants and their co-conspirators engaged in an unlawful contract, combination or conspiracy to fix, raise, maintain and/or stabilize prices of and allocate customers for Filters in the United States;

(b)     Whether Defendants' unlawful contract, combination or conspiracy as alleged in this Complaint violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

(c)     Whether the unlawful conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiffs and other Class members;

(d)     The impact of Defendants' conspiracy on the prices of Filters sold to Plaintiffs and other Class members in the United States during the Class Period;

(e)     The appropriate nature of Class-wide equitable relief; and

(f)     The appropriate measure of damages sustained by Plaintiffs and other Class members.

31.     These questions of law and fact common to the Class members predominate over any questions affecting only individual members.

32.     A class action is superior to other methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated

7

persons to adjudicate their claims in a single forum simultaneously, effectively, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of relatively small claims by Class members who otherwise could not afford to litigate an antitrust claim such as the antitrust claim asserted in this Complaint.  This action presents no difficulties in management that would preclude maintenance as a class action.

33.     The Class is also readily definable and is one for which records likely exist in the files of Defendants and their co-conspirators.

## INDUSTRY BACKGROUND

**The Nature of Automotive Filter Products**

34.     Nearly every car and light truck sold in the United States, excluding vehicles that are solely electric, uses filters to keep engines, fuel and other hydraulic systems free from particulate contamination.  Most vehicles contain three or more filters that must be replaced at regular intervals. While filter technology and the range of filter products have changed over time, the primary filters categories remain the same: oil, air and fuel.

35.     Oil filters clean the oil circulating through an engine by picking up tiny contaminants, such as metal, carbon, rust and dirt particles that can be abrasive and hinder efficient operation of engine parts.  Oil filtration in engines is essential for enhancing a vehicle's longevity and performance.

36.     Air filters trap air particles that mix with fuel and circulate into the engine.  The air filter's body is typically made of metal or heat-resistant plastic. Most fuel-injected vehicles use a pleated paper filter element in the form of a flat panel, while older, carburetor vehicles use radial air filters made of similar materials.

37. Fuel filters screen out dirt and rust particles, improving a vehicle's performance by enabling the fuel to burn more efficiently.

**The Distribution Channels for Filters**

38. Defendants primarily sell Filters to two separate channels: (i) Original Equipment Manufacturers ("OEMs") and (ii) aftermarket sellers of replacement filters ("Aftermarket Sellers").

39. OEMs purchase automotive filters for installation into new vehicles during the production process. OEMs are not members of the proposed Class.

40. Aftermarket Sellers, who are members of the proposed Class, purchase Filters directly from Defendants for wholesale or retail sale to the public, either (i) in connection with professional services rendered to an indirect ("Do it For Me") purchaser (for example, an oil filter sold to a customer as part of an oil change) or (ii) for individuals (known as "Do it Yourself" purchasers) who replace their own filters.

41. Aftermarket Sellers include, but are not limited to, traditional warehouse (wholesale) distributors, jobbers, automotive parts and mass merchandising retailers, and direct/private label purchasers. Sales to traditional distributors and automotive parts retailers account for almost seventy percent of aftermarket automotive filter revenues.

42. Defendants are the primary manufacturers and sellers of Filters purchased by Class Members. Filters are marketed and sold by Defendants through common distribution channels.

**The Nature and Size of the Filters Aftermarket**

43. The Filters aftermarket in the United States is a mature market. Oil and air filters in particular have shown low growth in unit shipments and revenues during the Class Period.

44.     Most vehicle maintenance guides recommend that in order to maintain the engine's efficient operation, Filters should be regularly replaced.

45.     Typically, oil filters and air filters require more frequent replacement and comprise the largest segment of the market, followed by fuel filters.  Oil filters account for over sixty percent of U.S. Filters revenues.

46.     Filters are fungible products.  Most manufacturers generally produce each type of Filter.  Brand loyalty for Filters is limited.

47.     Defendants purchase the same raw materials from the same group of suppliers and use identical designs to manufacture functionally equivalent Filters.  Specifically, each type of Filter (*i.e.*, oil, air and fuel) is interchangeable with the same type of Filter produced by any other manufacturer.  At aftermarket industry gatherings and events, Filters are often referred to as "light sweet crude" because of their complete substitutability.  Not surprisingly, many consumers perceive Filters as a commodity-type product.

