## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

IN RE AFTERMARKET FILTERS
ANTITRUST LITIGATION

_____

THIS DOCUMENT RELATES TO:

LOODVIK PEERALI, OYSTER
INCORPORATED,

        Plaintiffs, on behalf of
themselves and those similarly
situated,

v.

CHAMPION LABORATORIES, INC.;
PUROLATOR FILTERS N.A. LLC;
HONEYWELL INTERNATIONAL INC.;
WIX FILTRATION CORP. LLC; AFFINIA
GROUP INC.; CUMMINS FILTRATION,
INC.; DONALDSON COMPANY, INC.;
BALDWIN FILTERS, INC.; ROBERT
BOSCH L.L.C.; MANN + HUMMELL
U.S.A., INC.; and ARVINMERITOR, INC.,

        Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 08 C 4883
MDL. Docket No. 1957

Judge Robert W. Gettleman
Magistrate Judge Geraldine Soat Brown

JURY TRIAL DEMANDED

## GASOLINE RETAILERS' CONSOLIDATED
## FIRST AMENDED CLASS ACTION COMPLAINT

### I
### INTRODUCTION

1.    Plaintiffs LOODVIK PEERALI and OYSTER INCORPORATED (hereinafter collectively "Plaintiffs") bring this action on behalf of themselves and all other similarly situated operators of service stations in California (hereinafter "Plaintiff Class" or "Gasoline Retailers") who have indirectly purchased for resale oil, air, transmission, and fuel filters (hereinafter collectively "filters") from Defendants CHAMPION LABORATORIES, INC., PUROLATOR.FILTERS N.A. LLC, HONEYWELL INTERNATIONAL INC., WIX

FILTRATION CORP, LLC, AFFINIA GROUP INC., CUMMINS FILTRATION, INC., DONALDSON COMPANY, INC., BALDWIN FILTERS, INC., ROBERT BOSCH L.L.C., MANN + HUMMELL U.S.A., INC., and ARVINMERITOR, INC. (hereinafter collectively "Defendants").

2.      Plaintiffs challenge Defendants' unlawful price-fixing of filter prices under the antitrust laws of the State of California.

3.      Plaintiffs bring this action against Defendants for damages and injunctive relief caused by reason of Defendants' violations of, inter alia, the Cartwright Act and the Unfair Business Practices Act of the States of California.

4.      Plaintiffs demand a trial by jury of all issues triable thereby, and for their complaint, allege as follows:

## II

## THE PARTIES

5.      Plaintiff, LOODVIK PEERALI, is an individual doing business as a 76 branded motor fuel dealer who operates a 76 branded motor fuel service station located at 10984 Riverside Drive, North Hollywood, CA 91602.  Plaintiff Peerali is a Gasoline Retailer and has indirectly purchased filters for resale from one or more of the Defendants during the four years next prior to the filing of this complaint.

6.      Plaintiff, OYSTER INCORPORATED, is a California corporation currently operating two Shell branded motor fuel service stations located at 125 Sharon Park Drive, Menlo Park, CA 94025, and at 690 Veterans Boulevard, Redwood City, CA 94063.  Plaintiff Oyster Incorporated is a Gasoline Retailer and has indirectly purchased filters for resale from one or more of the Defendants during the four years next prior to the filing of this complaint.

7.      Defendant CHAMPION LABORATORIES, INC. (hereinafter "CHAMPION") is a Delaware corporation headquartered in Albion, Illinois, with a business address at 200 S. Fourth Street, Albion, Illinois 62806.  CHAMPION sells filters under the brand names Champ, Encore, Imperial, Kleener, Luber-finer, MXM, Petro Clear, Roughneck, TotalTec, United

Components, and Z Guard.  During the period covered by this complaint, CHAMPION and its co-conspirators sold filters in the State of California.

8.      Defendant PUROLATOR FILTERS N.A. LLC (hereinafter "PUROLATOR") is a Delaware limited liability company with its principal place of business in Fayetteville, North Carolina, with an address 3200 Natal Street, Fayetteville, North Carolina 28306-2845. PUROLATOR is a joint venture between Defendants ROBERT BOSCH L.L.C. and MANN + HUMMELL U.S.A., INC.  During the period covered by this complaint, PUROLATOR and its co-conspirators sold filters in the State of California.

