**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **IN RE: AFTERMARKET FILTERS ANTITRUST LITIGATION** | **Master Docket No.: 08-cv-4883** **MDL Docket No.: 1957** |
| **This Document Relates to: Case No.: 1:10-cv-05975** | **DEMAND FOR JURY TRIAL** **JUDGE ROBERT W. GETTLEMAN** |

<u>**FIRST AMENDED COMPLAINT**</u>

Relator/Plaintiff, William G. Burch ("Plaintiff" or "Mr. Burch"), brings this action on behalf of the United States and California, Delaware, the District of Columbia, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, and Virginia. (collectively the "States"), against Champion Laboratories, Inc., Purolator Products, NA, LLC, Purolator Products Co. LLC, ArvinMeritor, Inc., Honeywell International, Wix Filtration Corp. LLC, Affinia Group Inc., Cummins Filtration Inc., Donaldson Company, Inc., and Baldwin Filters, Inc. (collectively "Defendants").

<u>**INTRODUCTION**</u>

1.     This action is based partly on evidence of an antitrust conspiracy to fix prices between and among the largest manufacturers of light duty air, oil, and fuel filters ("Filters"). That price fixing conspiracy is the subject of private class actions, which this Court has determined sufficient state claims for relief under federal antitrust laws.

2.     At the same time that the Defendants conspired to fix prices for these Filters they also: a). concealed their conspiracy from the United States and from the States, and b). submitted, and caused to be submitted, false and fraudulent claims for payment to the United

1

States and the States and submitted false statements in support of such claims to the United States and the States.  Consequently, these entities paid inflated prices for the Filters and obtained and maintained contracts they would not have otherwise received and/or would have been terminated had the federal and state governments learned of the price fixing.

3.      This action seeks damages and penalties under the False Claims Act ("FCA") and comparable State laws based on false claims the Defendants submitted or caused to be submitted; false statements these Defendants made in support of such false claims; and the Defendants conspiratorial acts to violate the FCA and comparable State laws.

4.      The Complaint provides many examples of contracts the Defendants had with the United States and the States, and of claims and evidence of claims submitted by, and caused to be submitted by, the Defendants to these entities. Although not exclusive, these lists of contracts and claims are extensive; they also are representative of the Filter contracts that the Defendants had with the United States and the States, and the Filter claims they submitted and caused to be submitted while they colluded to fix the prices for these Filters.

5.      The Complaint also explains why and how the Defendants knew that their prices and claims were false, and how Defendants knowingly certified that they were not engaged in price-fixing, when they were doing just that.  Thus, Mr. Burch's allegations of the "who, what, when, where, and why" of these claims establish not only that Defendants might plausibly have submitted, and caused to be submitted, false claims and statements in support of claims; instead, they demonstrate that the Defendants did submit and cause to be submitted false claims and false statements in support of claims while also engaging in a conspiracy to defraud federal and state taxpayers. The damages to the United States and the States stemming from the Defendants' actions are substantial, though yet to be determined.

2

## SUMMARY OF CLAIMS

6.      Plaintiff brings this action to recover damages, civil penalties, and other relief, arising from a). false claims Defendants made, or caused to be made, b). false certifications and representations Defendants made in support of false claims, and c). Defendants' conspiracy to make false claims.

7.      Each of these acts violates the FCA, 31 U.S.C. § 3729, *et seq.*; the California False Claims Act, Cal. Gov. Code § 12650, *et seq.*; the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1201, *et seq.*; the District of Columbia False Claims Act, D.C. Code § 2-308.13, *et seq.*; the Florida False Claims Act, Fla. Stat. § 68.081, *et seq.*; the Hawaii False Claims Act, Hawaii Rev. Stat. § 661-21, *et seq.*; the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1, *et seq.*; the Indiana State False Claims Act, Ind. Code § 5-11-5.5-1, *et seq.*; the Massachusetts False Claims Act, Mass. Gen. Laws 12 § 5A, *et seq.*; the Minnesota False Claims Act, Minn. Stat. § 15C.01, *et seq.*; the Montana False Claims Act, Mont. Code Ann. § 17-8-401, *et seq.*; the Nevada False Claims Act, Nev. Rev. Stat. § 357.010, *et seq.*; the New Hampshire False Claims Act, N.H. Rev. Stat. Ann. § 167:58, *et seq.*; the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1, *et seq.*; the New Mexico Fraud Against Taxpayers Act, N.M. Stat. § 44-9-1, *et seq.*; the New York False Claims Act, N.Y. Finance Law § 187, *et seq.*; the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605, *et seq.*; the Oklahoma False Claims Act, Okla. Stat. tit. 63 § 5053, *et seq.*; the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1, *et seq.*; the Tennessee False Claims Act, Tenn. Code Ann. § 4-18-101, *et seq.*; and the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1, *et seq.* (collectively the "State FCAs").

8.      Defendants are the largest manufacturers and sellers of light vehicle aftermarket air, oil, and fuel filters. For years, the Defendants and their co-conspirators have conspired to

unlawfully eliminate competition among themselves and to fix, raise, maintain, and/or stabilize prices, and to coordinate the allocation of customers, for Filters in the United States. Their illegal activities, violating Section 1 of the Sherman Act, began on or around March 1, 1999 and continue to the present ("Time Period").

9. The unlawful, anticompetitive conspiracy of Defendants and their co-conspirators included, but was not limited to, in-person meetings, telephone calls, facsimiles, and other communications.

10. Throughout the Time Period, Defendants' unlawful conduct depressed competition and caused Filters to sell at artificially-inflated prices. As a result, retailers, consumers, the United States, and the States have consistently overpaid for Filters. This action seeks recovery for all Filters purchased by the United States and the States during the Time Period.

11. Throughout the Time Period, the United States and the States entered various contracts with Defendants and their subsidiaries or distributors to purchase Filters.

12. Every time the United States or the States paid a claim associated with Defendants' Filters during the Time Period, that claim was false and fraudulent because the prices were artificially inflated.

13. Moreover, each time any Defendant entered into a contract with the United States, renewed a contract, extended a contract, or modified its terms, as well as on other occasions, it certified that its prices were independent, (i.e., not the product of an antitrust price-fixing conspiracy). Defendants made similar certifications both explicitly and implicitly when they entered into, renewed, and extended contracts with the States, as well as on other occasions in their dealings with the States. These certifications were false statements in support of false claims.

4

14.     Each time a Defendant submitted an invoice for Filters under a contract, it was representing to the United States and the States that its prices were not artificially inflated. In fact, each certification and each invoice was false because the price for the filters was artificially inflated, and because the Defendants had colluded to depress competition and had artificially inflated the price of Filters.

15.     Defendants have entered contracts during the Time Period with, among others, the United States Department of Defense, other federal agencies, the States, and cities, counties and municipalities within the States. The FCA, and the State FCAs, prohibit Defendants' conduct and allow the United States, the States, and cities, counties and municipalities, to recover their damages, including statutory penalties and attorneys' fees.

16.     Defendants' claims were false, and in violation of the FCA and the State FCAs, for three primary reasons:

> a.  *First,* each claim submitted and paid was false because Defendants (either directly or through a distributor or subsidiary) misrepresented the true, non-inflated, price for the Filters. The price of any product is always a material term, and the United States and the States relied on the accuracy of the Filter prices in paying claims and entering contracts. If they had known of the antitrust conspiracy, they would not have purchased Defendants' Filters, and would not have paid inflated prices for them;

> b.  *Second*, each claim Defendants, their distributors, or subsidiaries, submitted was based on false certifications that Defendants were not colluding over prices. To the extent that Defendants did not actually sign certifications with the United States or the States, the United States and the States believed that Defendants were not engaged in a price-fixing conspiracy -and this was an implicit representation every time Defendants made a claim for payment on the United States or the States. If not for the false certifications, the contracts (that were premised upon these certifications) would never have been awarded, and/or would have been terminated, and the claims would never have been paid. These certifications were also material representations upon which the United States and the States relied;

> c.  *Third*, Defendants conspired with one another to violate each of the foregoing provisions. As explained in detail herein, during the Time

5

Period Defendants held secret meetings, made phone calls, and exchanged email and other documents to accomplish their antitrust violations.

17.     Defendants knowingly:

   a.   submitted, or caused to be submitted, false claims to the United States and the States, and improperly sought and obtained reimbursement that they were not entitled to;

   b.   made, or caused to be made, false statements in support of false claims; and,

   c.   conspired to submit false claims and statements in support of claims.

18.     Many of the allegations contained herein, particularly those regarding collusive meetings and communications between Defendants and their co-conspirators, are based upon the personal knowledge of the Plaintiff/Relator, William G. Burch.  Additionally, these allegations are further corroborated by recorded conversations that took place between Mr. Burch and Defendants' representatives who participated in and furthered the conspiracy, and statements made under oath by other individuals with personal knowledge of the conspiracy.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 31 U.S.C. §1331 and 31 U.S.C. § 3732 which confer jurisdiction on this Court for actions brought under 31 U.S.C. §§ 3729 and 3730.

20.     This Court has jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) that authorizes nation-wide service of process.

21.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found in, and/or they transact business in, the Northern District of Illinois.

## INTERSTATE COMMERCE

22.     The activities of Defendants and their co-conspirators as described herein were within the flow of, and substantially affected, interstate commerce.

23. During the Time Period, Defendants manufactured, sold, and/or distributed, substantial quantities of Filters in a continuous and uninterrupted flow of interstate commerce to customers located throughout the United States.

## THE PARTIES

24. Plaintiff/Relator William G. Burch was a senior sales executive at Defendants Purolator Products, NA, LLC, Purolator Products Co. LLC, and Champion Laboratories, Inc. during most of the Time Period. Burch began working with Purolator in 1987. He was employed there as a National Account Manager until 1999. After ArvinMeritor acquired Purolator in 1999, Burch began working for Champion Laboratories, Inc. Burch's primary responsibility at both companies was to sell Filters in the automotive aftermarket. Burch currently resides in Tulsa, Oklahoma.

25. Defendant Champion Laboratories, Inc. ("Champion") is a corporation headquartered in Albion, Illinois, with a business address at 200 S. Fourth St., Albion, Illinois 62806. Throughout the Time Period, Champion manufactured Filters and sold them to the United States and the States.

26. Defendants Purolator Products, NA, LLC and Purolator Products Co. LLC collectively "Purolator") are limited liability companies with their principal places of business in Fayetteville, North Carolina, and a business address at 3200 Natal St., Fayetteville, North Carolina 28306-2845. Throughout the Time Period, Purolator manufactured Filters and sold them to the United States and the States.

27. Defendant ArvinMeritor, Inc. ("ArvinMeritor") is a corporation headquartered in Troy, Michigan, with a business address at 2135 West Maple Road, Troy, Michigan 48084. From around March 1999 to April 2006, ArvinMeritor and/or its predecessor owned Purolator.

Throughout the Time Period, ArvinMeritor manufactured Filters and sold them to the United States and the States.

28.     Defendant Honeywell International ("Honeywell") is a corporation headquartered in Morristown, New Jersey, with a business address at 100 Columbia Road, Morristown, New Jersey 07962.  Honeywell International Consumer Products Group is a division of Honeywell located in Danbury, Connecticut, and is responsible for the manufacture and sale of Filters, principally under the FRAM® brand.  Throughout the Time Period, Honeywell manufactured Filters and sold them to the United States and the States.

29.     Defendant Wix Filtration Corp. LLC is a limited liability company headquartered in Gastonia, North Carolina, with a business address at One Wix Way, Gastonia, North Carolina. From on or about December 1, 2004 Wix Filtration Corp. LLC manufactured Filters and sold them to the United States and the States. Wix is now owned by Affinia Group.

30.     Defendant Affinia Group Inc. is a Delaware corporation located at 1101 Technology Drive, Ann Arbor, Michigan 48108.  On or about December 1, 2004 Affinia Group Inc. (formerly AAG OPCO Corp.) purchased the stock, assets, and liabilities of Wix Filtration Products from Dana Corporation, as set forth in the stock and asset purchase agreement between AAG OPCO Corp. and Dana Corporation dated as of July 8, 2004 (the "Purchase Agreement"). A true and correct copy of the Purchase Agreement was filed on March 16, 2009 as Exhibit C to Direct Purchaser Plaintiffs' Opposition to Defendants' Motion to Dismiss for Failure to State a Claim (Document 234).   The Purchase Agreement can also be found online at http://secinfo.com/dsvrn.z5Gy.7.htm#1stPage.

At all relevant times prior to December 1, 2004, Dana Corporation operated Wix Filtration Products through its Automotive Aftermarket Group.  Wix Filtration Products manufactured and sold Filters in the United States.

*********

Pursuant to the terms of the Purchase Agreement, Affinia Group Inc. assumed and succeeded to the liabilities of Dana Corporation's Aftermarket Automotive Group. The Purchase Agreement specifically states in the recitals that liabilities are being purchased relating to the manufacture and distribution of automotive aftermarket components:

Whereas, Seller and its Subsidiaries are, among other things, engaged through Seller's Aftermarket Automotive Group in the manufacture and distribution of automotive aftermarket components in the North America, Europe, Asia, and South America, as described in Exhibit A (the "Business"); and

Whereas, upon the terms and subject to the conditions hereinafter set forth, the parties desire that Seller and its Subsidiaries sell, assign and transfer to Purchaser, and that Purchaser purchase and acquire from Seller and its Subsidiaries, all of the right, title and interest of the Seller and its Subsidiaries in and to the Purchased Shares and the Purchased Assets, and that Purchaser assumes the Assumed Liabilities.

