**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **IN RE: AFTERMARKET FILTERS ANTITRUST LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:**<br>**ALL ACTIONS** | **Master Docket No. 1:08-cv-4883**<br><br>**MDL No. 1957**<br><br>Honorable Robert W. Gettleman<br>Magistrate Geraldine Soat Brown |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' SUPPOSED
BURCH-FREE CASE**

Defendants respectfully respond to plaintiffs' recitation of their conspiracy case based on non-Burch materials as follows. For the reasons set forth below, defendants request that plaintiffs re-plead their case based solely on the evidence on which they now rely.

**INTRODUCTION**

Plaintiffs' complaints allege a 10-year, industry-wide conspiracy that involves all 7 defendants based upon the first hand knowledge of William G. Burch.[1] This Court denied defendants' motion to dismiss those complaints, holding that they allege "an actual agreement initiated by specified persons, witnessed in its inception and on several later occasions by an actual participant in the price fixing scheme." (Order Nov. 5, 2009 at 7., Dkt. #304.) As a result of that decision, plaintiffs obtained access to millions of pages of defendants' documents, access that they never would have had if they had not satisfied this Court that their complaint states a claim because they had a witness who would support their conspiracy allegations.

After defendants informed this Court of Burch's guilty plea and had moved to exclude Burch's testimony and tapes from this case, this Court directed plaintiffs "to describe the other

---

[1] *See, e.g.*, Direct Purchaser Pls. Consol. Amd. Compl. ¶ 2 (Dkt. #150) ("CAC"); Gasoline Retailers' Consol. 2d Amd. Compl. ¶ 46 (Dkt. #410); Indirect Purchaser Pls. 4th Consol. Amd Compl. ¶ 2 (Dkt. #746); Pl. State of Florida's Compl. ¶ 2 (No. 1:09-cv-02321, Dkt. #1).

independent evidence that [they] have beyond the Burch evidence." (8/23/11 Hrg. Tr. 7:12.) But, plaintiffs have not done so.  Instead, they simply recite Burch's story without quoting him and cite documents that, they claim, support that story.  Not only does their presentation fail to establish unlawful conduct, but it also does not describe a "Burch-free" case.

For example, plaintiffs maintain (because Burch does) that, at a February 26, 2004 internal sales meeting at Champion, John Evans "devised" and "put into action" a "plan" to ensure that Purolator, Wix and Fram would follow Champion's price increase by contacting competitors before it publicly announced a price increase.  (Pls. Opp. at 14.)  But plaintiffs do not cite a single document that supports that assertion.  Instead, they cite evidence that shows that, *after* Champion had announced its increase, it tried to find out whether its competitors were going to follow.  (*Id*.)  Similarly, plaintiffs assert (again, because it is part of Burch's story) that, although Fram did not attend a trade association meeting where they claim defendants agreed to fix prices, "Champion obtained [Fram's] assent to the plan" to raise prices in the Fall of 2004. (*Id*. at 19 n.28.)  *But they do not cite any evidence at all to support that statement*.

Plaintiffs continue to rely on Burch's fictional account because, without the connective tissue that his "testimony" provides, there is no evidence whatsoever that establishes that any of the defendants agreed to fix prices.  Not surprisingly, plaintiffs' allegations continue to paint Purolator and Champion—Burch's former employers who terminated him under circumstances that he believed were unfair—as the ringleaders of a price fixing conspiracy in 1999 and 2004. But the entirety of plaintiffs' Burch-free evidence shows only that:  (1) some of the defendants raised prices, and sought to determine whether their competitors would also do so; (2) some of the defendants worried whether they should raise price after hearing that their competitors might or had done so; and (3) some of the defendants attended trade association meetings proximate in

time to those events. Plaintiffs misleadingly describe, and in some cases flatly mischaracterize, a good deal of this "proof" to try to suggest inferences that the evidence itself does not support. But it is clear that *none* of their evidence constitutes an agreement among defendants to fix prices; rather, it shows only that defendants legitimately worked in a competitive market in which only a few firms sold a commodity-like product.[2] One could replace the word "filter" in plaintiffs' complaint with "potash," "fiberglass insulation," "fuel additives,"[3] or any other product that is sold in a similar market, and the story would look very similar to the story that plaintiffs lay out in their brief.[4]

Plaintiffs' case cannot proceed as a matter of law without evidence from which a jury can find that defendants had "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp*., 465 U.S. 752, 768 (1984). Without Burch, plaintiffs do not have that evidence. Clearly, in light of Burch's guilty plea for manufacturing evidence, and the evidence that he perjured himself in his deposition, destroyed documents, and intentionally doctored the tapes, plaintiffs do not have a good faith basis to continue to rely on Burch to support their claims.