48.     Annual U.S. revenues for Filters were approximately $1.5 billion and total U.S. revenues were approximately $13 billion during the Class Period.

**Consolidation and Concentration in the Automotive Filters Aftermarket**

49.     The Filters aftermarket is highly concentrated.  Four manufacturers – Honeywell, Purolator, Wix, and Champion – control over eighty percent of the Filters aftermarket.

50.     Purolator and Honeywell's FRAM® are perhaps the most well known Filters brands.  Wix, while not having as strong a brand name, manufactures, among other things, private label Filters for NAPA Auto Parts and Carquest Auto Parts, and Wix is the number one filter supplier for NASCAR.  Champion also focuses on private label manufacturing.  Champion manufactures such private label Filters as Mobil 1, Valvoline, STP, Mighty and Firestone.

51.     The Filters aftermarket has become increasingly consolidated since the 1990s.  In 1999, for example, Honeywell merged with AlliedSignal; FRAM became part of Honeywell Consumer Products Group; and Mark IV sold Purolator to Arvin Industries.  In 2000, Arvin Industries merged with Meritor Automotive to become ArvinMeritor, Inc.  And, in 2006 ArvinMeritor sold Purolator to Bosch and Mann + Hummel.

52.     While the Filters industry has experienced a wave of consolidation, there have been no significant new entrants into the market.

53.     The high degree of concentration in the Filters aftermarket is conducive to cartel behavior because it makes it easier for Defendants and their co-conspirators to coordinate conduct, and it makes it more difficult for customers to avoid the effects of collusive behavior.

## DEFENDANTS' UNLAWFUL CONDUCT

54.     During the Class Period, Defendants and their co-conspirators conspired, contracted or combined to fix, raise, maintain and/or stabilize prices and allocate customers for Filters in the United States.  Defendants accomplished this through, among other things, in-person meetings, communications and the exchange of competitively-sensitive information.

55.     Defendants used these meetings, discussions and communications to reach an agreement to implement, monitor and further their unlawful, continuing price-fixing and customer allocation scheme.

56.     Throughout the Class Period and in furtherance of their conspiracy, Defendants and their co-conspirators engaged in numerous unlawful anticompetitive activities, including, but not limited to:

(a)     Agreeing with each other to charge prices for Filters at specified levels and otherwise fix, increase, maintain and/or stabilize the prices of and allocate customers for Filters sold in the United States;

(b)     Attending meetings or otherwise engaging in discussions and communications with each other in the United States and elsewhere by telephone, facsimile and electronic mail regarding the sale of Filters;

(c)     Communicating with each other to discuss, *inter alia*, the prices, customers, markets and price levels of Filters sold in the United States;

(d)     Selling Filters in the United States and elsewhere at collusive and non-competitive prices pursuant to the unlawful agreement reached;

(e)     Accepting payment for Filters sold in the United States and elsewhere at collusive and non-competitive prices;

(f)     Directing, authorizing or consenting to the participation of employees in the conspiracy; and

(g)     Concealing the conspiracy and conspiratorial contacts through various means.

57.     Beginning at least as early as March 1999 and continuing throughout the Class Period, Defendants and their co-conspirators met on numerous occasions, had confidential discussions and exchanged competitively-sensitive information regarding pricing and customers for Filters in the United States.  Defendants used their meetings, discussions and exchanges of information successfully to agree and to further their conspiracy to fix, raise, maintain and/or stabilize prices of and allocate customers for Filters in the United States.

58.     On or about February 26, 1999, Arvin Industries acquired Purolator.  Marlen
Silverii, an Arvin Industries Senior Vice President and formerly employed by Purolator, was
instrumental in completing the acquisition.

59.     At the time Arvin Industries acquired Purolator, Mr. Burch was a National
Accounts Manager at Purolator.

60.     Shortly after the acquisition, in or around March 1999, Mr. Silverii met with
certain Purolator senior employees, including Mr. Burch, to discuss Purolator's profit margins,
which, in the view of Arvin Industries' executives, were too low.