9.      Defendant      HONEYWELL      INTERNATIONAL,      INC.      (hereinafter "HONEYWELL") is a Delaware corporation headquartered in Morristown, New Jersey, with a business address of 101 Columbia Road, Morristown, New Jersey 07962.   Honeywell International Consumer Products Group is a division of HONEYWELL located in Danbury, Connecticut, and is responsible for the manufacture and sale of filters, principally under the FRAM brand name.  During the period covered by this complaint, HONEYWELL and its co-conspirators sold filters in the State of California.

10.      Defendant WIX FILTRATION CORP. LLC (hereinafter "WIX") is a Delaware company headquartered in Gastonia, North Carolina, with a principal mailing address of 1 Wix Way, Gastonia, North Carolina 28054.  During the period covered by this complaint, WIX and its co-conspirators sold filters in the State of California.

11.      Defendant AFFINIA GROUP INC. (hereinafter "AFFINIA") is a Delaware corporation located at 1101 Technology Drive, Ann Arbor, Michigan 48108.  Affinia operates Wix Filtration Products through its Affinia Global Filtration Operating Group and Wix Filtration Corp. LLC, a wholly-owned subsidiary.  Wix Filtration Corp. LLC and Affinia are collectively referred to herein as "WIX."  During the period covered by this complaint, WIX and its co-conspirators sold filters in the State of California.

12.      Defendant CUMMINS FILTRATION, INC. (hereinafter "CUMMINS") is an Indiana corporation headquartered in Nashville, Tennessee, with a business address of 2931 Elm

Hill Pike, Nashville, Tennessee 37214.   During the period covered by this complaint, CUMMINS and its co-conspirators sold filters in the State of California.

13.     Defendant DONALDSON COMPANY, INC. (hereinafter "DONALDSON") is a Delaware corporation headquartered in Minneapolis, Minnesota, with a business address of 1400 W. 94th Street, Minneapolis, Minnesota 55431.  During the period covered by this complaint, DONALDSON and its co-conspirators sold filters in the State of California.

14.     Defendant BALDWIN FILTERS, INC. (hereinafter "BALDWIN") is a Delaware corporation headquartered in Kearney, Nebraska, with a business address of 4400 East Hwy. 30, Kearney, Nebraska 68848.  During the period covered by this complaint, BALDWIN and its co-conspirators sold filters in the State of California.

15.     Defendant ROBERT BOSCH L.L.C. (hereinafter "BOSCH") is a Delaware company headquartered in Broadview, Illinois, with its business address at 2800 S. 25th Ave., Broadview, Illinois 60155.  During the period covered by this complaint, BOSCH and its co-conspirators sold filters in the State of California.

16.     Defendant MANN + HUMMELL U.S.A., INC. (hereinafter "MANN") is a Michigan corporation headquartered in Portage, Michigan, with its business address at 6400 S. Sprinkle Road, Portage, Michigan 49002.  During the period covered by this complaint, MANN and its co-conspirators sold filters in the State of California.

17.     Defendant ARVINMERITOR, INC. (hereinafter "ARVINMERITOR") is a Michigan corporation headquartered in Troy, Michigan, with its business address at 2135 West Maple Road, Troy, Michigan 48084.  ARVINMERITOR owned PUROLATOR from January 1999 through March 2006, at which point it sold PUROLATOR to BOSCH and MANN, which have since operated PUROLATOR as a joint venture.  During the period covered by this complaint, ARVINMERITOR and its co-conspirators sold filters in the State of California.

### III

### CO-CONSPIRATORS

18.     Plaintiffs are informed and believe that persons and entities whose identities are at

this time unknown have engaged with Defendants in the violations alleged herein and performed acts and made statements in furtherance thereof.  Plaintiffs may at a later time seek leave to amend this complaint to add said unknown co-conspirators as additional defendants when and if hey become known.

19.     The acts alleged in this Complaint have been done by the Defendants and their co-conspirators, or were authorized, ordered, or done by their respective officers, agents, employees, or representatives while actively engaged in the management of each Defendant's business or affairs.

20.     Each of the Defendants named herein acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## IV

## CLASS ACTION ALLEGATIONS

21.     Plaintiffs bring this action as a class action under §382 of the California Code of Civil Procedure for violations of, *inter alia*, the Cartwright Act and the Unfair Business Practices Act, and file this First Amended Consolidated Complaint for purposes of pretrial proceedings only, expressly reserving the right to remand after completion of pretrial proceedings pursuant to *Lexecon v. Milberg, Weiss, Bershad, Hynes & Lerach, et al*, 523 U.S. 261 (1998).  The class is comprised of all California Gasoline Retailers who indirectly purchased filters for resale from Defendants during the time period in which Defendants were engaged in price fixing (hereafter "the Class").