(Purchase Agreement at p. 5.)

The broad definition of Assumed Liabilities in Section 1.4 states:

Simultaneously with the Closing, on the terms and subject to the conditions set forth herein, Purchaser shall assume and be liable for, and shall pay, perform and discharge when due, all obligations and Liabilities of Seller and its Subsidiaries (other than the Acquired Companies), whether occurring or accruing before, on or after the Closing Date, whether known or unknown, fixed or contingent, asserted or unasserted, and not satisfied or extinguished as of the Closing Date, primarily relating to, primarily arising out of or primarily resulting from the Business (collectively, and excluding the Excluded Liabilities the "ASSUMED LIABILITIES"), including, by way of example and not limitation, all of the following obligations and liabilities of Seller and its Subsidiaries (other than the Acquired Companies):

********

all Liabilities arising from commitments (in the form of accepted purchase order or otherwise) to sell, distribute, manufacture or market products, or outstanding quotations, proposals or bids, primarily relating to, primarily arising out of or primarily resulting from the Business;

********

all Liabilities under Business Contracts;

********

9

(Purchase Agreement pp. 8-9.)

As set forth above, the liabilities of Dana Corporation transferred "simultaneous with the closing" and were not executor terms of the Purchase Agreement. Affinia Group Inc. is liable for the illegal practices alleged herein that occurred prior to December 1, 2004 as it assumed those liabilities by contract.

********

Affinia Group Inc. has represented that, since on or about December 1, 2004, Wix Filtration Products has been operating through the Affinia Global Filtration Operating Group and Wix Filtration Corp. LLC, a wholly-owned subsidiary of Affinia Group Inc. All references to "Wix" herein are to Affinia Group Inc., as the successor-in-interest to Dana Corporation, and Wix Filtration Corp. L.L.C.

31.     Defendant Cummins Filtration Inc. ("Cummins"), a wholly-owned subsidiary of Cummins, Inc., is headquartered in Nashville, Tennessee, with a business address at 2931 Elm Hill Pike, Nashville, Tennessee 37214. Throughout the Time Period, Cummins manufactured Filters and sold them to the United States and the States.

32.     Defendant Donaldson Company, Inc. ("Donaldson") is a corporation headquartered in Minneapolis, Minnesota, with a business address at 1400 West 94th St., Minneapolis, Minnesota 55431. Throughout the Time Period, Donaldson manufactured Filters and sold them to the United States and the States.

33.     Defendant Baldwin Filters, Inc. ("Baldwin") is a corporation headquartered in Kearney, Nebraska, with a business address at 4400 E. Hwy. 30, Kearney, Nebraska 68848. Throughout the Time Period, Baldwin manufactured Filters and sold them to the United States and the States.

34.     Wherever in this First Amended Complaint ("Complaint") reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business affairs.

35.     The acts alleged in this Complaint, engaged in by Defendants, were performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of the Defendants' business affairs.

## CO-CONSPIRATORS

36.     Various other persons, firms and corporations not named as Defendants herein have participated as co-conspirators in the violations of law alleged herein, and have aided, abetted and performed acts and made statements in furtherance thereof.

## INDUSTRY BACKGROUND

**Automotive Filter Products**

37.     Nearly every car and light truck sold in the United States, excluding vehicles that are solely electric, uses filters to keep engines, fuel, and other hydraulic systems free from particulate contamination.  Most vehicles contain three or more filters that must be replaced at regular intervals. While filter technology and the range of filter products have changed over time, the primary filters categories remain the same: oil, air, and fuel.

38.     Oil filters clean the oil circulating through an engine by picking up tiny contaminants, such as metal, carbon, rust and dirt particles that can be abrasive and hinder efficient operation of engine parts. Oil filtration in engines is essential for enhancing a vehicle's longevity and performance.

39.     Air filters trap air particles that mix with fuel and circulate into the engine.  The air filter's body is typically made of metal or heat-resistant plastic. Most fuel-injected vehicles use a pleated paper filter element in the form of a flat panel, while older, carburetor vehicles use radial air filters made of similar materials.

40.     Fuel filters screen out dirt and rust particles, improving a vehicle's performance by enabling the fuel to burn more efficiently.

**The Distribution Channels for Filters**

41.     Defendants primarily sell Filters through two separate channels: (i) Original Equipment Manufacturers ("OEMs") and (ii) aftermarket sellers of replacement filters ("Aftermarket Sellers").

42.     OEMs purchase automotive filters for installation into new vehicles during the production process.

43.     Aftermarket Sellers purchase Filters directly from Defendants for wholesale or retail sale to the public, either (i) in connection with professional services rendered to an indirect ("Do it For Me") purchaser (for example, an oil filter sold to a customer as part of an oil change) or (ii) for individuals (known as "Do it Yourself" purchasers) who replace their own filters.

44.     Aftermarket Sellers include, but are not limited to, traditional warehouse (wholesale) distributors, jobbers, automotive parts and mass merchandising retailers, and direct/private label purchasers.  Sales to traditional distributors and automotive parts retailers account for almost seventy percent of aftermarket automotive filter revenues. Defendants sell and market Filters through common distribution channels.  And, Defendants control 90 percent of the entire market for Filters.

### The Filters Aftermarket

45.     The Filters aftermarket in the United States is a mature market.  Oil and air filters in particular have shown low growth in unit shipments and revenues during the Time Period.

46.     Most vehicle maintenance guides recommend that in order to maintain the engine's efficient operation, Filters should be regularly replaced.

47.     Typically, oil filters and air filters require more frequent replacement and comprise the largest segment of the market, followed by fuel filters.  Oil filters account for over sixty percent of U.S. Filters revenues.

48.     Filters are fungible products.  Most manufacturers generally produce each type of Filter.  Brand loyalty for Filters is limited.  And, in addition to manufacturing their own brand filters, the largest filter manufacturers also make filters that are sold under well-known brand-names, such as Wal-Mart, Sears, AC Delco, and Mobil 1, just to name a few. While the filter business includes numerous brands, only a handful of manufacturers who actually make the filters.

49.     Defendants purchase the same raw materials from the same group of suppliers, and use identical designs to manufacture functionally-equivalent Filters.  Specifically, each type of Filter (*i.e.*, oil, air and fuel) is interchangeable with the same type of Filter produced by any other manufacturer.

50.     At aftermarket industry gatherings and events, Filters are often referred to as "light sweet crude" because of their complete substitutability.  Not surprisingly, many consumers perceive Filters as a commodity-type product.

51.     Annual U.S. revenues for Filters were approximately $1.5 billion, and total U.S. revenues over the Time Period were approximately $13 billion.

**Consolidation and Concentration in the Automotive Filters Aftermarket**

52.     The Filters aftermarket is highly concentrated.  Four manufacturers – Honeywell, Purolator (owned by Bosch and MANN+HUMMEL in a 50/50 joint venture), Wix (owned by Affinia Group) and Champion – control over eighty percent of the Filters aftermarket.

53.     Purolator and Honeywell's FRAM® are the most well-known Filters brands.  Wix, while not having as strong a brand name, manufactures, among other things, private label Filters for NAPA Auto Parts and Carquest Auto Parts.  Wix is also the number one filter supplier for NASCAR.  Champion also focuses on private label manufacturing.  Champion manufactures such private label Filters as Mobil 1, Valvoline, STP, Mighty and Firestone.

54.     The Filters aftermarket has become increasingly consolidated since the 1990s.  In 1999, for example, Honeywell merged with AlliedSignal; FRAM became part of Honeywell Consumer Products Group; and Mark IV sold Purolator to Arvin Industries.  In 2000, Arvin Industries merged with Meritor Automotive to become ArvinMeritor, Inc.  And, in 2006 ArvinMeritor sold Purolator to Bosch and Mann + Hummel.

55.     While the Filters industry has experienced a wave of consolidation, there have been no significant new entrants into the market.

56.     The small number of companies controlling the Filters aftermarket is conducive to cartel behavior, allowing Defendants and their co-conspirators to coordinate the conduct, while making it hard for customers to avoid the effects of collusive behavior.

## DEFENDANTS' ANTITRUST CONSPIRACY

**Defendants' Unlawfully Conspire to Fix Prices**

57.     During the Time Period, Defendants and their co-conspirators conspired, contracted, or combined to fix, raise, maintain and/or stabilize prices and allocate customers, including the United States government and the States, for Filters in the United States.

58.     Defendants' conspiracy conduct occurred via in-person meetings, electronic and other communications, and included the exchange of competitively-sensitive information.

59.     Defendants met, discussed, and communicated to reach an agreement to implement, monitor, and further their unlawful, continuing price-fixing and customer allocation scheme.

60.     Throughout the Time Period, and in furtherance of their conspiracy, Defendants and their co-conspirators engaged in numerous unlawful anticompetitive activities, including, but not limited to:

    a.      Agreeing with each other to charge prices for Filters at specified levels, and otherwise fix, increase, maintain and/or stabilize the prices of, and allocate customers for, Filters sold in the United States;

    b.      Engaging in discussions and communications between the Filter manufacturers via meetings, conferences, conventions, in the United States and elsewhere, and by telephone, facsimile, and electronic mail regarding the sale of Filters;

    c.      Communicating with each other to discuss, *inter alia*, Filter pricing, customer allocation, Filter markets and price levels generally of Filters sold in the United States;

    d.      Selling Filters in the United States and elsewhere at collusive and noncompetitive prices pursuant to the unlawful agreement reached;

    e.      Accepting payment for Filters sold in the United States and elsewhere at collusive and non-competitive prices;

    f.      Directing, authorizing or consenting to the participation of employees in the conspiracy; and

    g.      Concealing the conspiracy and conspiratorial contacts through various means.

61.     Beginning at least as early as March 1999 and continuing through to the present, Defendants and their co-conspirators met on numerous occasions, had confidential discussions, and exchanged competitively-sensitive information, regarding pricing and customers for Filters in the United States.

62.    Defendants used their meetings, discussions, and exchanges of information successfully to agree to, and to further, their conspiracy to fix, raise, maintain and/or stabilize prices of, and allocate customers for, Filters sold in the United States.

63.    On or about February 26, 1999, Arvin Industries acquired Purolator.  Marlen Silverii, an Arvin Industries Senior Vice President (and formerly employed by Purolator) was instrumental in completing the acquisition.

64.    At the time that Arvin Industries acquired Purolator, Mr. Burch was a National Accounts Manager at Purolator.

65.    Shortly after that acquisition (in or around March 1999), Mr. Silverii met with certain Purolator senior employees, including Mr. Burch, to discuss Purolator's profit margins, which, in the view of Arvin Industries' executives, were too low.

66.    During the meeting, Mr. Silverii explained that, to increase Filters' profit margins, Arvin Industries' executives wanted to implement a Filters price-increase.  But, to do so successfully and without losing market share or business, Mr. Silverii explained that Purolator would need all Defendants to agree to jointly raise their prices together.

67.    Mr. Silverii told the assembled Purolator senior personnel to contact their counterparts (the other Defendants) to obtain each Defendant's agreement to implement a coordinated, industry-wide Filters price-increase.

68.    A number of Purolator's senior personnel who attended the meeting complied with Mr. Silverii's directive. These individuals contacted and communicated with their counterparts regarding coordinated industry-wide price-increase for Filters.

69.    As part of their collusive agreement to increase Filters prices, Defendants met and discussed plans, and otherwise communicated with each other, to coordinate the timing, amount,

and purported false pretexts, that they would jointly agree to as the justification for planned, coordinated, and conspired price increases.

70.     One series of meetings occurred at the Jiffy Lube Association of Franchisees Show ("JLAF Show") at the Gaylord Opryland Hotel in Nashville, Tennessee, in or around May 1999.  At the JLAF Show, Defendants discussed increasing Filters prices.

71.     For example, at the JLAF Show, Mr. Silverii and at least one other senior Purolator employee met with a senior employee at Honeywell and discussed increasing Filters prices.

72.     A fellow Purolator employee told Mr. Burch that Purolator had spoken with Honeywell at the JLAF Show in Nashville and told them to raise prices.  That same Purolator employee also told Mr. Burch that "FRAM knows we're going up."   (As noted above, Fram filters are manufactured by Honeywell.)

73.     Also in mid-1999, Mr. Silverii met with Tom Mallett, Champion's President.  Mr. Silverii and Mr. Mallett discussed fixing and coordinating Filters prices in the United States.

74.     On or about June 28, 1999, Mr. Silverii directed Larry Curtis (Vice President of Sales at Purolator) to fax Brad Hayes (Honeywell) a copy of a letter that Purolator intended to send to its customers.  The letter informed Purolator's customers of an impending price-increase on all Purolator Filters.

75.     Mr. Curtis falsely back-dated this price-increase letter to appear as if it had been written earlier.  (In fact, he wrote the letter approximately a week after the date he put on it.)  And, Purolator actually sent this price-increase letter to its customers several weeks after coordinating the price-increase with Honeywell.

76.     The letter also provided a false pretext or excuse that the conspirators would give for their planned and conspired price-increase: the Defendants would claim that the increase in

Filter prices was directly and solely attributed to price increases in cost for labor, health care, freight, and raw materials. In truth, the price-increase was due to price fixing, and was the result of a conspiracy among various Defendants to raise the price for Filters.