Defendants respectfully request that plaintiffs re-plead their complaints based solely on the non-Burch evidence that this Court required them to put forward. If plaintiffs do re-plead,

---

[2] The filters industry has changed materially since 2004 with the emergence of many competitors from Asia and Mexico.

[3] *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028 (8th Cir. 2000) (en banc); *Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.*, 971 F.2d 37 (7th Cir. 1992); *E.I. Du Pont de Nemours & Co. v. FTC*, 729 F.2d 128 (2d Cir. 1984).

[4] The courts concluded in each case referenced in footnote 3 that the conduct that plaintiffs challenged was consistent with conduct in which firms in an oligopolistic market lawfully engage, and did not constitute evidence from which a jury can conclude that defendants violated the antitrust laws. *See also, e.g.*, *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122 (3d Cir. 1999); *In re Publication Paper Antitrust Litig.*, No. 04-1631, 2010 U.S. Dist. LEXIS 131931 (D. Conn. Dec. 14, 2010).

defendants submit that they will be entitled to judgment on the pleadings since plaintiffs' factual allegations do not state a claim that entitles them to relief.

## PLAINTIFFS' BURCH-FREE CASE

Far from the ten year industry-wide conspiracy that plaintiffs allege, the evidence that they describe involves four defendants and revolves around price increases in 1999, the Spring of 2004, the Fall of 2004 and early 2005. Plaintiffs do not identify any Burch-free evidence of any unlawful conduct between 2000 and 2003 or after 2005, and their Burch-free case does not include any evidence that any defendant engaged in any fraud to conceal the alleged conspiracy. *Compare* CAC ¶¶ 81-83. The following is a factual recitation of the evidence that plaintiffs cite, stripped of plaintiffs' fanciful characterizations and exaggeration:

**A.     1999**

Plaintiffs' evidence shows that, in March 1999 Fram announced a 9% price increase on oil filters relating to Fram's introduction of a new filter product. (Pls. Ex. 11.)[5] Many months later, Purolator announced an increase of 5-6% on all Purolator-branded filters, effective August 15, 1999. (Pls. Ex. 16.) Champion raised the price of filters that it sold to a single customer by 6% nearly a full year later.[6] (Pls. Ex. 17.)

Plaintiffs' evidence also shows that Purolator may have sent its price increase

---

[5] All references to Plaintiffs' Exhibits are to plaintiffs' exhibits to their brief in opposition to defendants' motions regarding Burch's tapes and testimony. (Dkt. #814.) Plaintiffs' Exhibit 11, which they cite as evidence that on March 1, 1999 Fram announced a 9% increase on oil filters, actually is a December 27, 1999 letter in which Fram announced a 9% price increase on air filters effective March 1, 2000. However, on March 1, 1999, Fram did, in fact, announce a 9% increase on a new filter product it introduced; defendants assume that plaintiffs' cited the wrong document.

[6] Although Wix announced a 1.9% price increase on April 30, 1999, that increase was expressly limited to *heavy duty* filters (Pls. Ex. 12), so it contributes nothing to plaintiffs' claim that defendants conspired to fix prices for *light duty* filters. *See, e.g.*, CAC ¶ 1 (defining "Filters" as "*light duty* … oil, air and fuel filters for sale in the aftermarket" (emphasis added)).

announcement to Fram in June 1999, months after Fram already raised prices.  (Pls. Exs. 4, 14,

16.)  Finally, Champion, Purolator and Wix employees attended trade association meetings in

1999, all after Fram had announced its price increase.[7]  (Pls. Ex. 5.)

### B.    Spring 2004

Plaintiffs' evidence regarding the Spring of 2004 shows that Champion began to consider

and internally discuss a price increase in response to rising steel costs in February 2004.  (*See*

Pls. Exs. 24, 28-29.)  Champion understood that a price increase could lead its customers to

switch suppliers, and for that reason, Champion's president wanted to determine if Champion's

competitors also intended to raise prices.  (*Id.*)  But plaintiffs do not cite any evidence that

anyone at Champion actually obtained information about whether competitors would follow

Champion's price increase, whether directly from competitors or from customers, until *after*

Champion announced its price increase on March 2, 2004.[8]  (Pls. Ex. 30.)  Plaintiffs also cite no

evidence that any defendant communicated with any other defendant about their pricing

intentions.