61.     During the meeting, Mr. Silverii explained that to increase Filters' profit margins,
Arvin Industries' executives wanted to implement a Filters price increase.  But to do so
successfully and without losing market share or business, Mr. Silverii said that Purolator would
need Defendants to agree to raise prices along with Purolator.  Mr. Silverii told the assembled
Purolator senior personnel to contact their counterparts at Defendants for the express purpose of
obtaining each Defendant's agreement to implement a coordinated, industry-wide Filters price
increase.

62.     A number of Purolator's senior personnel who attended the meeting complied
with Mr. Silverii's directive.  These individuals contacted and communicated with their
counterparts at Defendants regarding a Filters coordinated price increase.

63.     As part of their collusive agreement to increase Filters prices, Defendants met,
discussed and otherwise communicated with each other to coordinate the timing, amount and
purported justifications of the price increase.

64.     One such series of meetings took place in or around May 1999 at the Jiffy Lube Association of Franchisees Show ("JLAF Show") at the Gaylord Opryland Hotel in Nashville, Tennessee, where Defendants discussed increasing Filters prices.

65.     At the JLAF Show, Mr. Silverii and at least one other senior Purolator employee met with a senior employee at Honeywell and discussed increasing Filters prices.

66.     A fellow Purolator employee told Mr. Burch that Purolator had spoken with Honeywell at the JLAF Show in Nashville and told them to raise prices.  That same Purolator employee also told Mr. Burch that "FRAM knows we're going up."

67.     Also in mid-1999, Mr. Silverii met with Tom Mallett, Champion's President.  Mr. Silverii and Mr. Mallett discussed fixing and coordinating Filters prices in the United States.

68.     On or about June 28, 1999, Mr. Silverii directed a senior Purolator employee to fax Honeywell a draft letter that Purolator intended to send to its customers, informing Purolator's customers about an impending price increase on all Purolator Filters.  The draft letter was back-dated June 21, 1999, and it announced a price increase that Purolator planned to implement on August 15, 1999.  The letter also provided the following pretextual reasons for the price increase: increases in cost for labor, health care, freight, and raw materials.

69.     Pursuant to Mr. Silverii's directive, on June 28, 1999, the Purolator senior employee sent the draft price increase letter by fax to his counterpart at Honeywell.  The fax recipient at Honeywell was the same person that Mr. Silverii secretly met with at the JLAF Show.  Notably, as of June 28, 1999, Purolator had not yet sent the price increase letter to any of its customers.

70.     On July 14, 1999, Purolator sent the price increase letter to its customers (though the letter was dated "July 7, 1999"). The letter was similar to the draft letter Purolator shared with Honeywell a few weeks earlier, including the same percentage increase and effective date.

71.     Shortly after Purolator sent its price increase letter pursuant to the unlawful agreement, the other Defendants followed Purolator and implemented similar Filters price increases.

72.     After months of illicit, secret contacts and communications regarding a price increase, each Defendant successfully implemented the agreed-upon price increase for Filters in the United States in or around August 1999.

73.     In August 1999, Mr. Burch left Purolator to join Champion as a National Accounts Manager.

74.     In or around February 2004, Champion's President John Evans met with Champion's senior employees who were responsible for the Filters business, including Mr. Burch, to discuss Champion's intention to raise Filters prices. Mr. Evans told Champion's senior employees that Champion would "lead the way" with another Filters price increase. Mr. Evans advised those assembled that Champion needed to coordinate the price increase with Defendants to ensure the continued success of the conspiracy. It was important to Champion that its Filters price increase not come at the expense of its market share. Mr. Evans, therefore, directed Champion's senior employees to make frequent telephone calls to Defendants to discuss coordinated pricing and to reach agreement on the price increase.

75.     Mr. Evans, together with other Champion senior employees, contacted each Defendant, including Mr. Silverii at ArvinMeritor, to coordinate this planned Filters price increase.

76.     As a result of these illicit communications, and in furtherance of their continuing conspiracy, Defendants agreed to increase Filters prices.  In or around April 2004, each Defendant announced and successfully implemented a coordinated Filters price increase.