22.     Defendants' unlawful price fixing has harmed thousands of Gasoline Retailers throughout the State of California, as well as throughout the United States as a whole.  The members of the Class are so numerous that joinder of all members is impracticable.

23.     Defendants' business relationships with the Class members and Defendants' acts of price-fixing against the Class have been substantially uniform.  There are questions of law and fact common to the Class, including, but not limited to, whether Defendants agreed, combined,

and conspired to fix prices of filters, whether the defendants' conspiracy caused injury to the Class, and whether Defendants fraudulently concealed their price fixing conspiracy.

24.     The representative Plaintiffs' claims are typical of the Class generally.  Plaintiffs, as named herein, share the exact same interests as the other members of the Class.

25.     Plaintiffs and their counsel are able fairly and adequately to represent the interests of all members of the Class.

26.     The overall likelihood of individual Class members' prosecuting separate claims is remote at best.  Individual members of the Class may not or do not have a significant interest in individually controlling the prosecution of separate actions, and the impact of such a scenario upon the judicial system would be a tremendous waste of judicial resources with the potential of significantly clogging the court system.  Additionally, the prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications concerning the subject of this action, which adjudications could establish incompatible standards of conduct for Defendants under the laws alleged herein.

27.     Since there is a well-defined community of interest in the questions of law and fact among the Plaintiffs, as named herein, and the Class members and questions of law and fact common to the members of the aforesaid Class predominate over any questions that may affect only individual members, a class action is superior to any other method for the fair and efficient adjudication of this legal dispute.

## V

## FACTS

**A.     Overview of the Filters Markets**

28.     Filters are used to remove contaminants from combustion engines and related systems.  Oil filters remove contaminants from the motor oil used to lubricate an engine's pistons. Fuel filters primarily screen dirt and rust particles from an engine's fuel lines.  Engine air filters prevent particulate matter from entering an engine's cylinders.  Because they become less effective over time as contaminants are filtered out or away from the respective systems, the

Filters at issue in this litigation are designed to be replaced periodically.  Replacement filters are purchased to replace original equipment filters included in new motor vehicles.

29.     The Defendants herein are the primary manufacturers of filters in the United States.

30.     Filters are primarily sold into three separate channels: (1) to Original Equipment Manufacturers (hereinafter "OEMs"); (2) to aftermarket sellers of replacement filters (hereinafter "Aftermarket Sellers"), which include the Plaintiffs and the Class and (3) to consumers or end users of replacement filters (hereinafter "Consumers/End Users").

31.     OEMs purchase filters for use in connection with new vehicles.  These filters are installed in vehicles during the production process.

32.     Aftermarket Sellers, which include the Plaintiffs and the Class, purchase filters indirectly from Defendants for wholesale or retail sale to the public, either (1) in connection with professional services rendered to an indirect purchaser (for example, an oil filter sold to a customer as part of an oil change), or (2) for individuals to replace their own filters.

33.     The United States filters markets are highly concentrated, with just a handful of major producers manufacturing and producing these products.  This concentration, as well as interlocking business arrangements, assisted Defendants in successfully implementing their conspiracy.

34.     Annual revenues for filters markets in the United States are approximately $3 billion to $5 billion.

35.     The filters industry is highly susceptible to cartel activity.  This is a result of a number of factors including: (a) high market concentration, (b) the commodity nature of filters (including both interchangeability and price as the primary drivers of sales); (c) barriers to entry, (d) inelastic demand, and (3) lack of substitutability of the product.

36.     A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among possible co-conspirators and makes it more difficult for customers to avoid the effects of collusive behavior.  The market for filters is highly concentrated, with the Defendants controlling about 90 percent of the sales of these products.

Several of the Defendants also have interlocking businesses arrangements.  For example, in April 2006, ArvinMeritor sold Purolator to Bosch and Mann + Hummel.  Bosch and Mann + Hummel now operate Purolator as a joint venture.  Mann + Hummel CEO Dieter Seipler stated that the joint venture was a natural alliance because Bosch is a major private-brand customer for Mann + Hummel in Europe and in other regions of the world.  These interlocking business arrangements, in a highly concentrated market, assisted the Defendants in successfully implementing their conspiracy.

37.     Filters are considered to be inter-exchangeable, undifferentiated products.  All filters must undergo Society of Automotive Engineers (SAE) testing to ensure that they meet vehicle manufacturers' specifications.  An industry report notes that vehicle manufacturers have done a better job utilizing a small number of oil filters to cover all of their engine applications.  Thus, there are fewer part numbers in the aftermarket filter line than other aftermarket automotive products.