77.     On June 28, 1999, pursuant to Mr. Silverii's directive, Larry Curtis sent the draft price-increase letter by fax to his counterpart at Honeywell, Brad Hayes.  The fax recipient at Honeywell, Brad Hayes, was the person whom Mr. Silverii had already met with, secretly, at the JLAF Show.

78.     Notably, as of June 28, 1999, Purolator had not yet sent the price-increase letter to any of its customers.  The customer letter would not go out for several weeks.

79.     Recorded telephone conversations (from June 1999) further evidence the Defendants' collusive price-fixing activity during this time period.

80.     Purolator's actual customer price-increase letter (dated "July 7, 1999," but sent to its customers at a subsequent date) was virtually to identical to the draft letter Purolator had already shared with Honeywell a few weeks earlier.

81.     Significantly, both letters contained the *same exact* price percentage increase, and the same price-increase effective date.

82.     Shortly after Purolator sent its price-increase letter pursuant to the unlawful agreement, the other Defendants followed Purolator's lead and also implemented very similar Filters price increases.

83.     Following months of illicit, secret contacts and communications, regarding a price increase, each Defendant successfully implemented (in or around August 1999) the agreed-upon price-increase for Filters in the United States.

84.     Plaintiff/Relator Burch left Purolator to join Champion as a National Accounts Manager in August 1999.

85.     Champion's President John Evans met (in or around February 2004) with Champion's senior employees who were responsible for the Filters business (including Mr. Burch) to discuss Champion's intention to raise Filters prices.

86.     At that meeting, Mr. Evans told Champion's senior employees that Champion would "lead the way" with another Filters price increase.

87.     Mr. Evans advised those assembled that Champion needed to coordinate the price-increase with Defendants to ensure the continued success of the conspiracy. For example, it was critical to Champion that its Filter price increase not detrimentally affect its market share. For this reason, Mr. Evans directed Champion's senior employees to make frequent telephone calls to Defendants to discuss coordinated pricing and to conspire to reach an agreement about the coordinated price-increase.

88.     Mr. Evans, together with other Champion senior employees, contacted each Defendant, including Mr. Silverii at ArvinMeritor, to coordinate this planned Filters price-increase.

89.     Because of these illicit communications, and based on their conspiring, the Defendants agreed to jointly increase Filters prices.

90.     In or around April 2004, each Defendant announced and successfully implemented their coordinated Filters price-increase.

91.     Champion, in September 2004, then led Defendants' effort to implement a second 2004 coordinated Filters price-increase, in furtherance of their conspiracy.

92.     This second time, Mr. Evans once again enlisted several senior Champion sales representatives to discuss the price-increase with Defendants and to garner their agreement to the amount of the increase.

93.     Some of the conversations took place at the Filters Manufacturers Council meeting in Nashville, Tennessee between September 26 and September 28, 2004.

94.     At the Nashville meeting, Champion employees discussed with employees and agents of Purolator and Wix (among other Defendants) Champion's intention to raise Filters prices a second time in 2004.

95.     In the words of one Champion employee, the "primary goal over the next day and a half [at the Convention] is to get everybody to get out there, and the message is gonna be that we're going up again, and when."  This employee clarified: "That's basically our message to everybody."

96.     Champion's agenda was so crystal clear that a Champion sales representative joked that he and Mr. Evans "talked about going to [the] Filter Council cocktail party wearing T-shirts saying 'we went up first last time.'"

97.     By October 27, 2004, Champion had received confirmation from (Defendants) Honeywell, Cummins, Donaldson, and Purolator, that each Defendant would implement a Filters price-increase of at least 5%.

98.     Honeywell, Donaldson, and Cummins were so brazen that they sent to Champion their draft price-increase letters *in advance* of publicly-announcing their price hikes.

99.     Purolator confirmed to Champion that it had agreed with the other conspirators to also increase its Filters prices in this coordinated action.

100.    Subsequent to their unlawful coordination, in or around October or November 2004, the Defendants informed their respective customers of the previously agreed-upon Filters price-increase.

101.    In an attempt to conceal their conspiracy and their collusively coordinated price-increase, the Defendants agreed to, and did, falsely blame the increase solely on rising steel costs.

102.    At or around the same time, one of Champion's largest private-label customers questioned the need for another price-increase in 2004.   This customer also questioned Champion's explanation that rising steel prices necessitated the price-increase.  The customer requested that Champion provide it with an additional explanation justifying the price-increase.

103.    This customer request for an explanation created a serious dilemma for Champion.  A few months earlier, Champion had introduced a new oil filter called eCore, twelve models of which fit 75% of the cars on the road.  The eCore filter was made partly out of fabric *instead of steel*. Thus, Champion's oil filter input costs had in fact decreased by approximately 20% because of its diminished need for raw steel in the manufacture of eCore oil filters.

104.    Instead of providing its customer with its eCore input prices, Champion gave its customer a Purolator spreadsheet for *Purolator's outdated input costs*. Champions spreadsheet, falsely represented Purolator's costs as its own. The spreadsheet satisfied the complaining customer.  But more importantly, the spreadsheet concealed the true reason for Champion's price increase – the Defendants' unlawful price-fixing agreement, and not increasing steel prices that Champion would have to pay.

105.    By November or December 2004, each Defendant had successfully implemented the second 2004 coordinated Filters price-increase.

106.    In subsequent years, Defendants continued to adhere to their unlawful agreement and conspiracy as they continued to conspire to and increase Filters prices periodically.

107.    In addition to price-fixing, Defendants engaged in bid-rigging.

108.    In or about June of 2003, Shell asked Defendant Champion and other Defendants to bid for its business. (As noted within this complaint, Defendant Filter manufacturers made Filters for other brand-names besides their own.)

109.    At the time, Honeywell and Purolator shared Shell's Light Vehicle Aftermarket Filter business.  Plaintiff/Relator Burch and Mark McDaniel, Burch's supervisor, told Shell that Champion would bid for the business.  In truth, Champion had already secretly agreed with Purolator and Honeywell to bid high so that they could keep the business at an inflated price.

110.    Mr. McDaniel had instructed Burch to contact his counterpart at Purolator, Jim Burnham, to discuss the bidding for Shell's business and to tell Burnham that Champion would bid high -but Burch refused.

111.    Mr. McDaniel then told Burch that he would handle it since Burch was not being cooperative.

112.    Mr. McDaniel also complained in an email and verbally, telling Burch that he was going to write him up for mishandling the bid.  Burch responded in a formal letter and noted that he was not comfortable with McDaniel's request to rig the bid.

113.    During the Time Period, pursuant to, and in furtherance of, their unlawful agreement, Defendants fixed, raised, maintained and/or stabilized prices and allocated customers for Filters in the United States.  In so doing, Defendants acted unlawfully to foreclose price competition and to maintain artificially high prices for the Filters they sold in the United States.

114.    Similarly, Defendants' unlawful conduct during the Time Period in allocating customers amongst themselves was for the sole purpose of foreclosing price competition to maintain artificially high prices for the Filters they sold in the United States.

115.    As a result of Defendants' unlawful conspiracy, the United States and the States have been forced to pay super competitive and artificially inflated prices for Defendants' Filters.

116.    Throughout the Time Period, Defendants affirmatively concealed the conspiracy from the United States and the States by, among other things, engaging in secret meetings and communications in furtherance of the conspiracy, and by falsely certifying to the United States and the States that they were not engaged in price-fixing activity.

117.    Because of such fraudulent concealment and the inherently self-concealing nature of this conspiracy, the United States and the States could not have discovered, through reasonable due diligence, and did not discover, the existence of this conspiracy.

118.    As a result of the active-and-ongoing concealment of the conspiracy by Defendants and their co-conspirators, all applicable statutes of limitation are tolled.

**Defendants' Conduct Violates the Sherman Act**

119.    Defendants' conspiratorial conduct constitutes horizontal price-fixing that violates Section 1 of the Sherman Act, 15 U.S.C. § 1.

120.    This conspiracy is illegal *per se*, and consists of a continuing, unlawful understanding and concert of action among Defendants to coordinate their Filters prices. As a direct and proximate result, both direct and indirect purchasers of have been injured in their business and property, in an amount not presently known, in that they paid more for Filters than they otherwise would have paid in the absence of Defendants' unlawful conduct. (As discussed below, the United States and the States also have been injured by of the Defendants' illegal price-fixing conspiracy).

121.    In addition to this action, several groups of purchasers have filed private actions, in the form of class actions, in which these classes seek to recover their damages resulting from Defendants' conduct. On November 26, 2008, for example, a group of direct purchasers filed their Consolidated Amended Complaint. Defendants moved to dismiss that complaint, and on November 5, 2009, the Court denied that motion.

## FALSE CLAIMS

122.     During the Time Period, the United States spent many millions of dollars on Filters.  According to the OMB Watch, a public watch dog organization that monitors the Office of Management and Budget ("OMB"), between 2000 and 2009, the United States spent more than $40 million dollars on engine, air, and oil filters and cleaners for non-aircraft vehicles.  In 2004 alone, OMB Watch estimated that the United States spent almost $6 million on engine air and oil filters, strainers, and cleaners, for non-aircraft use.

123.     Significant as they are, however, these numbers most likely underestimate – perhaps substantially – the amount the federal government paid for Filters.  The reason for this is that the United States' contract coding system only captures the primary product sold as a result of the contract. Thus, there are likely to be many millions of dollars worth of additional Filters purchases that are not reflected in the foregoing numbers.

124.     Defendants manufactured well over 90 percent of the Filters on the market.  In addition to Filters sold under Defendants' own brand-names, Defendants also provided Filters to private brands such as Napa, CarQuest, and Firestone, among others.

125.     Regardless of brand name (or distributor), the majority of the Filters the United States and the States purchased during the time Period were undoubtedly manufactured by Defendants.

126.     Table 1 lists Filters by National Stock Number ("NSN") and Part Number.  It represents a portion of the Filters manufactured by Defendants (the most popular models) and sold to the United States during the Time Period.

127.     Table 2 shows particular, representative claims the United States paid during the Time Period for the Filters listed in Table 1.

128.   Attached as Exhibit A, are spreadsheets that show additional claims submitted to the United States by NSN and award date.

129.   Neither Table 2 nor Exhibit A is anywhere close to a complete list, because the United States paid thousands of claims for Filters from the Defendants during the Time Period.

**Table 1**
**Examples of Filters the U.S. Purchased**

| Manufacturer/Defendant | Part Number | NSN |
|---|---|---|
| Honeywell | PH47 | 2940000969529 |
| ArvinMeritor | PH47 | 2940000969529 |
| Honeywell | PH3387A | 2940011459456 |
| Wix | 51040 | 2940011459456 |
| ArvinMeritor | 51040 | 4330003360687 |
| Luber-finer/Champion | PH8A | 2940009860276 |
| Champion | PH8A | 2940009860276 |
| Honeywell | PH8A | 2940009860276 |
| ArvinMeritor | PER1A | 2940009860276 |
| Wix | 51515 | 2940009860276 |
| Luber-finer/Champion | PH253 | 2940005864792 |
| Champion | PH253 | 2940005864792 |
| Luber-finer/Champion | PH16 | 2940005864792 |
| Champion | PH16 | 2940005864792 |
| Honeywell | PH16 | 2940005864792 |
| ArvinMeritor | PER17 | 2940005864792 |
| Wix | 51068 | 2940005864792 |
| Luber-finer/Champion | PH2835 | 2940011545127 |
| Champion | PH2835 | 2940011545127 |
| Wix | 51348 | 2940011545127 |
| Honeywell | PH3614 | 2940011545127 |
| ArvinMeritor | 335 | 2940011545127 |
| Honeywell | PH3600 | 2940011741347 |
| Wix | 51516 | 2940011741347 |
| Honeywell | PH2 | 2940013997371 |
| Wix | 51372 | 2940013997371 |
| Honeywell | PH3593A | 2940013362632 |
| Champion | PH51A | 2940011949730 |
| Honeywell | PH3980 | 2940011949730 |
| Wix | 51036 | 2940011949730 |
| Champion | PH1218 | 4330013988484 |
| Honeywell | PH5 | 4330013988484 |
| Wix | 51060 | 4330013988484 |
| Honeywell | PH3766 | 2940012311696 |
| ArvinMeritor | PER288 | 2940012311696 |

| Manufacturer/Defendant | Part Number | NSN |
|---|---|---|
| Wix | 51742 | 2940012311696 |
| Honeywell | PH3786 | 2940014457560 |
| Wix | 51734 | 2940014457560 |
| Honeywell | PH3976 | 2940012808419 |
| Wix | 79396 | 2940012808419 |