Instead, plaintiffs' evidence shows that, *after* Champion had already sent its price

increase letter to customers, Champion tried to find out whether its competitors would follow its

lead.  On March 9, 2004, Burch learned that Purolator did not intend to raise its prices.  (Pls. Ex.

31.)  On March 15, 2004, a Champion sales representative who was concerned about losing

business to the competition asked a sales representative from Wix whether Wix intended to raise

---

[7] Fram did not attend any Filter Manufacturers Council meetings in 1999.  (Pls. Ex. 5.)

[8] The only "information exchanges" that the plaintiffs identify show only that:  (a) Champion
conducted a due diligence meeting at Dana Corporation (Dana was then the company that owned
Wix), which involved a review of materials pertinent to Champion's interest in acquiring Wix
assets from Dana (Wix eventually was sold to the Wix management team); the internal
Champion due diligence memo records that "Wix can get price increases - or so they indicate"
(Pls. Ex. 23) and (b) Purolator shared with Champion a Purolator's customer's views regarding
surcharges versus percentage increases.  (Pls. Ex. 25.)

prices, and the Wix representative said that he was not aware of an increase. (Pls. Ex. 32.) And on March 17, 2004, a Champion sales representative requested that someone reach out to Purolator and Wix to find out whether either company intended to raise prices. (Pls. Ex. 33.) Plaintiffs do not cite any evidence that any Champion employee did so.

Plaintiffs' evidence does not show that Fram communicated with any competitor about this price increase. Their evidence as to Fram is that, after Champion announced an increase but before Purolator had announced its own, a Fram sales manager reported internally that both companies were "looking to move." (Pls. Ex. 34.)

Finally, plaintiffs' evidence shows that Champion may have told AutoZone that Purolator had sent a letter to its customers informing them that it was increasing prices.[9] (Pls. Ex. 38.)

What happened in the real world, as plaintiffs' evidence shows, is that Fram, Wix and Purolator all announced price increases of different amounts, *after* Champion announced its 4% increase on March 2, 2004: Fram announced a $.045 surcharge on oil filters on March 19th, and later replaced that surcharge on April 21st with a 3% price increase in response to documented customer complaints. (Pls. Exs. 35-36.) Wix then announced on April 22, 2004 a 4.55% weighted average price increase effective in early June 2004. (Pls. Ex. 40.) On April 1st, Purolator notified customers that it intended to raise prices by 4-6%. (Pls. Ex. 39.) Each of those price increases took place at a time when it is undisputed that steel costs were rising; and each announcement cited those steel costs as the reason for the respective increases.

## C.    Fall 2004

The evidence that plaintiffs cite that relates to price increases in the Fall 2004 tells a

---

[9] Plaintiffs' exhibit regarding Champion's meeting with AutoZone is ambiguous at best because the document was edited on April 6th, was attached to an email from the same date, after Purolator announced its increase, and the document lists competitive information that it has collected "to date." (Pls. Ex. 38.)

similar story.  It shows that Champion made a decision to take a second price increase to account for continued increases in steel costs, and it recognized that there was a risk in doing so if other companies did not follow.  (Pls. Ex. 42.)  Nevertheless, Champion decided to announce price increases in the Fall.  *After* Champion decided the amount and timing of its price increase, it discussed the topic of price increases with Purolator at an FMC meeting in late September.  (Pls. Ex. 46.)  Then, Champion raised prices to certain competitors to whom it sold filters under "co-manufacturing agreements" two weeks before Champion raised prices to its other customers. (Pls. Ex. 7-8 & 45.)  Plaintiffs complain that Champion did so to "send a message to the industry."  (Pls. Opp. at 19.)  Champion sent a price increase letter to all of its customers on October 18, 2004, and Fram followed.  (Pls. Ex. 8, 52.)  Wix increased its prices for filters that Wix supplied to Champion.  (Pls. Ex. 56.)  But plaintiffs' evidence does not show that Wix took any other light duty filter price increase for the balance of 2004 or through most of 2005[10] and Purolator did not raise its prices at all in the Fall of 2004.  As in the Spring of 2004, the remaining evidence that plaintiffs cite shows only that, after Champion announced its price increase, it tracked the market closely to determine whether other competitors would follow. (Pls. Exs. 53-55 & 57.)