77.     In early September 2004, Champion led Defendants' effort to implement a second 2004 coordinated Filters price increase in furtherance of their conspiracy.  Mr. Evans again enlisted several senior Champion sales representatives to discuss the price increase with Defendants and to gain their agreement for the amount of the increase.

78.     Some of the conversations took place at the Filters Manufacturers Council meeting in Nashville, Tennessee between September 26 and September 28, 2004.  At the meeting, Champion employees discussed with Purolator and Wix, among other Defendants, Champion's intention to raise Filters prices a second time in 2004.  In the words of one Champion employee, the "primary goal over the next day and a half [at the Convention] is to get everybody to get out there, and the message is gonna be that we're going up again, and when." The employee clarified: "That's basically our message to everybody." Champion's agenda was so clear that a Champion sales representative joked that he and Mr. Evans "talked about going to [the] Filter Council cocktail party wearing T-shirts saying 'we went up first last time.'"

79.     By October 27, 2004, Champion had received confirmation from Honeywell, Cummins, Donaldson, and Purolator that each would follow (or had already followed) Champion in implementing a Filters price increase of at least 5%.  Honeywell, Donaldson and Cummins went so far as to send Champion their draft price increase letters.  Purolator gave Champion a verbal confirmation that it agreed to increase its Filters prices.

80.     In or around October or November 2004, Defendants informed their respective customers of the previously agreed-upon Filters price increase.  In an attempt to conceal the

conspiracy and the collusively coordinated price increase, Defendants "blamed" the increase on rising steel costs.

81.     At or around the same time, one of Champion's largest private-label customers questioned the need for another price increase in 2004.  The customer also questioned Champion's explanation that rising steel prices necessitated the price increase.  The customer requested that Champion provide it with an additional explanation justifying the price increase.

82.     The request created a serious dilemma for Champion.  A few months earlier, Champion had introduced a new oil filter called eCore, twelve models of which fit 75% of the cars on the road.  The eCore filter was made, in part, out of fabric *instead of steel*.  Thus, Champion's oil filter input costs had actually decreased by approximately 20% because of its diminished need for raw steel in the manufacture of eCore oil filters.

83.     Instead of providing its customer with its eCore input prices, Champion gave its customer a Purolator spreadsheet for *Purolator's outdated input costs*, falsely representing Purolator's costs as its own.  The spreadsheet satisfied the complaining customer.  But more importantly, the spreadsheet concealed the true basis for the price increase: Defendants' unlawful price-fixing agreement.

84.     Ultimately, in or around November or December 2004, each Defendant successfully implemented the second 2004 coordinated Filters price increase.

85.     Thereafter, in subsequent years, Defendants continued to adhere to their unlawful agreement and conspiracy, increasing Filters prices periodically.

17

## ANTICOMPETITIVE EFFECTS

86.     Throughout the Class Period, pursuant to and in furtherance of their unlawful agreement, Defendants fixed, raised, maintained and/or stabilized prices and allocated customers for Filters in the United States.

87.     Defendants' unlawful conduct during the Class Period in collusively fixing, raising, maintaining and/or stabilizing Filters prices was for the sole purpose of foreclosing price competition in order to maintain artificially high prices for the Filters they sold in the United States.

88.     Similarly, Defendants' unlawful conduct during the Class Period in allocating customers amongst themselves was for the sole purpose of foreclosing price competition in order to maintain artificially high prices for the Filters they sold in the United States.

89.     As a result of Defendants' unlawful conspiracy, Plaintiffs and the Class have been forced to pay supracompetitive prices for Defendants' Filters.

## FRAUDULENT CONCEALMENT

90.     Throughout the relevant Class Period, Defendants affirmatively concealed from Plaintiffs and the Class their participation in the conspiracy alleged herein by, *inter alia*, engaging in secret meetings and communications in furtherance of the conspiracy, and by falsely holding themselves out to the public and their customers, including Plaintiffs, as true competitors.

91.     Because of such fraudulent concealment and the inherently self-concealing nature of this conspiracy, Plaintiffs could not have discovered, through reasonable due diligence, and did not discover, the existence of this conspiracy until shortly before this action was commenced.

92.     Defendants fraudulently concealed their unlawful conspiracy in several ways, including making misrepresentations to the public and their customers that the price increases were due to the increases in the price of steel, among other things, and that the prices for Filters were fair and the result of competition.