38.     Purolator and Honeywell's FRAM are perhaps the most well known filters brands. Wix lacks a similarly strong brand name but manufacturers filters under private label for, *inter alia*, NAPA Auto Parts and Carquest Auto Parts.  Wix is also the number one filter supplier for NASCAR.  Champion focuses on private label manufacturing as well and manufacturing filters under Mobile 1, Valvoline, STP, Mighty, and Firestone labels.

39.     The private label segment provides an example of the fungible nature of filters.  Shell and Pennzoil, for example, both sell private label filters made for them by a number of the Defendants to Shell or Penzoil's specifications.   Table 1 below shows the manufacturers (suppliers) of filters for Shell in 2004.

**Table 1**

| Company/Brand | Sales Volume |
|---|---|
| Honeywell/FRAM | 28% |
| ArvinMeritor/Purolator | 26% |
| Champion Laboratories | 17% |

| | |
|---|---|
| Wix | 14% |
| Baldwin/Hastings | 3% |
| AC Delco | 10% |

For the Pennzoil and Quaker brand filters, Honeywell (FRAM) and Purolator are the main suppliers, as shown in Table 2.

**Table 2**

| Filter Brand | Manufacturer | Purchase Volume |
|---|---|---|
| Pennzoil Filters (USA) | Honeywell/FRAM | 40 Million Units |
| Quaker State Filters (CAN) | | |
| Quaker State Filters (USA) | ArvinMeritor/Purolator | 25.1 Million Units |
| Pennzoil Filters (CAN | | |

40.　　　Price is the key driver of sales of filters.  According to an industry report, direct purchasers surveyed for the report considered price to be the most important factor in their purchase of filters.

41.　　　The presence of significant barriers to entry makes new entry by others difficult and facilitates the operation of a cartel.  In the market for filters, there are significant barriers to entry.  In the filters market, barriers to entry arise primarily from the need for significant start-up capital expenditures, initial product depth within a product line, distribution infrastructure, and long-standing customer relationships.

42.　　　There is significant evidence that demand for filters is inelastic, or in other words, does not change in the face of price changes.  It is well established in economics that goods which form a small share of consumer expenditure exhibit inelastic demand, because consumers are less likely to change consumption patterns when the absolute price increase is limited.  Because vehicle manufacturers either require or strongly encourage filter changes at specific intervals, end users do not decrease their use of filters when prices increase.  Filters are a small

part of the cost of owning and maintaining an automobile.

43.      There are no reasonable substitutes for filters.  Vehicle owners have little choice but to have the filters in their vehicles replaced because they tend to wear out over time and are necessary for the operation of their vehicles.

**B.      Defendants' Unlawful Conduct**

44.      Beginning at least as early as January 1, 1999, and continuing thereafter, Defendants and their co-conspirators participated in a continuing agreement, combination, and conspiracy to fix, raise, maintain, or stabilize prices for filters in the United States.  Defendants acted in furtherance of their scheme by, among other things: (1) having their officers and/or representatives meet at industry trade shows and other locations to set prices; and (2) exchanging confidential information regarding pricing.

45.      As a result of their unlawful actions, Defendants were able to force coordinated price increases on the filters market.

46.      Defendants' unlawful conduct took many forms including, but not limited to:

   a.      attending meetings and/or otherwise exchanging information regarding the pricing and sale of filters;

   b.      selling filters to customers at collusive and non-competitive prices;

   c.      agreeing to sell filters at specified, pre-arranged prices;

   d.      agreeing not to compete for each other's customers;

   e.      accepting payment at non-competitive prices;

   f.      giving actual and/or apparent authority to employees' participation in furtherance of the wrongful conduct; and

   g.      fraudulently concealing the wrongful conduct.

47.      The Defendants, as a result of their unlawful actions, were able to impose multiple coordinated price increases for filters during the Class Period, including in 1999, early 2004, and late 2004/early 2005.

48.      Numerous allegations contained herein, particularly with respect to the collusive meetings and communications between and among the Defendants and their co-conspirators, are

based upon the personal knowledge of William G. Burch, a former senior sales executive at Defendants Purolator and Champion during most of the relevant period.

### i.  The Defendants' 1999 Coordinated Price Increase.

49.    In February 1999, ArvinMeritor acquired Purolator.   Marlen Silverii, an ArvinMeritor Senior Vice President formerly employed by Purolator, was instrumental in completing the acquisition.