**Table 2**
**Examples of Claims the U.S. Paid for Filters**

| NSN | Part No. | Unit Price | Award Date | Quantity |
|---|---|---|---|---|
| 2940013362632 | PH3593A | $5.04 | 4/9/2002 | 6 |
| 2940013362632 | PH3593A | $5.04 | 4/15/2002 | 24 |
| 2940013362632 | PH3593A | $5.04 | 4/22/2002 | 34 |
| 2940013362632 | PH3593A | $5.04 | 5/21/2002 | 15 |
| 2940013362632 | PH3593A | $5.04 | 9/25/2003 | 5 |
| 2940013362632 | PH3593A | $.504 | 1/6/2005 | 3 |
| 2940013362632 | PH3593A | $5.45 | 7/26/2006 | 11 |
| 2940000969529 | PH47 | $8.00 | 5/25/2006 | 1 |
| 2940000969529 | PH47 | $8.00 | 5/26/2006 | 1 |
| 2940000969529 | PH47 | $8.00 | 5/27/2006 | 3 |
| 2940005864792 | PH253 PH16 PER17 51068 | $2.36 | 3/28/2006 | 95 |
| 2940005864792 | PH253 PH16 PER17 51068 | $2.36 | 5/3/2006 | 6,094 |
| 2940005864792 | PH253 PH16 PER17 51068 | $2.36 | 5/3/2006 | 1730 |
| 2940011741347 | PH3600 51516 | $1.89 | 3/3/2006 | 177 |
| 2940013997371 | PH2 51372 | $2.12 | 5/5/2006 | 918 |
| 2940013997371 | PH2 51372 | $2.12 | 5/5/2006 | 948 |
| 2940012311696 | PH3766 PER288 | $4.65 | 4/24/2006 | 121 |
| 2940012311696 | PH3766 PER288 | $4.65 | 4/24/2006 | 470 |
| 2940012808419 | PH3976 51607 | $5.20 | 3/15/2006 | 29 |
| 2940012808419 | PH3976 | $5.20 | 7/18/2006 | 13 |

| NSN | Part No. | Unit Price | Award Date | Quantity |
|---|---|---|---|---|
|  | 51607 |  |  |  |
| 2940012808419 | PH3976 51607 | $5.20 | 6/29/2006 | 984 |
| 4330003360687 | 51040 | $4.35 | 1/28/1999 | 4 |
| 4330003360687 | 51040 | $3.84 | 3/17/1999 | 20 |
| 4330003360687 | 51040 | $4.70 | 5/12/2000 | 4 |
| 4330003360687 | 51040 | $6.18 | 10/6/2000 | 8 |
| 2940009860276 | PH8A PER1A 51515 | $2.22 | 4/14/2004 | 40 |
| 2940009860276 | PH8A PER1A 51515 | $2.22 | 2/4/2005 | 56 |
| 2940009860276 | PH8A PER1A 51515 | $2.22 | 2/7/2005 | 58 |
| 2940005864792 | PH16 PH253 51068 PER17 | $2.17 | 2/9/2005 | 97 |
| 2940011545127 | PH2835 PH3614 51348 335 | $2.31 | 3/23/2005 | 32 |
| 2940011545127 | PH2835 PH3614 51348 335 | $2.31 | 3/23/2005 | 72 |
| 2940013997371 | PH2 51372 | $2.50 | 5/9/2002 | 179 |

130.    The United States and the States purchased Filters from Defendants both directly through contracts with individual Defendants, and through distributors.

131.    With regard to the latter, in some instances, the United States or the States contracted with a Filters' distributor to purchase a large quantity of Filters. Those distributors would then purchase Filters from the Defendants and provide them to the United States or the States.

132.    Whether the United States or the States purchased Filters via a direct contract with an individual Defendant or through a distributor, the result was the same: The United States

and the States paid money to purchase Defendants' Filters at inflated prices, and would not have purchased the Filters at all, at any price, had the Defendants disclosed their price fixing.

133.    Thus, during the Time Period, every time the United States or the States paid for Defendants' Filters, there was a false and fraudulent claim – sometimes for more than one reason. This was true whether the Defendants themselves submitted the contract or claim, or whether it was submitted by a distributor or subsidiary that merely supplied Defendants' Filters.

**Defendants Submitted False Claims and Caused Others to Submit False Claims**

134.    Each time Defendants directly made a claim for payment under a contract for Filters, they submitted or caused to be submitted a false claim.  Defendants conspired to fix and artificially inflate the prices of Filters during the Time Period.

135.    When Defendants made a direct claim on the United States or the States for payment under a Filters contract, that claim was false.  The United States and the States relied on the accuracy of Defendants' prices, and obviously price is always a material term of any contract.  The prices that the United States and States paid for the Filters were inflated were artificially inflated as a result of the Defendants' price-fixing conspiracy.

136.    Moreover, if the United States and States had known the truth – that Defendants conspired to fix prices and bid – they never would have purchased the Filters.

137.    Similarly, when the United States or the State purchased Filters from a subsidiary or distributor for one of the Defendants, the Defendants themselves also submitted and/or caused false claims to be submitted.

138.    For example, during the Time Period, U.S. Motor Works contracted to provide the United States with spare vehicle parts that included, among other things, Filters.  U.S. Motor Works distributed many brand name parts, including Wix and Cummins. Because Defendants controlled substantially more than 90 percent of the Filters market during the Time Period, in

virtually all instances the Defendants actually manufactured and provided the requisite Filters, and they profited from the sale of the Filters at inflated prices -regardless of whether the claim was submitted directly by the Defendant, or through an intermediary like a distributor (and caused to be distributed by or more or the Defendants).

139. As another example, on or about September 28, 2007, the United States sold $359,681.38 worth of Filters to the United States pursuant to Contract No. SPM7MX-07-D-9005) with Facet USA, Inc. ("Facet USA"), which allowed for the purchase of as much as $24 million worth of Filters over time.

140. Like other government contracts, this one identified the required part by NSN. The NSN identifies the part generically and does not refer to a particular brand. Thus, where multiple companies make the same part under different brand names, the United States might accept any number of the brand names as long as it is the correct part. Here, the contract identifies a number of Filters by NSN. Under each NSN, the contract provides an acceptable list of sources/manufacturers and identifies them by a Commercial and Governmental Entity Code ("Cage Code"), the code assigned to companies that register with United States to compete for government business.

141. The contract lists the following Defendants and their Cage Codes as acceptable sources for the Filters: Cummins, Wix, Baldwin, Luber-Finer (i.e., Champion), and ArvinMeritor. The contract also lists Quaker State Oil Refining Corp. as an acceptable source, and during the Time Period, Honeywell and ArvinMeritor manufactured and provided Filters to Quaker State. Thus, under the contract, Facet USA was allowed to, and did, provide the United States with Filters from each of these Defendants at various times. Because Filters are largely a fungible product, it matters little to the United States which Filters it receives so long as they

come from one of the approved companies.  And, that list of approved companies was comprised virtually exclusively of the Defendants and filter brands they manufactured.

142.    Each time Facet USA provided Filters to the United States under the contract it would have had to be providing the Defendants' products.  Because the price of Defendants' Filters was inflated, any negotiations between Facet and the United States were predicated on an inflated market price.  Thus, the Defendants ultimately caused Facet USA to submit inflated, false, and fraudulent claims to the United States. (Moreover, these Filters would not have been acceptable at all to the United States irrespective of the inflated price had the United States known of the price fixing conspiracy by the Defendants).

**Defendants Made False Certifications and Representations in Support of Claims**

143.    Defendants also submitted false certifications and representations in support of false and fraudulent claims.  To compete for and receive contracts to supply the government with Filters, and to maintain and sustain those contracts after they were obtained, Defendants represented in contracts and certifications (as required by governmental regulations) that their prices were not the result of collusive activity, including any price-fixing conspiracy.

144.    Contracts with the United States are governed by a comprehensive set of statutes and regulations.  One of the primary goals of these laws is to ensure robust competition, which results in the United States (and all of its agencies or departments) receiving fair prices for goods. The United States Code mandates that agency heads "obtain full and open competition through the use of competitive procedures in accordance with the requirements of the . . . Federal Acquisition Regulation."  *See* 10 U.S.C. § 2304; 41 U.S.C. § 253 (same); 48 C.F.R. § 6.101 (requiring government officials to use policies that "promote and provide for full and open competition . . .").

145.   The Federal Acquisition Regulations or "FAR" require all "prospective contractors" to complete a number of steps before they can be awarded a government contract or provide their products to the government.

146.   During the Time Period, all Defendants had registered through CCR and received a Cage Code.  Defendants operated under a variety of Cage Codes during the Time Period.  And, when a given Defendant's name or corporate affiliation changed, its Cage Code may have also changed.  The following chart lists examples of Cage Codes for Defendants during the Time Period:

| Defendant | Current Cage Code |
|---|---|
| Champion | 50284 |
| Purolator | 57108 |
| ArvinMeritor | 3QYY9 |
| Honeywell | 73370 |
| Wix | 79396 |
| Affinia | 54M54 |
| Cummins | 4NUM0 |
| Baldwin | 12658 |
| Donaldson | 18265 |

147.   In addition, all prospective vendors must make certain representations and certifications when they contract with the government and periodically thereafter.  For instance, the Code of Federal Regulations requires "prospective contractors to update their representations and certifications annually to ensure they are kept current, accurate and complete.  *See* C.F.R. § 4.1201(b)(1) (At the beginning of the Time Period, vendors were required to submit these representations and certifications prior to receipt of any individual larger purchase contract award.   Since about January 1, 2005, vendors have been allowed to complete their representations and certifications online using the Online Representations and Certifications Application ("ORCA")).

148.    The representations and certifications remain valid for a year, and any time during that year the relevant vendor may compete for government business. After implementation of ORCA, each time a vendor signs a solicitation it certifies that its representations and certifications are current, accurate, and complete.

149.    ORCA contains an explicit representation and certification of an "Independent Price Determination."  The certification states, among other things, that:

- the prices contained in a bid or proposal "*have been arrived at independently, without, for the purpose of restricting competition, any consultation, communication, or agreement with any other offeror or competitor relating to (i) those prices, (ii) the intention to submit an offer, or (iii) the methods or factors used to calculate the prices offered*"; and

- the vendors have not done anything to "*induce any other concern to submit or not submit and offer for the purpose of restricting competition.*"

150.    During the Time Period, each time a Defendant signed such certification it falsely certified that it was not price-fixing.  Likewise, because the same certification language also is in all government solicitations, any time any Defendant applied for a contract and signed a solicitation or submitted a proposal in response to a solicitation it also falsely certified that it engaged in anti-competitive activities, including pricing-fixing.

151.    Even those Defendants, who solely sold their Filters to the United States through a distributor or subsidiary, were required to be register through CCR and complete the ORCA certifications.  There is a reason for this: If any Defendant did not register through CCR and complete the ORCA certifications, they could not sell their products to the United States, even through a distributor.

152.    Notably, solicitations all also contain an explicit warning that "[b]idders must provide full, accurate, and complete information as required by this solicitation . . ." and that there is a criminal penalty for making false statements in a bid.  (The States have similar statutory provisions.)

32

153.    To the extent that Defendants did not explicitly make such certifications with regard to any given contract or claim, they were nonetheless implicitly certifying to both the United States and the States that they were not engaged in a price-fixing.

154.    Neither the United States nor the States would knowingly purchase products from Defendants at inflated prices resulting from violation of the federal and state antitrust laws.

155.    Defendants were engaged in a conspiracy to fix the prices of Filters in violation of the federal antitrust laws.  As a result, contrary to their ORCA certifications, their prices were not "independent," or the product of full and fair competition.

156.    Thus, each time any Defendant was awarded a contract to supply the United States or the States with Filters, that Defendant had misrepresented that its prices were the product of competition not collusion.

157.    Similarly, if Defendants products appeared as acceptable products under a government contract awarded to a distributor or subsidiary of the Defendants (e.g. Contract No. No. SPM7MX-07-D-9005, referenced herein), then that Defendant had made a false certification and representation that caused the United States to pay a false claim.

158.    Such terms were material terms of every contract between the United States and the States, and the United States and the States would not have entered the contracts for Filters had they known of the Defendants antitrust conspiracy.

159.    Defendants' false certifications were false statements that caused the United States and the States to pay fraudulent claims.

**Evidence of Defendants' False Claims**

160.    A complete list of contracts between Defendants and the United States, and Defendants' claims for payment to the United States and the States, is uniquely within the possession of Defendants.  Although Defendants manufactured more than 90 percent of the

Filters during the Time Period, in many instances, the United States and the States purchased the Filters from a variety of distributors, and Defendants manufactured and distributed Filters under a variety of private brand names. The distribution chain is complex.

161. The following non-exclusive list of contracts and claims provides strong evidence that all Defendants: a.) sold filters to the United States and the States; b.) made or caused others to make false claims to the United States and the States; and c.) made false representations or certifications in support of claims for payment to the United States and the States.

**Evidence of Defendant Donaldson's False Claims**

162. During the Time Period, Donaldson sold Filters to the United States and the States both directly and through subsidiaries and distributors. Donaldson's primary contact for government related business is Robyn Barlarge.

163. Donaldson was registered with the United States through the CCR systems during the Time Period, had a Cage Code, and regularly certified to the United States that its prices were independent.

164. Donaldson also regularly made similar certifications to the States, either explicitly or implicitly.

165. Donaldson made false claims for payment, caused others to make false claims for payment, and conspired to violate the FCA and parallel laws of the States. The States and the United States paid for Donaldson Filters in reliance on Donaldson's false certifications and false claims.