Plaintiffs' evidence does not show any communications between Fram and any competitor regarding this price increase.  The evidence shows that Fram did not attend the FMC meeting and did not receive any co-manufacturing announcement of a price increase from any of the defendants.  (Pls. Exs. 5, 7.)

### D.    2005 Shell Price Increase

Plaintiffs' proof with respect to 2005 rests on a basic misunderstanding of the

---

[10] Wix raised prices on heavy duty filters in May 2005, but that has nothing to do with this case.

relationship among Shell, Purolator and Fram. Fram sold filters to Shell that Purolator manufactured. Plaintiffs' evidence shows that in February 2005, Fram sent a letter to Shell informing Shell that Fram intended to terminate its distribution arrangement with Shell. (Pls. Ex. 9.) Fram (Purolator's distributor) notified Purolator of this decision by forwarding its Shell letter to Purolator. Purolator then informed Shell that it had received Fram's letter and sought Shell's advice as to how to respond. (Pls. Ex. 60.)

Plaintiffs also cite an earlier (June 2004) communication between Purolator and Shell in which Shell rejected Purolator's request to raise prices (Pls. Ex. 58); and an internal Purolator email referencing Fram's decision to terminate its Shell agreement and quoting a Fram representative who supposedly said that there were unspecified "other economic issues" associated with the termination. (Pls. Ex. 10.) Plaintiffs' evidence demonstrates only ordinary and expected business communications in a third-party distributor arrangement.

## PLAINTIFFS' MISCHARACTERIZATION OF THE EVIDENCE

Because plaintiffs do not have a Burch-free case that actually shows an agreement to fix prices, they mischaracterize evidence to create the appearance of inferences supporting their case. Plaintiffs' brief is filled with examples of this, but a few are particularly egregious.

The "evidence" that plaintiffs cite to support their assertion that Fram was part of an agreement to raise prices in the Fall of 2004, because it "behaved as if it" had advanced word of other firms' pricing, illustrates the point. (Pls. Opp. at 20.) Plaintiffs refer to an internal Fram email that they characterize as a discussion of "how to prepare Fram to be ready to follow Champion on short notice." (*Id.* at 20-21.) But the actual email does not even mention Champion. There is no suggestion in the document that the "short notice" the employee would be given would come from a competitor—the conclusion plaintiffs leap to—rather than more

naturally as a result of Fram's internal decision-making. (Pls. Ex. 47.) Plaintiffs also misleadingly cite to communications in the Fall of 2004 between a Fram representative and a representative from Champion's parent company, UCI, suggesting that those discussions were about price-fixing. (Pls. Opp. at 21.) But the documents that they cite show that the discussions involved a *proposed trademark licensing agreement* that related to *spark plugs*, not filters. (Pls. Exs. 48-51.) Plaintiffs' reach to transform these utterly mundane facts into proof of a price-fixing conspiracy exposes the reality that the only "evidence" that they have ever had that Fram participated in a coordinated price increase in this, or any other, time period, other than Burch's allegations, was the pricing letter that Burch criminally altered to frame Fram's employees.

Similarly, plaintiffs' supposed proof that Purolator and Fram coordinated a price increase to Shell in 2005 fundamentally mischaracterizes the nature of the relationship among Shell, Fram and Purolator. Plaintiffs suggest that Fram and Purolator were strictly competitors vis-à-vis Shell and that there was something improper about Fram's communicating with Purolator about that relationship. (Pls. Opp. at 24.) But in 2005, Fram had an agreement with Shell to *distribute* filters manufactured by third-parties, including Purolator. As plaintiffs concede, this arrangement was undertaken with Shell's approval. (*Id.* at 23.) During that time, Purolator and Fram had a vertical supply relationship with respect to these Shell products, and they obviously communicated to service the Shell account. Plaintiffs' own evidence that Purolator *openly told Shell* that it had received notice from Fram undermines plaintiffs' suggestion that there was something surreptitious about Fram notifying Purolator that it would no longer distribute Purolator's products on behalf of Shell.[11] (Pls. Ex. 60.)