93.     As a result of the active concealment of the conspiracy by Defendants and their co-conspirators, any and all applicable statutes of limitation have been tolled.

## CLAIM FOR RELIEF

**(Sherman Act Section 1 – Horizontal Price-Fixing Against All Defendants)**

94.     Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein.

95.     Beginning at least as early as March 1, 1999, and continuing thereafter through the present, the exact dates being unknown to Plaintiffs, Defendants contracted, combined or conspired to fix, raise, maintain and/or stabilize prices and allocate customers for Filters in the United States, the purpose and effect of which is to maintain supracompetitive prices for their Filters.  This conspiracy is illegal *per se* under Section 1 of the Sherman Act, 15 U.S.C. § 1.

96.     This conspiracy consists of a continuing, unlawful understanding and concert of action among Defendants to coordinate their Filters prices.

97.     This conspiracy has foreclosed and restrained competition among Defendants and caused Plaintiffs and the Class to pay artificially high prices for Defendants' Filters.

98.     As a direct and proximate result of the unlawful conduct of Defendants and their co-conspirators, as alleged herein, Plaintiffs and other members of the Class have been injured in their business and property in an amount not presently known in that they paid more during the

19

Class Period for Filters than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## RELIEF SOUGHT

WHEREFORE, Plaintiffs, individually and on behalf of the Class proposed in this Complaint, respectfully request the following relief:

A.     That the Court certify the Class pursuant to Fed. R. Civ. P. 23(a) and (b)(3), and adjudge Plaintiffs to be adequate representatives thereof;

B.     That Defendants' unlawful combination, contract or conspiracy as alleged in this Complaint be declared, adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.     That Plaintiffs and the Class recover damages against Defendants and their co-conspirators, jointly and severally, in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. § 15(a);

D.     That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner:

(1)     continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and

(2)     communicating or causing to be communicated to any other person

engaged in the manufacture, distribution or sale of Filters information

concerning prices, customers, markets or other terms or conditions of sale

of any such product except to the extent necessary in connection with bona

fide sales transactions between the parties to such communications.

E.     That Plaintiffs and the Class be awarded expenses and costs of suit, including

reasonable attorneys' fees, to the extent provided by law;

F.     That Plaintiffs and the Class be awarded pre-judgment and post-judgment interest

at the highest legal rate to the extent provided by law; and

G.     That Plaintiffs be awarded such additional relief as the Court may deem proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues triable by

jury.

Dated:  November 26, 2008

By: _/s/ Bernard Persky____

Bernard Persky
Gregory S. Asciolla
Benjamin D. Bianco
**Labaton Sucharow LLP**
140 Broadway
New York, NY  10005
Tel.:  (212) 907-0700
Fax:  (212) 818-0477

Michael J. Freed
Steven A. Kanner
William H. London
Douglas A. Millen
**Freed Kanner London & Millen LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL  60015

Tel.:  (224) 632-4500
Fax:  (224) 632-4519

Roberta D. Liebenberg
Donald L. Perelman
Adam J. Pessin
**Fine, Kaplan and Black, R.P.C.**
1835 Market Street, 28th Floor
Philadelphia, PA  19103
Tel.:  (215) 567-6565
Fax:  (215) 568-5872

Marc M. Seltzer
Stephen E. Morrissey
**Susman Godfrey LLP**
1901 Avenue of the Stars, Suite 950
Los Angeles, CA  90067-6029
Tel.:  (310) 789-3100
Fax:  (310) 789-3005

Vineet Bhatia
**Susman Godfrey LLP**
1000 Louisiana, Suite 5100
Houston, TX  77002-5096
Tel.:  (713) 653-7855
Fax:  (713) 654-3344

*Interim Co-Lead Counsel*
*for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing **Consolidated Amended Complaint** was filed electronically with the Clerk of Courts using the CM/ECF system, which will send notification of such filing to all counsel of record on the 26th day of November, 2008.

s/Bernard Persky
Bernard Persky
LABATON SUCHAROW LLP
140 Broadway
New York, NY  10005
Telephone:  (212) 907-0700