50.    Shortly after the acquisition, in or around March 1999, Mr. Silverii met with certain Purolator senior employees to discuss Purolator's profit margins. In the view of ArvinMeritor executives, those profit margins were too low.

51.    At the time ArvinMeritor acquired Purolator, Mr. Burch was a National Accounts Manager at Purolator. Mr. Burch was present at the March 1999 meeting with Mr. Silverii and other senior Purolator employees.

52.    During the meeting, Mr. Silverii explained that ArvinMeritor's executives wanted to implement a filters price increase. In order to do so successfully without losing market share or business, Mr. Silverii said that Purolator would need the agreement of other Defendants to raise prices along with Purolator. Mr. Silverii told the assembled Purolator senior personnel to contact their counterparts at other Defendant filter manufacturers with the express purpose of obtaining each Defendant's agreement to implement a coordinated, industry-wide filters price increase.

53.    A number of the senior Purolator personnel who attended the meeting complied with Mr. Silverii's directive. These individuals contacted and communicated with their counterparts at the other Defendants regarding a coordinated price increase for filters. The Defendants met, discussed, and otherwise coordinated the timing, amount and purported public justification for the price increase on at least several occasions in the following months.

54.    In or about May 1999, the Defendants discussed increasing filter prices at the Jiffy Lube Association of Franchisees Show ("JLAF Show") in Nashville, Tennessee. Mr. Silverii and at least one other senior Purolator employee met with a senior Honeywell employee at the JLAF Show and discussed increasing filters prices.

55.     In or about June 1999, Mr. Burch heard from a fellow Purolator employee that Purolator had spoken with Honeywell at the JLAF Show and told them to raise prices. The fellow Purolator employee also told Mr. Burch that "FRAM knows we're going up."

56.     Also in mid-1999, Mr. Silverii met with Champion's President, Tom Mowatt. Mr. Silverii and Mr. Mowatt discussed fixing and coordinating filters prices in the United States.

57.     On or about June 28, 1999, Mr. Silverii directed a senior Purolator employee to fax Honeywell a draft letter that Purolator intended to send to its customers informing them of an impending price increase on all Purolator filters. The draft letter, back-dated June 21, 1999, announced a price increase that Purolator planned to implement on August 15, 1999. The pretext for the price increase, as set out in the letter, included increases in costs for labor, health care, freight, and raw materials.

58.     On June 28, 1999, the Purolator senior employee sent the draft price increase letter by fax to his counterpart at Honeywell, as requested by Mr. Silverii. The fax recipient at Honeywell was the same person with whom Mr. Silverii secretly met at the JLAF Show. When the fax was sent, Purolator had not yet sent the price increase letter to any of its customers.

59.     On July 14, 1999, Purolator sent the price increase letter to its customers (though the letter was dated "July 7, 1999"). The letter was nearly identical to the draft letter Purolator shared with Honeywell a few weeks earlier. Shortly thereafter, around August 1999, the other Defendants followed Purolator and successfully implemented similar filters price increases. With this unlawful agreement in place, Defendants could maintain their price fixing scheme going forward.

60.     Over the next years, the Defendants continued to adhere to their unlawful agreement and conspiracy. Each Defendant acted with the knowledge that every other Defendant had already made a conscious commitment to the common scheme of joint price Increases.

61.     No Defendant announced its withdrawal from the conspiracy. No Defendant voiced any hesitation. In fact, before a trade association meeting in 2004, a Champion sales representative joked that he and Champion's President, John Evans, "talked about going to [the] Filter [Manufacturers] Council cocktail party wearing T-shirts saying 'we went up first last

time.'"

### ii.     The Defendants' Early 2004 Coordinated Price Increase.

62.     In or about February 2004, Champion's President, Mr. Evans, met with Champion's senior employees who were responsible for the filters business, including Mr. Burch (who had left Purolator in August 1999 to join Champion as a National Accounts Manager). Mr. Evans indicated at that meeting that Champion would "lead the way" with another filters price increase. Mr. Evans advised the assembled employees that it was important the filters price increase not come at the expense of Champion's market share. Champion needed to coordinate the price increase with the other Defendants to ensure the continued success of the conspiracy. Mr. Evans therefore directed Champion's senior employees to make frequent telephone calls to the other Defendants to discuss pricing.

63.     Mr. Evans, together with other Champion senior employees, contacted each of the other Defendants, including Mr. Silverii at ArvinMeritor, to coordinate this proposed filters price increase.

64.     As a result of these illicit communications, and in furtherance of their continuing conspiracy, the Defendants agreed to increase filters prices. In or about April 2004, each of the Defendants announced and successfully implemented a coordinated filters price increase.