166. The following is a non-exclusive list of examples of contracts the United States entered with Donaldson during the Time Period:

| Defendant/Company | Product | Total Value | Date | Agency |
|---|---|---|---|---|
| Western Filter Corporation, a division of Donaldson | Engine, air, and oil filters, non- | $66,060.00 | Aug. 19, 2010 | Defense Logistics |

| Defendant/Company | Product | Total Value | Date | Agency |
|---|---|---|---|---|
| | aircraft | | | Agency |
| Western Filter Corporation, a division of Donaldson | Engine, air, and oil filters, non-aircraft | $35,266.00 | June 12, 2010 | Defense Logistics Agency |
| Western Filter Corporation, a division of Donaldson | Engine, air, and oil filters, non-aircraft | $26,145.00 | May 26, 2010 | Defense Logistics Agency |
| Western Filter Corporation, a division of Donaldson | Engine, air, and oil filters, non-aircraft | $47,854.00 | May 10, 2010 | Defense Logistics Agency |
| Western Filter Corporation, a division of Donaldson | Engine, air, and oil filters, non-aircraft | $24,640.00 | Mar. 24, 2010 | Defense Logistics Agency |
| Western Filter Corporation, a division of Donaldson | Engine, air, and oil filters, non-aircraft | $31,524.00 | Mar. 12, 2010 | Defense Logistics Agency |
| Western Filter Corporation, a division of Donaldson | Engine, air, and oil filters, non-aircraft | $20,174.00 | Feb. 5, 2010 | Defense Logistics Agency |
| Donaldson | Engine, air, and oil filters, non-aircraft | $9,848.00 | Dec. 29, 2009 | Defense Logistics Agency |
| Western Filter Corporation, a division of Donaldson | Engine, air, and oil filters, non-aircraft | $28,968.00 | Nov. 30, 2009 | Defense Logistics Agency |
| Western Filter Corporation, a division of Donaldson | Engine, air, and oil filters, non-aircraft | $28,730 | Nov. 25, 2009 | Defense Logistics Agency |
| Western Filter Corporation, a division of Donaldson | Engine, air, and oil filters, non-aircraft | $8,004.00 | Oct. 26, 2009 | Defense Logistics Agency |
| Donaldson | Engine, air, and oil filters, non-aircraft | $32,279.00 | Oct. 5, 2009 | Defense Logistics Agency |
| Western Filter Corporation, a division of Donaldson | Engine, air, and oil filters, non-aircraft | $34,506.00 | Sept. 11, 2009 | Defense Logistics Agency |
| Western Filter Corporation, a division of Donaldson | Engine, air, and oil filters, non-aircraft | $24,282.00 | June 19, 2009 | Defense Logistics Agency |
| Western Filter Corporation, a division of Donaldson | Engine, air, and oil filters, non-aircraft | $4,860.00 | Aug. 24, 2009 | Defense Logistics Agency |
| Western Filter Corporation, a division of Donaldson | Engine, air, and oil filters, non-aircraft | $8,280.00 | Mar. 26, 2009 | Defense Logistics Agency |

| Defendant/Company | Product | Total Value | Date | Agency |
|---|---|---|---|---|
| Donaldson | Engine, air, and oil filters, non-aircraft | $8,352.00 | Feb. 26, 2009 | Dept. of the Army |
| Donaldson | Engine, air, and oil filters, non-aircraft | $7,344 | June 17, 2008 | Dept. of the Army |
| Donaldson | Engine, air, and oil filters, non-aircraft | $460,044.00 | January 2, 2008 | Defense Logistics Agency |
| Donaldson | Engine, air, and oil filters, non-aircraft | $18,860.00 | Oct. 30, 2007 | Defense Logistics Agency |
| Donaldson | Engine, air, and oil filters, non-aircraft | $22,115.00 | Sept. 24, 2007 | Defense Logistics Agency |
| Donaldson | Engine, air, and oil filters, non-aircraft | $23,454.00 | Sept. 7, 2007 | Defense Logistics Agency |
| Donaldson | Engine, air, and oil filters, non-aircraft | $410,004.00 | July 10, 2007 | Dept. of the Army |
| Donaldson | Engine, air, and oil filters, non-aircraft | $3,626.00 | June 22, 2007 | Defense Logistics Agency |
| Donaldson | Engine, air, and oil filters, non-aircraft | $71,598.00 | June 6, 2007 | Defense Logistics Agency |
| Donaldson | Engine, air, and oil filters, non-aircraft | $28,875.00 | May 21, 2007 | Defense Logistics Agency |
| Donaldson | Engine, air, and oil filters, non-aircraft | $83.00 | May 16, 2007 | Dept. of the Army |
| Donaldson | Engine, air, and oil filters, non-aircraft | $120,125.00 | March 28, 2007 | Dept. of the Army |
| Donaldson | Engine, air, and oil filters, non-aircraft | $11,336 | March 27, 2007 | Dept. of the Navy |
| Donaldson | Engine, air, and oil filters, non-aircraft | $3,136.00 | March 23, 2007 | Dept. of the Army |
| Donaldson | Engine, air, and oil filters, non-aircraft | $71,598.00 | June 6, 2007 | Defense Logistics Agency |

| Defendant/Company | Product | Total Value | Date | Agency |
|---|---|---|---|---|
| Western Filter Corporation, a division of Donaldson | Engine, air, and oil filters, non-aircraft | $56,160.00 | Nov. 18, 2005 | Defense Logistics Agency |

167.  Many of Donaldson's contracts were multi-year installment agreements under which the United States made continuous and periodic orders for Filters.  For example, contract SP0740-03-D-7680 was a multi-year contract between the United States and Donaldson.

168.  The United States made at least the following orders under contract SP0740-03-D-7680 and each time it made such an order Donaldson submitted a false and fraudulent claim for payment:

| Date | Order | Total Price Paid |
|---|---|---|
| June 25, 2007 | 291 Filters (x $8.01 per unit) | $2,330.91 |
| December 17, 2007 | 456 Filters (x $15.21 per unit) | $6,935.76 |
| May 12, 2008 | 500 Filters (x $8.36 per unit) | $4,180.00 |

169.  Each time the United States awarded Donaldson a contract, Donaldson delivered the Filters and received payment, i.e., made a claim to a governmental entity.

170.  Donaldson made many claims for payment to the United States and the States in addition to those claims listed above, and Donaldson conspired with the other Defendants to violate the FCA.

171.  Each time Donaldson made a claim for payment under any Filters contract, it violated the FCA because: a.) it was engaged in a long-running price-fixing conspiracy, contrary to its representations and certifications, and b.) the prices of its Filters were falsely inflated. Similarly, each time a subsidiary of or a distributor for Donaldson submitted claims for payment to the United States or the States, Donaldson violated the FCA because: a.) it was engaged in a long-running price-fixing conspiracy, contrary to its representations and certifications, and b.) the prices of its Filters were falsely inflated.

37

172.    If the United States or the States had been aware of this it would not have paid Donaldson's false claims or paid the claims of subsidiaries of and distributors for Donaldson.

**Evidence of Defendant Honeywell's False Claims**

173.    During the Time Period, Honeywell sold Filters to the United States and the States both directly and through subsidiaries and distributors.

174.    Honeywell's primary contact for government related business is Nancy Luna. Honeywell was registered with the United States through the CCR systems during the Time Period, had a Cage Code, and regularly certified to the United States that its prices were independent. Honeywell also regularly made similar certifications to the States, either explicitly or implicitly.

175.    Honeywell made false claims for payment, caused others to make false claims for payment, and conspired to violate the FCA and parallel laws of the States. The States and the United States paid for Honeywell Filters in reliance on Honeywell's false certifications and false claims.

176.    The following is an example of such claims: On or about March 19, 2004, Honeywell had a contract to supply the United States, through the Army & Air Force Exchange Services with FRAM Filters. (*See* Exhibit B.)

177.    At the time, Honeywell was renegotiating its prices with the United States. Honeywell represented to the United States that it needed to increase the price of its Filters because of a shortage of raw materials and an increase in the cost of steel. This representation was false. The United States implemented this price-increase at Honeywell's request.

178.    As noted, in or about April 2004 and again in September 2004, Defendants, including Honeywell, Champion, Cummins, Donaldson, and Purolator all collusively decided to raise their prices and "blame" the price-increase on the rising cost of steel.

179.    Prior to and after this negotiation, Honeywell continuously and repeatedly made claims on the United States for payment under this Filters contract.  (*See* Exhibit B.)    For example, Honeywell made the following claims for payment:

| Date | Quantity of Filters | Price Per Filter |
|------|---------------------|------------------|
| April 15, 2002 | 24 | $5.04 |
| April 22, 2002 | 34 | $5.04 |
| July 26, 2006 | 11 | $5.45 |
| June 29, 2006 | 1750 | $4.54 |

180.    Additional Honeywell claims for payment under this contract are listed on Exhibit B.

181.    Moreover, Tables 1 and 2 above, also show that the United States purchased Honeywell Filters during the Time Period.

182.    Each time the United States awarded Honeywell a contract, Honeywell delivered the Filters and received payment, i.e., made a claim to a governmental entity.  Honeywell made many claims for payment to the United States and the States in addition to those claims listed above, and Honeywell conspired with the other Defendants to violate the FCA.

183.    Each time Honeywell made a claim for payment under any Filters contract, it violated the FCA because: a.) it was engaged in a long-running price-fixing conspiracy, contrary to its representations and certifications, and b.) the prices of its Filters were falsely inflated.

184.    Similarly, each time a subsidiary of or a distributor for Honeywell submitted claims for payment to the United States or the States, Honeywell violated the FCA because: a.) it was engaged in a long-running price-fixing conspiracy, contrary to its representations and certifications, and b.) the prices of its Filters were falsely inflated.  If the United States or the States had been aware of this it would not have paid Honeywell's false claims or paid the claims of subsidiaries of and distributors for Honeywell.

185.    In addition to the false claims submitted to the United States, Honeywell also submitted, and caused to be submitted, false claims to the States. For example, Honeywell sold more than $1 million in Fram filters to the State of Illinois between 2004 and 2010.

186.    Attached as Exhibit C is a list of Fram filters that Illinois purchased for one six month time frame during this period. Illinois has provided Mr. Burch with eleven additional similar lists of Illinois purchases of Fram filters during this time frame. Each of these twelve lists consists of approximately $100,000 worth of Fram filter purchases over a six month period.

**Evidence of Defendant Champion's False Claims**

187.    Champion has a sales department devoted solely to processing claims to the United States and the States. Sheryl McBride is the current Government Contract Specialist who handles Champion's Filter sales to the United States and the States. Ms. McBride has worked for Champion during most of the Time Period.

188.    Champion was registered with the United States through the CCR systems during the Time Period, had a Cage Code, and regularly certified to the United States that its prices were independent. Champion also regularly made similar certifications to the States, either explicitly or implicitly.

189.    During the Time Period, part of which time the Relator worked for Champion, Champion sold Filters to the United States and the States both directly and through subsidiaries and distributors. Champion made false claims for payment, caused others to make false claims for payment, and conspired to violate the FCA and parallel laws of the States. The States and the United States paid for Champion Filters in reliance on Champion's false certifications and false claims.

190.    As noted under Contract No. SPM7MX-07-D-9005, Facet USA agreed to provide the United States with Filters. Most if not all of the Filters that Facet provided to the United

States were manufactured by Defendants Cummins, Wix, Baldwin, Champion, and ArvinMeritor. Thus, United States purchased Champion Filters during the Time Period.

191.    Moreover, Tables 1 and 2 above, also show that the United States purchased Champion Filters during the Time Period.

192.    Each time the United States awarded Champion a contract, Champion delivered the Filters and received payment, i.e., made a claim to a governmental entity. Champion made many claims for payment to the United States and the States in addition to those claims listed above, and Champion conspired with the other Defendants to violate the FCA.

193.    Each time Champion made a claim for payment under any Filters contract, it violated the FCA because: a.) it was engaged in a long-running price-fixing conspiracy, contrary to its representations and certifications, and b.) the prices of its Filters were falsely inflated.

194.    Similarly, each time a subsidiary of or a distributor for Champion submitted claims for payment to the United States or the States, Champion violated the FCA because: a.) it was engaged in a long-running price-fixing conspiracy, contrary to its representations and certifications, and b.) the prices of its Filters were falsely inflated. If the United States or the States had been aware of this it would not have paid Champion's false claims or paid the claims of subsidiaries of and distributors for Champion.

**Evidence of Defendant Purolator's False Claims**

195.    During the Time Period, Purolator sold Filters to the United States and the States both directly and through subsidiaries and distributors. Purolator was registered with the United States through the CCR systems during the Time Period, had a Cage Code, and regularly certified to the United States that its prices were independent. Purolator also regularly made similar certifications to the States, either explicitly or implicitly.

196.    Purolator made false claims for payment, caused others to make false claims for payment, and conspired to violate the FCA and parallel laws of the States.  The States and the United States paid for Purolator Filters in reliance on Purolator's false certifications and false claims.

197.    For example, on January 8, 2003, Purolator contracted to provide non-air engine fuel system components to the United States (Defense Logistics Agency).  The United States paid Purolator $90,520.00 in connection with this contract, and some if not all of the products supplied under this contract were Filters.

198.    Similarly on May 28, 2002, Purolator contracted to provide non-air engine fuel systems components to the United States (Defense Logistics Agency).  The United States paid Purolator $100,394.00 in connection with this contract, and some if not all of the products supplied under this contract were Filters.

199.    Each time the United States awarded Purolator a contract, Purolator delivered the Filters and received payment, i.e., made a claim to a governmental entity.  Purolator made many claims for payment to the United States and the States in addition to those claims listed above, and Purolator conspired with the other Defendants to violate the FCA.