---

[11] Notably, plaintiffs appear to have abandoned the allegation—advanced by Burch and the State of Florida—that a 2003 e-bid for Shell was tainted by collusion, as there is simply no Burch-free evidence at all to support that claim. Instead, they invent this new 2005 conspiracy.

Plaintiffs also misleadingly cite evidence in support of an alleged coordinated price increase in 1999. They assert, for instance, that, as part of a plan that Purolator supposedly sponsored to ensure that "other filter manufacturers simultaneously raised prices," a Purolator employee faxed a price increase announcement to Fram in June 1999.[12] (Pls. Opp. at 7-8.) But that theory collides with the undisputed facts: by the time Purolator allegedly decided to send this announcement, *Fram had already announced to the market, in March 1999, that it was raising prices*. Plaintiffs also selectively stitch together quotes from the deposition testimony, from another case, of Purolator's then-employee, Larry Curtis to leave the misleading suggestion that Curtis acknowledged that he engaged in improper pricing discussions with a Fram employee in 1999. (*Id.* at 10.) Of course, the quote that plaintiffs omit is the most important one, in which Curtis flatly *rejected* the implication that plaintiffs try to draw: "[D]id I solicit [Fram's] Brad Hays to raise prices, *absolutely not*." (Pls. Ex. 4, 76:4-11 (emphasis added).)

## ARGUMENT

## I. PLAINTIFFS' BURCH-FREE FACTS ARE NOT EVIDENCE OF A CONSPIRACY TO FIX PRICES

### A. Consciously Parallel Conduct Does Not Violate The Sherman Act

Plaintiffs' evidence does not remotely show an *agreement*, a conscious commitment to a common scheme designed to achieve an unlawful objective. It only shows that defendants were afraid to raise price unless their competitors did, were unsure what their competitors' reactions would be if they did raise price, and tried to find out what those competitors did and were going to do by collecting information from the market. Their conduct was interdependent, reflecting the fact that "the profit-maximizing choice of price and output for one depends on the choices made by others." *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1299 (11th Cir.

---

[12] Plaintiffs cite no evidence that anyone at Fram ever actually received that announcement.

2003) (citations omitted). The practice of trying to find out what competitors are going to do, and following the lead of a competitor who raises price, is called "conscious parallelism," and it is not unlawful. *Id.* The Supreme Court held almost 60 years ago that consciously parallel conduct is not equivalent to conspiracy. *Theatre Enters., Inc v. Paramount Film Distrib. Corp.*, 346 U.S. 537 (1954).

In *Williamson Oil*, plaintiffs alleged that cigarette manufacturers had engaged in a 7-year conspiracy to fix wholesale prices. 346 F.3d at 1291. In support of their allegations, the plaintiffs identified eleven parallel price increases during that period. They also pointed to evidence that defendants had signaled their intentions to raise price by discussing them in the press, and closely monitored each other's sales and prices through the joint use of a third party service. *Id.* at 1305. The court observed that competitors in a concentrated market "realize that attempts to cut prices usually reduce revenue without increasing any firm's market share." *Id.* at 1299 (quotation and citation omitted). In contrast, "simple price leadership in such a market can readily increase all competitors' revenues." *Id.* In such a case, price increases are "in the interests of each manufacturer," and it makes sense that the industry's larger players should be the ones to lead. *Id.* at 1312. The court affirmed summary judgment for the defendants, and held that plaintiffs' evidence of price leadership, signaling, and potential interfirm communications did not permit a jury to infer conspiracy.

The Seventh Circuit reached a similar conclusion in *Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.*, 971 F.2d 37 (7th Cir. 1992). There, the court affirmed summary judgment for defendants on a complaint that alleged a horizontal conspiracy to fix the price of fiberglass insulation. The plaintiff claimed that a jury could infer such a conspiracy because, among other things, the defendants engaged in parallel pricing, and sometimes found out about a

competitor's pricing intentions from large customers. *Id.* at 52. The plaintiff also pointed to evidence of some direct communication between competitors, *id.* at 50 n.9; and that the defendants had sent advance notice of price increases to their customers to signal to the other defendants that they also should raise prices. *Id.* at 53. The court explained that in an oligopoly, there is a natural tendency for firms to lead or follow the market because a firm that charges prices higher than the industry leader "might lead a customer to buy elsewhere, while a lower-than-leader's price might simply lead competitors to match the lower price, reducing profits for all." *Id.* The evidence was thus not probative of conspiracy.