### iii.    The Defendants' Late 2004/Early 2005 And Subsequent Coordinated Price Increases.

65.     In early September 2004, Champion led the effort to implement yet another price increase among the Defendants in furtherance of the conspiracy. Mr. Evans again enlisted several senior Champion sales representatives, including Mr. Burch, to discuss the price increase with the other Defendants.

66.     In September 2004, at the Filters Manufacturers Council meeting in Nashville, Tennessee, Champion employees discussed with Purolator and Wix, among other Defendants, Champion's intention to raise filters prices again in 2004. At the time of the meeting, Mr. Evans (from Champion) was the Council's Vice-Chairman, and Mr. Silverii (from ArvinMeritor) was Secretary. In the words of one Champion employee, the "primary goal over the next day and a

half [of the Council meeting] is to get everybody to get out there, and the message is gonna be that we're going up again, and when."  The employee noted: "That's basically our message to everybody."

67.     By October 27, 2004, Champion had received confirmation from Honeywell, Cummins, Donaldson, and Purolator that each would follow (or had already followed) Champion in implementing a filters price increase of at least 5 percent. Honeywell, Donaldson and Cummins went so far as to send Champion their draft price increase letters. Purolator gave Champion an oral confirmation that it agreed to increase its filters prices.

68.     In or around October or November 2004, the Defendants informed their respective customers of the previously agreed-upon filters price increase. In an attempt to conceal the conspiracy and the collusively coordinated price increase, the Defendants "blamed" the increase on rising steel costs.

69.     At or around the same time, one of Champion's largest private-label customers questioned the need for another price increase in 2004. The customer also questioned Champion's explanation that rising steel prices necessitated the price increase. The customer requested that Champion provide it with an additional explanation justifying the price increase.

70.     The request created a serious dilemma for Champion. A few months earlier, Champion had introduced a new oil filter called eCore, twelve models of which fit 75 percent of the cars on the road. The eCore filter was made, in part, out of fabric instead of steel. Thus, Champion's oil filter input costs had actually decreased by approximately 20 percent because of its diminished need for raw steel in the manufacture of eCore oil filters.

71.     Instead of providing its customers with its eCore input prices, Champion gave its customer a Purolator spreadsheet for Purolator's outdated input costs, falsely representing Purolator's costs as its own. The spreadsheet satisfied the complaining customer. But more importantly, the spreadsheet concealed the true basis for the price increase: the Defendants' price-fixing agreement.

72.     Likewise, in the same time period, Honeywell changed the design of most of its FRAM filters, and its private-label filters for Pennzoil and Quaker State, to have cardboard end

caps instead of steel, greatly reducing the amount of steel needed for its filters. Yet, when it increased prices in late 2004, it cited increased steel costs as the pretextual reason.

73.     Ultimately, in or around November or December 2004, each of the Defendants had successfully implemented another coordinated filters price increase. Thereafter, in subsequent years, the Defendants continued to adhere to their unlawful agreement and conspiracy, maintaining or increasing filters prices. To date, no Defendant has announced its withdrawal from the conspiracy.

74.     On January 19, 2006, William G. Burch, former employee of both PUROLATOR and CHAMPION, filed a complaint against CHAMPION in state court in Tulsa, Oklahoma, alleging, among other things, that Mr. Burch was wrongfully terminated from his employment with CHAMPION for knowing about, and subsequently reporting to authorities, the antitrust violations alleged in this Complaint.  This action brought by Mr. Burch was removed to federal court and then transferred to Illinois for consolidation with a subsequently filed action, Champion Labs, Inc. v. Burch, 06-CV-4031 (JPG) (S.D. Ill.).

75.     On March 25, 2008, Mr. Burch, former National Accounts and Division Sales Manager for Defendant CHAMPION, executed an affidavit under oath in connection with the Champion Labs case.  This affidavit, which was made on the basis of personal knowledge, states as follows:

a.      Mr. Burch "became aware that Champion was involved in activities with Champion's competitors that constitute price-fixing.  For example, Champion provided information concerning price increases to competitors before it provided that information to consumers or to the general public.  Champion was also given advance information about price increases by its competitors.  Further information is set forth accurately and in detail in the mediation statement dated September 21, 2007, that I understand will be filed under seal in this case."

b.      Mr. Burch also stated that "[d]uring the time I worked at Champion, I was

directed by Champion to conduct discussions regarding 'pricing' with employees of competitors of Champion.  I refused to conduct those discussions."