200.    Each time Purolator made a claim for payment under any Filters contract, it violated the FCA because: a.) it was engaged in a long-running price-fixing conspiracy, contrary to its representations and certifications, and b.) the prices of its Filters were falsely inflated.

201.    Similarly, each time a subsidiary of or a distributor for Purolator submitted claims for payment to the United States or the States, Purolator violated the FCA because: a.) it was engaged in a long-running price-fixing conspiracy, contrary to its representations and certifications, and b.) the prices of its Filters were falsely inflated.  If the United States or the

States had been aware of this it would not have paid Purolator's false claims or paid the claims of subsidiaries of and distributors for Purolator.

### Evidence of Defendant ArvinMeritor's False Claims

202.    During the Time Period, ArvinMeritor sold Filters to the United States and the States both directly and through subsidiaries and distributors.

203.    ArvinMeritor's primary contact for government related business is Timothy Burns.  ArvinMeritor was registered with the United States through the CCR systems during the Time Period, had a Cage Code, and regularly certified to the United States that its prices were independent. ArvinMeritor also regularly made similar certifications to the States, either explicitly or implicitly.

204.    ArvinMeritor made false claims for payment, caused others to make false claims for payment, and conspired to violate the FCA and parallel laws of the States.  The States and the United States paid for ArvinMeritor Filters in reliance on ArvinMeritor's false certifications and false claims.

205.    As noted under Contract No. SPM7MX-07-D-9005, Facet agreed to provide the United States with Filters.  Most if not all of the Filters that Facet provided to the United States were manufactured by Defendants Cummins, Wix, Baldwin, Champion, and ArvinMeritor. Thus, United States purchased ArvinMeritor Filters during the Time Period.

206.    Moreover, Tables 1 and 2 above, also show that the United States purchased ArvinMeritor Filters during the Time Period.

207.    Each time the United States awarded ArvinMeritor a contract, ArvinMeritor delivered the Filters and received payment, i.e., made a claim to a governmental entity. ArvinMeritor made many claims for payment to the United States and the States in addition to

43

those claims listed above, and ArvinMeritor conspired with the other Defendants to violate the FCA.

208. Each time ArvinMeritor made a claim for payment under any Filters contract, it violated the FCA because: a.) it was engaged in a long-running price-fixing conspiracy, contrary to its representations and certifications, and b.) the prices of its Filters were falsely inflated.

209. Similarly, each time a subsidiary of or a distributor for ArvinMeritor submitted claims for payment to the United States or the States, ArvinMeritor violated the FCA because: a.) it was engaged in a long-running price-fixing conspiracy, contrary to its representations and certifications, and b.) the prices of its Filters were falsely inflated. If the United States or the States had been aware of this it would not have paid ArvinMeritor's false claims or paid the claims of subsidiaries of and distributors for ArvinMeritor.

**Evidence of Defendant Affinia's False Claims**

210. During the Time Period, Affinia sold Filters to the United States and the States both directly and through subsidiaries and distributors.

211. Affinia's primary contact for government related business is Melissa Fletcher. Affinia was registered with the United States through the CCR systems during the Time Period, had a Cage Code, and regularly certified to the United States that its prices were independent. Affinia also regularly made similar certifications to the States, either explicitly or implicitly.

212. Affinia made false claims for payment, caused others to make false claims for payment, and conspired to violate the FCA and parallel laws of the States. The States and the United States paid for Affinia Filters in reliance on Affinia's false certifications and false claims.

213. Each time the United States awarded Affinia a contract, Affinia delivered the Filters and received payment, i.e., made a claim to a governmental entity. Affinia made many

claims for payment to the United States and the States in addition to those claims listed above, and Affinia conspired with the other Defendants to violate the FCA.

214.    Each time Affinia made a claim for payment under any Filters contract, it violated the FCA because: a.) it was engaged in a long-running price-fixing conspiracy, contrary to its representations and certifications, and b.) the prices of its Filters were falsely inflated.

215.    Similarly, each time a subsidiary of or a distributor for Purolator submitted claims for payment to the United States or the States, Affinia violated the FCA because a.) it was engaged in a long-running price-fixing conspiracy, contrary to its representations and certifications, and b.) the prices of its Filters were falsely inflated. If the United States or the States had been aware of this it would not have paid Affinia's false claims or paid the claims of subsidiaries of and distributors for Affinia.

**Evidence of Defendant Wix's False Claims**

216.    During the Time Period, Wix, which is wholly-owned by Affinia Group's Affinia Global Filtration, sold Filters to the United States and the States both directly and through subsidiaries and distributors.

217.    Wix was registered with the United States through the CCR systems during the Time Period, had a Cage Code, and regularly certified to the United States that its prices were independent. Wix also regularly made similar certifications to the States, either explicitly or implicitly.

218.    Wix made false claims for payment, caused others to make false claims for payment, and conspired to violate the FCA and parallel laws of the States. The States and the United States paid for Wix Filters in reliance on Wix's false certifications and false claims.

219.    As noted under Contract No. SPM7MX-07-D-9005, Facet USA agreed to provide the United States with Filters.

220.     Most if not all of the Filters that Facet USA provided to the United States were manufactured by Defendants Cummins, Wix, Baldwin, Champion, and ArvinMeritor.   Thus, United States purchased Wix Filters during the Time Period.

221.     The United States also entered contracts for Filters with Northeast Filter & Equipment Co. ("Northeast").   Northeast is a supplier and distributor of, among others, Wix brand Filters.   During the Time Period, the United States entered the following contracts with Northeast.

| Defendant/Company | Product | Total Value | Date | Contracting Agency/ Issuing Agency |
|---|---|---|---|---|
| Northeast | Engine, air, and oil filters, non-aircraft | $15,516.00 | Dec. 10, 2009 | Defense Logistics Agency |
| | Engine, air, and oil filters, non-aircraft | $8,195.00 | Aug. 23, 2009 | Defense Logistics Agency |
| Northeast | Engine, air, and oil filters, non-aircraft | $6,603.00 | Nov. 20, 2008 | Defense Logistics Agency |
| Northeast | Filters | Unknown | July 5, 2005 | Defense Supply Center Columbus |

222.     Under the foregoing contracts, Northeast supplied Wix filters to the United States. Moreover, Tables 1 and 2 above, also show that the United States purchased Wix Filters during the Time Period.

223.     In addition to these claims, Wix, based on information and belief, sold its Flam filters to the United States through the General Services Administration.   The General Services Administration (GSA) supplies products and communications for U.S. government offices.   In its GSA catalogues distributed to governmental agencies to order supplies from that are paid for by the United States, Wix filters are specifically listed as product to be purchased for government vehicles.

224.    Each time the United States awarded Wix a contract, Wix delivered the Filters and received payment, i.e., made a claim to a governmental entity.  Wix made many claims for payment to the United States and the States in addition to those claims listed above, and Wix conspired with the other Defendants to violate the FCA.

225.    Each time Wix made a claim for payment under any Filters contract, it violated the FCA because: a.) it was engaged in a long-running price-fixing conspiracy, contrary to its representations and certifications, and b.) the prices of its Filters were falsely inflated.

226.    Similarly, each time a subsidiary of or a distributor for Wix submitted claims for payment to the United States or the States, Wix violated the FCA because: a.) it was engaged in a long-running price-fixing conspiracy, contrary to its representations and certifications, and b.) the prices of its Filters were falsely inflated.  If the United States or the States had been aware of this it would not have paid Wix's false claims or paid the claims of subsidiaries of and distributors for Wix.

**Evidence of Defendant Cummins's False Claims**

227.    During the Time Period, Cummins sold Filters to the United States and the States both directly and through subsidiaries and distributors.

228.    Cummins's primary contact for government related business is Russ Wong. Cummins was registered with the United States through the CCR systems during the Time Period, had a Cage Code, and regularly certified to the United States that its prices were independent. Cummins also regularly made similar certifications to the States, either explicitly or implicitly.

229.    Cummins made false claims for payment, caused others to make false claims for payment, and conspired to violate the FCA and parallel laws of the States.  The States and the

United States paid for Cummins Filters in reliance on Cummins's false certifications and false claims.

230.     As noted under Contract No. SPM7MX-07-D-9005, Facet USA agreed to provide the United States with Filters.

231.     Most if not all of the Filters that Facet USA provided to the United States were manufactured by Defendants Cummins, Wix, Baldwin, Champion, and ArvinMeritor.   Thus, United States purchased Cummins Filters during the Time Period.

232.     Moreover, the following is one example of a contract between Cummins and the United States during the Time Period:

| Defendant/Company | Product | Total Value | Date | Agency |
|---|---|---|---|---|
| Cummins NPower LLC, the exclusive distributor for Cummins | Engine, air, and oil filters, and cleaners, non-aircraft | $36,925.00 | Dec. 30, 2008 | Dept. of Defense |

233.     Under this and other contracts, the United States purchased Cummins Filters.

234.     Each time the United States awarded Cummins a contract, Cummins delivered the Filters and received payment, i.e., made a claim to a governmental entity.

235.     Cummins made many claims for payment to the United States and the States in addition to those claims listed above, and Cummins conspired with the other Defendants to violate the FCA.  Each time Cummins made a claim for payment under any Filters contract, it violated the FCA because: a). it was engaged in a long-running price-fixing conspiracy, contrary to its representations and certifications, and b: the prices of its Filters were falsely inflated.

236.     Similarly, each time a subsidiary of or a distributor for Cummins submitted claims for payment to the United States or the States, Cummins violated the FCA because: a). it was engaged in a long-running price-fixing conspiracy, contrary to its representations and certifications, and b). the prices of its Filters were falsely inflated.  If the United States or the

48

States had been aware of this it would not have paid Cummins's false claims or paid the claims of subsidiaries of and distributors for Cummins.

### Evidence of Defendant Baldwin's False Claims

237. During the Time Period, Baldwin sold Filters to the United States and the States both directly and through subsidiaries and distributors.

238. Baldwin was registered with the United States through the CCR systems during the Time Period, had a Cage Code, and regularly certified to the United States that its prices were independent. Baldwin also regularly made similar certifications to the States, either explicitly or implicitly.

239. Baldwin made false claims for payment, caused others to make false claims for payment, and conspired to violate the FCA and parallel laws of the States. The States and the United States paid for Baldwin Filters in reliance on Baldwin's false certifications and false claims.

240. As noted under Contract No. SPM7MX-07-D-9005, Facet USA agreed to provide the United States with Filters. Most if not all of the Filters that Facet USA provided to the United States were manufactured by Defendants Cummins, Wix, Baldwin, Champion, and ArvinMeritor. Thus, United States purchased Baldwin Filters during the Time Period.

241. Moreover, the following is one example of a contract the United States entered with Baldwin during the Time Period. On or about September 30, 2008, the United States entered a year-long contract with Jasmin Defense Depot ("Jasmin") to provide Filters.

242. The United States extend this contract through the year 2010. The United States specified that certain of its Filters requirements were only to be satisfied by Baldwin Filters. Thus, as part of the contract, the United States required Jasmin to provide proof that it was an

authorized dealer for Filters manufactured by Baldwin and that it was providing Baldwin Filters to the United States.

243.    To fulfill this requirement, Jasmin a fax from Diesel Equipment Inc., indicating that it was in fact an authorized Baldwin dealer, as well as a letter from Baldwin to Diesel evidencing a strategic sales relationship between the companies.

244.    The United States accepted this chain of letters and entered the contract. Ultimately, Jasmin supplied Baldwin Filters to the United States as requested and made claims for payment to the United States.

245.    These claims for payment were false as a result of Baldwin's participation in the antitrust conspiracy.

246.    First, the United States chose Baldwin based on its knowledge that it was an approved manufacturer that had registered with the United States and signed the annual ORCA representations, i.e. represented that it was not colluding to fix prices.  Had Baldwin not fulfilled its annual ORCA obligations, the United States would not have sought to purchase Baldwin Filters.  Thus, Baldwin made a false certification in support of a claim for payment.

247.    Second, the Baldwin's prices for Filters under the contract were inflated and false. Baldwin submitted its false and inflated prices to Diesel Equipment Inc. and then Jasmin, who in turn submitted the false prices to the United States for payment.

248.    Each time the United States awarded Baldwin a contract, Baldwin delivered the Filters and received payment, i.e., made a claim to a governmental entity.

249.    Baldwin made many claims for payment to the United States and the States in addition to those claims listed above, and Baldwin conspired with the other Defendants to violate the FCA.

250.    Each time Baldwin made a claim for payment under any Filters contract, it violated the FCA because: a.) it was engaged in a long-running price-fixing conspiracy, contrary to its representations and certifications, and b.) the prices of its Filters were falsely inflated.

251.    Similarly, each time a subsidiary of or a distributor for Baldwin submitted claims for payment to the United States or the States, Baldwin violated the FCA because: a.) it was engaged in a long-running price-fixing conspiracy, contrary to its representations and certifications, and b.) the prices of its Filters were falsely inflated.  If the United States or the States had been aware of this it would not have paid Baldwin's false claims or paid the claims of subsidiaries of and distributors for Baldwin.

### Additional False State Claims and Statements in Support of Claims

252.    Besides Illinois, which as alleged above, purchased Fram Filters manufactured by Honeywell during the Time Period, other states have also purchased Defendants' Filters during the Time Period.