Likewise, in *In re Baby Food Antitrust Litigation*, the court concluded that the exchange of pricing information between sales staff before the defendants announced price increases was merely the "desultory collection of information 'on the street,'" and was "far removed from a concerted reciprocal exchange of important pricing and marketing information." 166 F.3d 112, 135 (3d Cir. 1999). Even information exchanges at the highest levels of an organization prior to a formal announcement to the market do not prove a price fixing conspiracy when the exchanges occur after the competitors have "independently decided" to implement the increase. *In re Publication Paper Antitrust Litig.*, 2010 U.S. Dist. LEXIS 131931, at *66.

These cases show that the threads of conduct that plaintiffs tried to knit together, based on Burch's script, do not entitle them to proceed with discovery in this case.

**B.     Plaintiffs' Burch-Free Evidence Shows Nothing More That Consciously Parallel Conduct**

Plaintiffs' "evidence" of the two price increases that some filters manufacturers took in 2004 shows precisely the sort of lawful, consciously parallel conduct that the courts held in *Williamson Oil*, *Reserve Supply* and *Baby Food* did not constitute evidence from which a jury

could infer conspiracy.[13]  The evidence shows that Champion was worried about raising prices in the Spring of 2004 because it knew that it would lose sales if its competitors did not follow. After it raised prices, Champion tried to find out whether certain of its competitors were going to do so.  This is the antithesis of agreement; it shows uncertainty as to whether competitors would follow Champion's lead.

Moreover, just as Champion tried to find out whether its competitors would follow its price increase, plaintiffs' evidence shows that Wix and Fram were watching the market to see what information they could obtain about other companies' intentions with respect to pricing, (Pls. Exs. 27, 34.)  In mid-March, Fram learned that Champion and Purolator were "looking to move."  (Pls. Ex. 34.)  Far from establishing a conspiracy, this evidence merely proves that all three companies tried to collect information on competitors' pricing, as any rational company in a consolidated industry would do—a conclusion underscored by the complete absence of any evidence of communications between Fram and its competitors concerning this increase. *Williamson Oil*, 346 F.3d at 1305 ("[T]he nature of the economic interdependence of the companies in an oligopoly" is such that "each company is aware of the others' actions." (quote and cite omitted).[14]  Plaintiffs would have this Court read the internally expressed belief that a

---

[13]  Plaintiffs' evidence regarding 1999 does not even show parallel conduct.  Only two defendants raised price to all of their customers, and they did so at different percentages and at different times: one raised price only on oil filters and the second raised price on all filters four months later; then six months after that announcement the first defendant raised price on air filters.  Champion raised price to one customer almost a year after the first price increase announcement.

[14]  The remaining documents that plaintiffs cite also show nothing other than competition.  For instance, the documents that plaintiffs cite to show that Champion was concerned about its margins (*see* Pls. Ex. 18) establish only that Champion had a motive to maximize its profits: a motive that all firms in a free market share.  As the Third Circuit recognized in *In re Baby Food Antitrust Litigation*, "[p]rofit is a legitimate motive in pricing decisions," and, indeed, "[i]n a free capitalistic society, profit is always a motivating factor in the conduct of a business." 166 F.3d at 134.  Other evidence that the filter manufacturers attended trade association meetings and had

competitor was "looking to move" as "an agreement to move." There is a world of difference.

The evidence from the Fall of 2004 shows nothing more. Champion had decided to raise price before it went to the Filters Manufacturers Council meeting in late September. Subsequent to that meeting, Champion sent price increase letters to some, but not all, of its competitors, which were also customers, before it informed other customers of its decision, hoping that the competitors would go to the market first. Fram did not even attend that meeting and did not receive Champion's increase letter. Making pricing announcements hoping that competitors will follow is not illegal, and is not evidence from which a jury can infer conspiracy. *Id.* at 1305; *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980). Again, Champion's expressed desire to "send a message to the industry" that it was going to raise price, and its hope that someone would beat Champion out with a price increase, is the antithesis of agreement: if there were an agreement, Champion would have known what its competitors were going to do.

This Court should not allow plaintiffs to continue this case based on the facts that they have assembled from the discovery that they achieved by relying on Bill Burch because those facts do not state a claim. Antitrust defendants do not conspire with each other through interdependent conduct; that is the lesson of *Williamson Oil*, *Reserve Supply*, *Baby Foods* and a host of other cases that have dealt with facts such as those present here. More discovery will not turn interdependent conduct into conspiracy.