76.     Defendants' wrongful conduct in manipulating prices was undertaken in order to charge artificially inflated prices for their filters.

77.     Defendants' wrongful conduct caused Plaintiffs and members of the Class to purchase filters at artificially enhanced, non-competitive prices.

78.     Had Defendants not engaged in the illegal conduct alleged herein, Plaintiffs and other members of the Class would have been able to purchase filters that were competitively priced.

79.     Because of the competitive nature of the Gasoline Retailer business, plaintiffs were unable to pass on to their customers the non-competitive overcharges they paid for filters as a direct and proximate result of the Defendants' unlawful conspiracy to fix prices for filters.

80.     Defendants' unlawful conduct has stifled competition in filters markets and has had a direct, substantial, and adverse effect on competition by artificially increasing price and stifling innovation.

# VI

## FRAUDULENT CONCEALMENT

81.     Throughout the Class Period, the Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct by engaging in secret meetings and communications in furtherance of their conspiracy, and by holding themselves out to the public and their customers, including Plaintiffs, as true competitors.

82.     Plaintiffs and Class members had no knowledge of the Defendants' unlawful scheme and could not have discovered the Defendants' unlawful conduct at an earlier date by the exercise of due diligence.  The Defendants affirmatively concealed their illegal acts, and these acts only recently became known to the public through filings in a lawsuit in the Southern District of Illinois.  As a result of Plaintiffs' lack of knowledge of the Defendants' unlawful scheme, Plaintiffs assert the tolling of any applicable statutes of limitations affecting the rights of action by Plaintiffs and Class members.

83.     Moreover, the Defendants' actions constitute a continuing violation in that the Defendants' anticompetitive practices have resulted in unlawfully priced filters, and each and every such transaction at artificially inflated prices is an overt act that injures Plaintiffs and/or other Class members.  These artificially inflated prices continue to exist in the relevant market as the Defendants have yet to cease their unlawful conduct or otherwise withdraw from the conspiracy.  Upon each and every instance that the Defendants failed to disclose their illegal conduct and their effect on the prices paid by Plaintiffs and Class members, the Defendants knew or should have known that the undisclosed information was material to those who purchased such products.

84.     In addition to this overcharging, the Defendants committed numerous additional overt acts in furtherance of their conspiracy, both within and prior to four years from the date of the filing of this Complaint.  Such overt acts included the illegal meetings and communications regarding filter prices described herein.

85.     Therefore, each instance in which the Defendants engaged in the conduct complained of herein and each instance in which a Class member unknowingly paid supracompetitive prices for filters constitute part of a continuing violation and operate to toll any applicable statutes of limitation.  Furthermore, the Defendants are estopped from relying on any statute of limitations defense because of their unfair and deceptive conduct.

## VII

## FIRST CLAIM FOR RELIEF

### FOR VIOLATIONS OF CALIFORNIA
### BUSINESS AND PROFESSIONS CODE §§16700, et seq.

86.     Plaintiffs hereby incorporate by reference and re-allege the allegations of paragraphs 1 through 85, inclusive, hereinabove as if fully set forth herein.

87.     Plaintiffs are informed, believe, and, based thereon, allege that Defendants have, within at least the last four years next prior to the filing of this complaint, entered into, performed, and carried out a contract, combination, and conspiracy to charge Plaintiffs, and the members of the Class Plaintiffs represent, artificial and supra-competitive prices for filters in

connection with the unlawful price-fixing set forth above.

88.     Defendants' contract, combination, and conspiracy to raise, fix, peg, or stabilize prices  of the filters sold to Plaintiffs constitutes a *per se* violation of California Business and Professions Code §16720.

89.     Plaintiffs, and the members of the Class Plaintiffs represent, have been forced to purchase filters manufactured by Defendants at supra-competitive prices by the means and overt acts set forth above.

90.     As a direct result of Defendants' violations of California Business and Professions Code §16720, Plaintiffs and the members of the Class Plaintiffs represent have been injured and damaged in amount to be proven at the time of trial and will continue to be injured and damaged unless and until Defendants are enjoined from engaging in further violations of §16720 as alleged herein.

91.     Plaintiffs request that judgment be entered for three times the amount at which Plaintiffs' actual damages are assessed.

92.     Plaintiffs are also entitled to and so request attorneys' fees and costs in connection with bringing the instant action.

## VIII

### SECOND CLAIM FOR RELIEF

### FOR VIOLATIONS OF CALIFORNIA
### BUSINESS AND PROFESSIONS CODE §§17200, et seq.

93.     Plaintiffs hereby incorporate by reference and re-allege the allegations of paragraphs 1 through 92, inclusive, hereinabove as if fully set forth herein.