The State of California entered a contract (contract number 1-04-29-02) with American Transit Supply ("ATS") to provide, among other things, Filters.  The contract was effective between December 1, 2004 and November 30, 2009.  (Prior to the entry of this contract, California entered similar contracts to purchase Defendants' Filters.)  The terms of the California contract specified which brand of Filters the state would accept.  The list included among others: Fram (manufactured by Honeywell); Luber-finer (manufactured by Champion); Baldwin (manufactured by Baldwin); Fleetguard (a Cummins product); Mighty and Purolator (manufactured by Purolator); and Wix, Carquest, Napa, and Big A (all manufactured by Wix). Under the foregoing contract, Defendants provided Filters to California through ATS.  ATS submitted claims to California for payment, and California paid those claims. Each time this

happened, Defendants had caused ATS to submit a false claim to California, because of the price-fixing conspiracy.

253.    The State of Florida has filed a complaint alleging that during the Time Period it purchased Filters from Defendants through various distributors.

254.    Suffolk County in New York State has filed a complaint with similar allegations. Suffolk County alleges that it purchased Filters indirectly from Wix, Donaldson, Honeywell, and Baldwin, apparently through distributors. From 2002 until the present, Suffolk County purchased 207 Wix Filters, 119 Donaldson Filters, and 15 Baldwin Filters.  Suffolk County paid $9,025.21 for these Filters.  Additionally, Suffolk County purchased approximately $63,000 of Fram filters (manufactured by Defendant Honeywell) during the Time Period.

255.    The State of New Hampshire entered a contract with Wix for Filters (contract number 8000056).  The contract became effective in July 2009 and lasts until 2014.  Each time New Hampshire submits an order, Wix delivers the Filters and submits an invoice.  As explained above, all of these invoices were false as a result of the price-fixing conspiracy.

## COUNT ONE
### (False Claims Act 31 U.S.C. § 3729(a)(1))
### (Against All Defendants)

256.    Plaintiff realleges and incorporates by reference all paragraphs set forth herein.

257.    As result of price-fixing conspiracy described herein, Defendants knowingly, or acting with deliberate ignorance or reckless disregard, presented or caused to be presented to the United States false of fraudulent claims for approval in violation of the FCA.

258.    Because of these acts the United States has suffered damages.

## COUNT TWO
### (False Claims Act 31 U.S.C. § 3729(a)(2))
### (Against All Defendants)

259.    Plaintiff realleges and incorporates by reference all paragraphs set forth herein.

260. As a result of the price-fixing conspiracy described herein, Defendants knowingly, or acting with deliberate ignorance or reckless disregard, made, used, or caused to be made or used, a false record or false statement to get a false or fraudulent claim paid or approved by the United States in violation of the FCA.

261. Because of these acts, the United States has suffered damages.

## COUNT THREE
### (False Claims Act 31 U.S.C. § 3729(a)(3))
### (Against All Defendants)

262. Plaintiff realleges and incorporates by reference all paragraphs set forth herein.

263. As a result of the price-fixing conspiracy, Defendants conspired to defraud the United States by getting a false or fraudulent claim allowed or paid in violation of the FCA.

264. Because of these acts, the United States has suffered damages.

## COUNT FIVE
### (Common Law Fraud)
### (Against All Defendants)

265. Plaintiff realleges and incorporates by reference all paragraphs set forth herein.

266. The false records or statements made by defendants, as described above, misrepresented and concealed material facts.

267. Defendants knowingly, and/or in reckless disregard of the truth, misrepresented and concealed material facts.

268. Defendants made these misrepresentations of material fact, or failed to disclose material facts, intending that the United States and the States would rely on their accuracy in purchasing Defendants Filters and approving and paying claims associated therewith.

269. The United States and the States justifiably relied on Defendants' false and misleading representations in evaluating claims associated with payment for Defendants' Filters.

270. Defendants defrauded the United States and the States.

271.    Defendants have caused the United States and the States to suffer damages.

## COUNT SIX
### (Unjust Enrichment)
### (Against All Defendants)

272.    Plaintiff realleges and incorporates by reference all paragraphs set forth herein.

273.    The United States and the States paid Defendants monies to which Defendants were not entitled.

274.    By reason of these payments, Defendants have been unjustly enriched at the expense of the United States and the States.

275.    The United States and the States are entitled to the amount of the Defendants' unjust enrichment as damages.

## COUNT SEVEN
### Payment Under Mistake of Fact
### (Against All Defendants)

276.    Plaintiff realleges and incorporates by reference all paragraphs set forth herein.

277.    The United States and the States paid or approved the claims submitted by Defendants under the erroneous belief that the statements Defendants made in their claims at issue were truthful.

278.    The United States and the States erroneous beliefs were material to the amount of money the United State and the States paid for Defendants' claims.

279.    Because of these mistakes of fact, Defendants received money to which they were not entitled.

280.    By reason of the overpayment described above, the United States and the States are entitled to damages in the amount of overpayment.

## COUNT EIGHT
### California False Claims Act
### Cal. Gov. Code §12651(a)(1), (2) and (3)

281.    Plaintiff realleges and incorporates by reference all paragraphs set forth herein.

282.    This is a claim for treble damages and penalties under the California False Claims Act.

283.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of California for payment or approval.

284.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the State of California, the state government, and its agencies, to approve and pay such false and fraudulent claims.

285.    By virtue of the acts described above, Defendants knowingly conspired to violate the California False Claims Act.

286.    The State of California, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal price-fixing and false statements made in submitting Filter bids to the State.

287.    By reason of the Defendants' acts, the State of California has been damaged, and continues to be damages, in substantial amount to be determined at trial.

288.    The State of California is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, records or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT NINE
### Delaware False Claims And Reporting Act
### 6 Del. Ann. tit. §1201(a)(1), (2) and (3)

289.     Plaintiff realleges and incorporates by reference all paragraphs set forth herein.

290.     This is a claim for treble damages and penalties under the Delaware False Claims and Reporting Act.

291.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

292.     By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used, false records and statements, and omitted material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

293.     By virtue of the acts described above, Defendants knowingly conspired to violate the Delaware False Claims Act.

294.     The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal practices.

295.     By reason of the Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

296.     The State of Delaware is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT TEN**
**District of Columbia**
**District of Columbia False Claims Act**
**D.C. Code §2-308.14(a)(1), (2), and (3)**
**(formerly D.C. Code Ann. §1-1188.14(a))**

297.     Plaintiff realleges and incorporates by reference all paragraphs set forth herein.

298.    This is a claim for treble damages and penalties under the District of Columbia False Act.

299.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

300.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the District of Columbia Government to approve and pay such false and fraudulent claims.

301.    By virtue of the acts described above, Defendants knowingly conspired to violate the District of Columbia False Claims Act.

302.    The District of Columbia Government, unaware of the falsity of the records, statement and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal practices.

303.    By reason of defendants' acts, the District of Columbia has been damaged and continues to be damaged in substantial amount to be determined at trial.

304.    The District of Columbia is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, records or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT ELEVEN**
**Florida False Claims Act**
**Fla. Stat. § 68.082(2)(a), (b), and (c)**

305.    Plaintiff realleges and incorporates by reference all paragraphs set forth herein.

306.    This is a claim for treble damages and penalties under the Florida False Claims Act.

307.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Florida for payment or approval.

308.    By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used, false records and statements, and omitted material facts, to induce the State of Florida, the state government and its agencies, to approve and pay such false and fraudulent claims.

309.    By virtue of the acts described above, Defendants knowingly conspired to violate the Florida False Claims Act.

310.    The State of Florida, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal price-fixing, bid-rigging, and false statements made in submitting Filter bids to the State.

311.    By reason of the Defendants' acts, the State of Florida has been damaged, and continues to be damages, in substantial amount to be determined at trial.

312.    The State of Florida is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, records or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT TWELVE**
**Hawaii False Claims Act**
**Haw. Rev. Stat. § 661-21(a)(1), (2), and (3)**

313.    Plaintiff realleges and incorporates by reference all paragraphs set forth herein.

314.    This is a claim for treble damages and penalties under the Hawaii False Claims Act.

315. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

316. By virtue of the acts described above, Defendants knowingly made, used, or cause to be made or used, false records and statements, and omitted material facts, to induce the Hawaii State Government to approve and pay such false and fraudulent claims.

317. By virtue of the acts described above, Defendants knowingly conspired to violate the Hawaii False Claims Act.

318. The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for defendants' illegal practices.

319. By reason of the Defendants' acts, the State of Hawaii has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

320. The State of Hawaii is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, records or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT THIRTEEN**
**Illinois False Claims Act**
**740 Ill. Comp. Stat. §175/1(a)(1)(A), (B), and (C)**

321. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

322. This is a claim for treble damages and penalties under the Illinois False Claims Act.

323. By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Illinois for payment or approval.

324.     By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used, false records and statements, and omitted material facts, to induce the State of Illinois, the state government and its agencies, to approve and pay such false and fraudulent claims.

325.     By virtue of the acts described above, Defendants knowingly conspired to violate the Illinois False Claims Act.

326.     The State of Illinois, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal price-fixing and false statements made in submitting Filter bids to the State.

327.     By reason of the Defendants' acts, the State of Illinois has been damaged, and continues to be damages, in substantial amount to be determined at trial.

328.     The State of Illinois is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, records or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT FOURTEEN
### Indiana False Claims Act
### Ind. Code § 5-11-5.5-2(b)(1), (2), and (7)

329.     Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

330.     This is a claim for treble damages and penalties under the Indiana False Claims Act.

331.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Indiana for payment or approval.

332.     By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used, false records and statements, and omitted material facts, to induce the

State of Indiana, the state government and its agencies, to approve and pay such false and fraudulent claims.

333.    By virtue of the acts described above, Defendants knowingly conspired to violate the Indiana False Claims Act.

334.    The State of Indiana, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal price-fixing and false statements made in submitting Filter bids to the State.

335.    By reason of the Defendants' acts, the State of Indiana has been damaged, and continues to be damages, in substantial amount to be determined at trial.

336.    The State of Indiana is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, records or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT FIFTEEN**
**Massachusetts False Claims Law**
**Mass. Gen Laws ch. 12 § 5B(1), (2), and (3)**

337.    Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

338.    This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

339.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts State Government for payment or approval.

340.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Massachusetts State Government to approve and pay such false and fraudulent claims.

341.    By virtue of the acts described above, Defendants knowingly conspired to violate the Massachusetts False Claims Act.

342.    The Massachusetts State Government, unaware of the falsity of the records, statement and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal practices.

343.    By reason of defendants' acts, the State of Massachusetts has been damages and continues to be damaged in substantial amount to be determined at trial.

344.    The State of Massachusetts is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, records or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT SIXTEEN**
**Minnesota False Claims Act**
**Minn. Stat. § 15C.02(a)(1), (2), and (3)**

345.    Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

346.    This is a claim for treble damages and penalties under the Minnesota False Claims Act.

347.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Minnesota State Government for payment or approval.

348.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Minnesota State Government to approve and pay such false and fraudulent claims.

349.    By virtue of the acts described above, Defendants knowingly conspired to violate the Minnesota False Claims Act.

350.    The Minnesota State Government, unaware of the falsity of the records, statement and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal practices.

351.    By reason of defendants' acts, the State of Minnesota has been damages and continues to be damaged in substantial amount to be determined at trial.

352.    The State of Minnesota is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, records or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT SEVENTEEN**
**Montana False Claims Act**
**Mont. Code Ann. § 17-8-403(1)(a), (b), and (c)**

353.    Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

354.    This is a claim for treble damages and penalties under the Montana False Claims Act.

355.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Montana State Government for payment or approval.

356.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Montana State Government to approve and pay such false and fraudulent claims.

357.    By virtue of the acts described above, Defendants knowingly conspired to violate the Montana False Claims Act.

358.    The Montana State Government, unaware of the falsity of the records, statement and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal practices.

359.     By reason of defendants' acts, the State of Montana has been damages and continues to be damaged in substantial amount to be determined at trial.

360.     The State of Montana is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, records or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT EIGHTEEN
### Nevada False Claims Act
### Nev. Rev. Stat. Ann. § 357.040(1) (a), (b), and (c)

361.     Plaintiff realleges and incorporates by reference the allegations all paragraphs contained herein.

362.     This is a claim for treble damages and penalties under the Nevada False Claims Law.

363.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

364.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

365.     By virtue of the acts described above, Defendants knowingly conspired to violate the Nevada False Claims Act.

366.     The Nevada State Government, unaware of the falsity of the records, statement and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal practices.

367.     By reason of defendants' acts, the State of Nevada has been damages and continues to be damaged in substantial amount to be determined at trial.

368.     The State of Nevada is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, records or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT NINETEEN
### New Hampshire False Claims Act
### N.H. Rev. Stat. Ann. § 167:61-a, *et seq.*

369.     Plaintiff realleges and incorporates by reference the allegations all paragraphs contained herein.

370.     This is a claim for treble damages and penalties under the New Hampshire False Claims Law.

371.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Hampshire State Government for payment or approval.

372.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the New Hampshire State Government to approve and pay such false and fraudulent claims.

373.     By virtue of the acts described above, Defendants knowingly conspired to violate the New Hampshire False Claims Act.

374.     The New Hampshire State Government, unaware of the falsity of the records, statement and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal practices.