## II. DEFENDANTS ARE ENTITLED TO RESPOND TO A COMPLAINT THAT REFLECTS THE EVIDENCE THAT PLAINTIFFS NOW ALLEGE ESTABLISHES A CONSPIRACY WITHOUT BURCH

Plaintiffs' original complaint is based on a fraud. Plaintiffs initiated this lawsuit and

---

interactions in connection with co-manufacturing agreements, joint ventures and a potential acquisition are proof only that they interacted in the industry. But it is well established that "the mere opportunity to conspire" is not "probative evidence" of a conspiracy. *Weit v. Cont'l Ill. Nat'l Bank & Trust Co.*, 641 F.2d 457, 462 (7th Cir. 1981).

overcame defendants' motions to dismiss based on a supposed eyewitness' account of the alleged events. But that eyewitness was Burch, and plaintiffs do not contest that he manipulated the legal system to injure his former employers and the entire industry, as well as to line his own pockets. Tellingly, they offer no defense of his misconduct. Plaintiffs know that Burch is a fraud and that they cannot continue in good faith to assert his claims. *See* Fed. R. Civ. P. 11(b)(3) ("[B]y presenting to the court a pleading, written motion, or other paper … an attorney … certifies that … the factual contentions have evidentiary support."). Indeed, it would be sanctionable conduct for plaintiffs to ignore Burch's malfeasance, and continue to rely on him despite it. *See Fabriko Acquisition Corp. v. Prokos*, 536 F.3d 605, 610 (7th Cir. 2008) (affirming Rule 11 sanctions where the plaintiff "continued to advocate a claim that had no legal basis and refused to alter or withdraw it when that deficiency was pointed out to it"); *Jolly Grp., Ltd. v. Medline Indus., Inc.*, 435 F.3d 717, 720 (7th Cir. 2006) (recognizing court's inherent power to "impose sanctions *sua sponte*" where attorneys fail to satisfy their "continuing duty … to dismiss claims that are no longer viable" (citations omitted)); *Jimenez v. Madison Area Tech. Coll.*, 321 F.3d 652, 655 (7th Cir. 2003) (plaintiffs' attorney sanctioned where attorney "failed to perform a reasonable inquiry into the validity of" forged documents).

Without Burch, there is no factual support for the conspiracy that plaintiffs allege in their complaints. Instead of a 10-year, 7-firm conspiracy, plaintiffs' evidence shows fragmented and independent conduct by certain defendants on three occasions in 1999 and 2004. Thus, they should re-plead their complaints based on that evidence, and not the Burch evidence that they can no longer use in good faith. When plaintiffs do re-plead, defendants will move for judgment on the pleadings. In other words, even assuming that plaintiffs' entire story were true it does not constitute evidence from which a jury can infer a conspiracy.

15

Dated: October 6, 2011

/s/ Peter J. Kadzik
Peter J. Kadzik
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC 20006
Tel: 202-420-2200
Fax: 202-420-2201

*Counsel for ArvinMeritor Inc., Purolator
Products NA, LLC and Purolator Products
Company, LLC*

/s/ John DeQ. Briggs
John DeQ. Briggs
AXINN VELTROP HARKRIDER
1330 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202-721-5400
Fax: 202-912-4701

*Counsel for Wix Filtration Corp LLC and
Affinia Group, Inc.*

Respectfully submitted,

/s/ Margaret M. Zwisler
Margaret M. Zwisler
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington DC 20004-1304
Telephone: 202-637-1092
Fax: 202-637-2201

*Counsel for Champion Laboratories, Inc.*

/s/ Richard G. Parker
Richard G. Parker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
Telephone: 202-383-5300

/s/ Mark Racanelli
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
Telephone: 212-326-4403

*Counsel for Honeywell International Inc.*

**CERTIFICATE OF SERVICE**

I, Marguerite M. Sullivan, hereby certify that on October 6, 2011, I caused the foregoing

Defendants' Response to Plaintiffs' Supposed Burch-Free Case to be filed with the Clerk of the

Court using the CM/ECF system, which will send notification of such filing to all parties

indicated on the electronic filing receipt.


/s/ Marguerite M. Sullivan
Marguerite M. Sullivan