94.     Plaintiffs are informed, believe, and, based thereon, allege that Defendants have engaged in unfair and/or fraudulent business practices against Plaintiffs within the meaning of California Business and Professions Code §§17200, et seq., by engaging in unlawful price-fixing in violation of the Cartwright Act.

95.     Plaintiffs are entitled to restitution of their losses incurred as a result of each of Defendants' violations of California Business and Professions Code §§17200, et seq., in an

amount according to proof at the time of trial.

# IX

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all persons similarly situated pray for relief as follows:

**With respect to the First Claim for Relief, an order granting:**

1.  That Plaintiffs and Class Members recover such actual damages as the jury shall find them to have sustained and that the damages be trebled pursuant to California Business and Professions Code §16750 of the Cartwright Act; and

2.  A permanent injunction restraining and enjoining Defendants, their agents, employees, officers, directors, managing agents, joint venturers, attorneys, affiliates, or subsidiaries from engaging in future unlawful price-fixing of filters.

**With respect to Plaintiffs' Second Claim for Relief, an order granting:**

3.  Restitution of the losses sustained by Plaintiffs and the Class as a result of Defendants' unlawful price-fixing of filters in an amount according to proof at the time of trial; and

4.  A permanent injunction restraining and enjoining Defendants, their agents, employees, officers, directors, managing agents, joint venturers, attorneys, affiliates, or subsidiaries from engaging in future unlawful price-fixing of filters;

**With respect to All Claims for Relief:**

5.  That the Court adjudge and decree that the instant action proceed as a Class Action on behalf of the defined Class;

6.  Attorneys' fees and expenses of expert witnesses in an amount determined by the Court to be reasonable as authorized by statute;

7.  Costs incurred in this action; and

8.  Any other and further relief the Court deems just and proper.

Dated:   February 9. 2010

Respectfully submitted,

**ALIOTO LAW FIRM**
**BLEAU FOX, A P.L.C.**
**GRAY, PLANT, MOOTY, MOOTY & BENNETT,  P.A.**
**GARY D. McCALLISTER & ASSOCIATES, LLC**

By:       */s Gary D. McCallister*
                    Gary D. McCallister, Esq.
                    Attorney for Plaintiffs,
                    LOODVIK PEERALI and
                    OYSTER INCORPORATED

**Joseph M. Alioto, Esq. SBN 42680**
**ALIOTO LAW FIRM**
**555 California Street, Suite 3160**
**San Francisco, CA 94104**
**Telephone:  (415) 434-8900**
**Fax:          (415) 434-9200**

**Thomas P. Bleau, Esq., SBN 152945**
**Martin R. Fox, Esq., SBN 155783**
**BLEAU FOX, A P.L.C.**
**3575 Cahuenga Blvd. West, Suite 580**
**Los Angeles, CA 90068**
**Telephone:  (323) 874-8613**
**Fax:          (323) 874-1234**

**Daniel R. Shulman, Esq., MBN 100651**
**GRAY, PLANT, MOOTY, MOOTY & BENNETT, P.A.**
**500 IDS Center**
**80 South 8th Street**
**Minneapolis, MN 55402**
**Telephone:  (612) 632-3000**
**Fax:          (612) 632-4000**

**Gary D. McCallister, Esq., IBN 6219649**
**Jamie G. Goldstein, Esq.,  IBN  6286258**
**GARY D. MCCALLISTER & ASSOCIATES, LLC**
**120 N. LaSalle St., Suite 2800**
**Chicago, IL 60602**
**Telephone:  (312) 346-0611**
**Fax:          (312) 345-0612**

Attorneys for Plaintiffs,
LOODVIK PEERALI and
OYSTER INCORPORATED

<u>DEMAND FOR JURY TRIAL</u>

Plaintiffs and the members of the Class Plaintiffs represent hereby demand a trial by jury

of all claims herein that are properly the subject of a trial by jury.

Dated: February 9, 2010

> **ALIOTO LAW FIRM**
> **BLEAU FOX, A P.L.C.**
> **GRAY, PLANT, MOOTY, MOOTY & BENNETT, P.A.**
> **GARY D. McCALLISTER & ASSOCIATES, LLC**


> By:___*/s Gary D. McCallister*____
>      Gary D. McCallister, Esq.
>      Attorneys for Plaintiffs,
>      LOODVIK PEERALI and
>      OYSTER INCORPORATED