375.     By reason of defendants' acts, the State of New Hampshire has been damages and continues to be damaged in substantial amount to be determined at trial.

376.    The State of New Hampshire is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, records or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWENTY
### New Jersey False Claims Act
### N.J. Stat. Ann. § 2A:32C-3(a), (b), and (c)

377.    Plaintiff realleges and incorporates by reference all paragraphs set forth herein.

378.    This is a claim for treble damages and penalties under the New Jersey False Claims Act.

379.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of New Jersey for payment or approval.

380.    By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used, false records and statements, and omitted material facts, to induce the State of New Jersey, the state government and its agencies, to approve and pay such false and fraudulent claims.

381.    By virtue of the acts described above, Defendants knowingly conspired to violate the New Jersey False Claims Act.

382.    The State of New Jersey unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal price-fixing, bid-rigging, and false statements made in submitting filter bids to the State.

383.    By reason of the Defendants' acts, the State of New Jersey has been damaged, and continues to be damages, in substantial amount to be determined at trial.

384.    The State of New Jersey is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, records or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWENTY ONE
### New Mexico Fraud Against Taxpayers Act
### N.M. Stat. § 44-9-3(A)(1), (2), and (3)

385.    Plaintiff realleges and incorporates by reference all paragraphs set forth herein.

386.    This is a claim for treble damages and penalties under the New Mexico Fraud Against Taxpayer's Act.

387.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of New Mexico for payment or approval.

388.    By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used, false records and statements, and omitted material facts, to induce the State of New Mexico, the state government and its agencies, to approve and pay such false and fraudulent claims.

389.    By virtue of the acts described above, Defendants knowingly conspired to violate the New Mexico Fraud Against Taxpayer's Act.

390.    The State of New Mexico unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal price-fixing and false statements made in submitting filter bids to the State.

391.    By reason of the Defendants' acts, the State of New Mexico has been damaged, and continues to be damages, in substantial amount to be determined at trial. The State of New Mexico is entitled to the maximum penalty of $10,000 for each and every false or fraudulent

claim, records or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWENTY TWO
### New York False Claims Act
### N.Y. Finance Law § 189(1)(a), (b), and (c)

392.     Plaintiff realleges and incorporates by reference all paragraphs set forth herein.

393.     This is a claim for treble damages and penalties under the New York False Claims Act and includes claims presented to officers, employees or agents of state and local governments under § 188(1)(i), including but not limited to officers, employees or agents of Suffolk County and the City of New York.

394.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of New York for payment or approval.

395.     By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the State of New York, the state government and its agencies, to approve and pay such false and fraudulent claims.

396.     By virtue of the acts described above, Defendants knowingly conspired to violate the New York False Claims Act.

397.     The State of New York, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal price-fixing and false statements made in submitting Filter bids to the State.

398.     By reason of the Defendants' acts, the State of New York has been damaged, and continues to be damages, in substantial amount to be determined at trial.

399.     The State of New York is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, records or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNTY TWENTY THREE**
**The North Carolina False Claims Act**
**N.C. Gen. Stat. § 1-607(a)(1), (2), and (3)**

400.     Plaintiff realleges and incorporates by reference all paragraphs set forth herein.

401.     This is a claim for treble damages and penalties under the North Carolina False Claims Act.

402.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of North Carolina for payment or approval.

403.     By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used, false records and statements, and omitted material facts, to induce the State of North Carolina, the state government and its agencies, to approve and pay such false and fraudulent claims.

404.     By virtue of the acts described above, Defendants knowingly conspired to violate the North Carolina False Claims Act.

405.     The State of North Carolina, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal price-fixing and false statements made in submitting filter bids to the State.

406.     By reason of the Defendants' acts, the State of North Carolina has been damaged, and continues to be damages, in substantial amount to be determined at trial.

407. The State of North Carolina is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, records or statement made, used, presented or caused to be made, used or presented by Defendants.

### COUNT TWENTY FOUR
### the Oklahoma False Claims Act
### Okla. Stat. tit. 63 § 505.1 B., 1, 2, and 3

408. Plaintiff realleges and incorporates by reference all paragraphs set forth herein.

409. This is a claim for treble damages and penalties under the Oklahoma False Claims Act.

410. By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Oklahoma for payment or approval.

411. By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used, false records and statements, and omitted material facts, to induce the State of Oklahoma, the state government and its agencies, to approve and pay such false and fraudulent claims.

412. By virtue of the acts described above, Defendants knowingly conspired to violate the Oklahoma False Claims Act.

413. The State of Oklahoma, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal price-fixing and false statements made in submitting filter bids to the State.

414. By reason of the Defendants' acts, the State of Oklahoma has been damaged, and continues to be damages, in substantial amount to be determined at trial.

415.    The State of Oklahoma is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, records or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWENTY FIVE
### the Rhode Island False Claims Act
### R.I. Gen. Laws § 9-1.1-3(a)(1), (2), and (3)

416.    Plaintiff realleges and incorporates by reference all paragraphs set forth herein.

417.    This is a claim for treble damages and penalties under the Rhode Island False Claims Act.

418.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Rhode Island for payment or approval.

419.    By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used, false records and statements, and omitted material facts, to induce the State of Rhode Island, the state government and its agencies, to approve and pay such false and fraudulent claims.

420.    By virtue of the acts described above, Defendants knowingly conspired to violate the Rhode Island False Claims Act.

421.    The State of Rhode Island, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal price-fixing and false statements made in submitting filter bids to the State.

422.    By reason of the Defendants' acts, the State of Rhode Island has been damaged, and continues to be damages, in substantial amount to be determined at trial.

423. The State of Rhode Island is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, records or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT TWENTY SIX**
**the Tennessee False Claims Act**
**Tenn. Code Ann. § 4-18-103(a)(1), (2), and (3)**

424. Plaintiff realleges and incorporates by reference all paragraphs set forth herein.

425. This is a claim for treble damages and penalties under the Tennesse False Claims Act.

426. By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Tennessee for payment or approval.

427. By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used, false records and statements, and omitted material facts, to induce the State of Tennessee, the state government and its agencies, to approve and pay such false and fraudulent claims.

428. By virtue of the acts described above, Defendants knowingly conspired to violate the Tennessee False Claims Act.

429. The State of Tennessee, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal price-fixing and false statements made in submitting Filter bids to the State.

430. By reason of the Defendants' acts, the State of Tennessee has been damaged, and continues to be damages, in substantial amount to be determined at trial.

431.     The State of Tennessee is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, records or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWENTY SEVEN
### Virginia Fraud Against Taxpayers Act
### Va. Code Ann. §8.01-216.3(a)(1), (2), and (3)

432.     Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

433.     This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

434.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Virginia State Government for payment or approval.

435.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Virginia State Government to approve and pay such false and fraudulent claims.

436.     By virtue of the acts described above, Defendants knowingly conspired to violate the Virginia False Claims Act.

437.     The Virginia State Government, unaware of the falsity of the records, statement and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal practices.

438.     By reason of defendants' acts, the State of Virginia has been damages and continues to be damaged in substantial amount to be determined at trial.

439.     The State of Virginia is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, records or statement made, used, presented or caused to be made, used or presented by Defendants.

## PRAYER

**WHEREFORE, RELATOR DEMANDS JUDGMENT AGAINS DEFENDANT AS FOLLOWS:**

A.      Judgment against Defendants rescinding all contracts for Filters between the Defendants and the United States, and the States, during the Time Period;

B.      Judgment against Defendants for treble the damages sustained by the United States, plus civil monetary penalties of $5,500 to $11,000 for each false claim and each statement or record in support of a false claim;

C.      Judgment against Defendants for the damages sustained by both the United States and the States;

D.      Judgment against Defendants for treble the damages sustained by the State of California because of Defendants' conduct, plus a civil monetary penalties of $5000 to $10,000 for each violation of Cal. Gov. Code §12651(a)(1), (2), and (3).

E.      Judgment against Defendants for treble the damages sustained by the State of Delaware because of Defendants' conduct, plus civil monetary penalties of $5,500 to $11,000 for each violation of 6 Del. Code Ann. tit. § 1201(a)(1), (2), and (3).

F.      Judgment against Defendants for treble the damages sustained by the District of Columbia because of Defendants' conduct, plus civil monetary penalties of $5000 to $10,000 for each violation of D.C. Code § 2-308.14(a)(1), (2), and (3).

G.      Judgment against Defendants for treble the damages sustained by the State of Florida because of Defendants' conduct, plus civil monetary penalties of $5,500 to $11,000 for each violation of Fla. Stat. § 68.082(2)(a), (b), and (c).

H.      Judgment against Defendants for treble the damages sustained by the State of Hawaii because of Defendants' conduct, plus civil monetary penalties of $5000 to $10,000 for each violation of Haw. Rev. Stat. § 661-21(a)(1), (2), and (3).

I.      Judgment against Defendants for treble the damages sustained by the State of Illinois because of Defendants' conduct, plus civil monetary penalties of $5,500 to $11,000 for each violation of 740 Ill. Comp. Stat. 175/3 § 3(a)(1)(A), (B), and (C).

J.      Judgment against Defendants for treble the damages sustained by the State of Indiana because of Defendants' conduct, plus civil monetary penalties of at least $5000 for each violation of Ind. Code § 5-11-5.5-2(b)(1), (2), and (3).

K.      Judgment against Defendants for treble the damages sustained by the State of Massachusetts because of Defendants' conduct, plus civil monetary penalties of $5000 to $10,000 for each violation of Mass. Gen. Laws ch. 12 § 5B(1), (2), and (3).

L.      Judgment against Defendants for treble the damages sustained by the State of Minnesota because of Defendants' conduct, plus civil monetary penalties of $5,500 to $11,000 for each violation of Minn. Stat. 15C.02(a)(1), (2), and (3).

M.      Judgment against Defendants for treble the damages sustained by the State of Montana because of Defendants' conduct, plus civil monetary penalties of $5000 to $10,000 for each violation of Mont. Code Ann. § 17-8-403(1)(a), (b), and (c).

N.      Judgment against Defendants for treble the damages sustained by the State of Nevada because of Defendants' conduct, plus civil monetary penalties of $5000 to $10,000 for each violation of Nev. Rev. Stat. Ann. § 357.040(1)(a), (b), and (c).

O.      Judgment against Defendants for treble the damages sustained by the State of New Hampshire because of Defendants' conduct, plus civil monetary penalties of $5000 to $10,000 for each violation of N.H. Rev. Stat. Ann. § 167:61-a and § 167:61-b.

P.       Judgment against Defendants for treble the damages sustained by the State of New Jersey because of Defendants' conduct, plus civil monetary penalties of $5,500 to $11,000 for each violation of N.J. Stat. Ann. § 2A:32C-3(a), (b), and (c).

Q.       Judgment against Defendants for treble the damages sustained by the State of New Mexico because of Defendants' conduct, plus civil monetary penalties of $5,000 to $10,000 for each violation of N.M. Stat. § 44-9-3(A)(1), (2), and (3).

R.       Judgment against Defendants for treble the damages sustained by the State of New York because of Defendants' conduct, plus civil monetary penalties of $6,000 to $12,000 for each violation of N.Y. Finance Law § 189(1)(a), (b), and (c).

S.       Judgment against Defendants for treble the damages sustained by the State of North Carolina because of Defendants' conduct, plus civil monetary penalties of $5,500 to $11,000 for each violation of N.C. Gen. Stat. § 1-607(a)(1), (2), and (3).

T.       Judgment against Defendants for treble the damages sustained by the State of Oklahoma because of Defendants' conduct, plus civil monetary penalties of $5000 to $10,000 for each violation of Okla. Stat. tit. 63 § 5053.1 B., 1, 2, and 3.

U.       Judgment against Defendants for treble the damages sustained by the State of Rhode Island because of Defendants' conduct, plus civil monetary penalties of $5000 to $10,000 for each violation of R.I. Gen. Laws § 9.1.1-3(a)(1), (2), and (3).

V.       Judgment against Defendants for treble the damages sustained by the State of Tennessee because of Defendants' conduct, plus civil monetary penalties of $2,500 to $10,000 for each violation of Tenn. Code Ann. § 4-18-103(a)(1), (2), and (3).

W.       Judgment against Defendants for treble the damages sustained by the State of Virginia because of Defendants' conduct, plus civil monetary penalties of $5,500 to $11,000 for each violation of Va. Code Ann. § 8.01-216.3(a), (1), (2), and (3).

X.       For costs, attorneys' fees, and other relief as may be just and proper;

K.       For a ten percent (10%) surcharge in the amount of the debt owed pursuant to 28

U.S.C. § 3011.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues triable by

jury.

Dated: November 24, 2010                          MOTLEY RICE LLP

/s/ Mark I. Labaton
Mark I. Labaton
1100 Glendon Ave.
Los Angeles CA  90024
Tele:  310-500-3488
Fax:   310-824-2870
mlabaton@motleyrice.com

Lance V. Oliver
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29466
Tele: 843-216-9000
Fax:  843-216-9450
loliver@motleyrice.com

G. Steven Stidham
SNEED LANG HERROLD
1700 Williams Center Tower I
One West Third Street
Tulsa, Oklahoma 74103-3522
Tele:  918-583-3145
Fax:   918-582-0410
gstidham@sneedlangherrold.com

**Attorneys for the Plaintiff/Relator**