# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **IN RE: AFTERMARKET FILTERS ANTITRUST LITIGATION** | **Master Docket No. 08-cv-4883** <br> **MDL Docket No. 1957** |
| **This Document Relates To:** <br> **Direct Purchaser Actions** | **Judge Robert W. Gettleman** <br> **Magistrate Geraldine Soat Brown** |

## DIRECT PURCHASER PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR FINAL APPROVAL OF SETTLEMENTS

**Table of Contents**

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND ................................................................................................. 2

    A.    The Litigation ................................................................................................. 2

    B.    The Settlements ................................................................................................. 6

        1.    Negotiations and Terms of the Settlement Agreements ................................... 6

        2.    Cooperation ................................................................................................. 7

        3.    Attorneys' Fees and Expenses ........................................................................ 8

        4.    Orders Preliminarily Approving the Settlements ............................................. 8

        5.    Notice of the Proposed Settlements ................................................................. 8

III.    ARGUMENT ................................................................................................. 9

    A.    The Proposed Settlements are Fair, Reasonable, and Adequate, and Should be Finally Approved by The Court ........................................................... 9

        1.    The Standard for Approval .............................................................................. 9

        2.    The Settlement Recovery is Excellent in Light of the Merits and Difficulties of the Litigation ........................................................................... 12

        3.    Further Litigation in the Absence of the Settlements Would be Lengthy, Complex, and Expensive .................................................................. 14

        4.    There were No Objections to Preliminary Approval of the Settlements and Requests for Exclusion were Minimal ..................................................... 15

        5.    The Settlements were Negotiated at Arm's-Length and are Not Collusive ................................................................................................. 15

i

6.   The Settlements were Negotiated by Experienced and Informed
     Counsel for the Class ..................................................................................... 16

7.   Co-Lead Counsel Developed Extensive Factual Information ......................... 17

IV.   CONCLUSION ..................................................................................................... 17

## Table of Authorities

**Cases**

*Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305 (7th Cir. 1980)............... 9, 10

*Carson v. Am. Brands Inc.*, 450 U.S. 79 (1981) .......................................................... 10

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).................................... 11

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977).......................................................... 10

*Depoister v. Mary M. Holloway Found.*, 36 F.3d 582 (7th Cir. 1994)......................... 10

*E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884 (7th Cir. 1985) .................... 9, 10

*Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998)........................................................ 10

*Frank v. Eastman Kodak Co.*, 228 F.R.D. 174 (W.D.N.Y. 2005)................................. 11

*Goldsmith v. Tech. Solutions Co.*, No. 92-C-4374, 1995 WL 17009594
   (N.D. Ill. Oct. 10, 1995)............................................................................................ 15

*Hanrahan v. Britt*, 174 F.R.D. 356 (E.D. Pa. 1997) .................................................... 16

*In re AT&T Mobility Wireless Data Services Sales Tax Litig.*,
   789 F. Supp. 2d 935 (N.D. Ill. 2011) ........................................................................ 12

*In re Corrugated Containerboard Antitrust Litig. (II)*, 659 F.2d 1233 (5th Cir. 1981) ............... 11

*In re Domestic Air Tranp. Antitrust Litig.*, 148 F.R.D. 297 (N.D. Ga. 1993) ............... 13

*In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*,
   733 F. Supp. 2d 997 (E.D. Wis. 2010).................................................................... 12

*In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631 (E.D. Pa. 2003)...................... 15

*In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. 1379 (D. Md. 1983) ............ 15

*In re Newbridge Networks Sec. Litig.*, No. 94-1678-LFO, 1998 WL 765724
   (D.D.C. Oct. 22, 1998)............................................................................................. 14

*In re Ravisent Techs., Inc. Sec. Litig.*, No. 00-CV-1014, 2005 WL 906361
   (E.D. Pa. Apr. 18, 2005) .......................................................................................... 14

*Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.,* 497 F.3d 615 (6th Cir. 2007) ........................................................................ 10

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996) ................................................................. 9, 10

*Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290 (W.D. Pa. 1997) .............................. 13

*Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002) ................................. 12

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill. 2011) ............................... 13

*Shy v. Navistar Int'l Corp.*, No. C-3-92-333, 1993 WL 1318607 (S.D. Ohio May 27, 1993) ........................................................................................ 11

*Synfuel Tech., Inc. v. DHL Express, Inc.*, 463 F.3d 646 (7th Cir. 2006) ...................... 12

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978 (7th Cir. 2002) ............. 9

## Statutes

28 U.S.C. § 1651 ............................................................................................................ 6

28 U.S.C. § 1715(b) ....................................................................................................... 9

## Other Authorities

NEWBERG ON CLASS ACTION, § 11.40 at 451 (2d ed. 1985) .......................................... 15

MOORE'S FED. PRAC. at § 23.164[2] ............................................................................... 11

Wright & Miller, FED. PRAC. & PROC. at § 1797.5 ....................................................... 11

Fed. R. Civ. P. 23(e) ...................................................................................................... 9

## I.    INTRODUCTION

Plaintiffs Central Warehouse Sales Corporation, Neptune Warehouse Distributors, Inc., William C. Bruene d/b/a Lone Star Lube, and A&L Systems Inc. ("Direct Purchaser Plaintiffs"), on behalf of themselves and a class of direct purchasers of Filters[1] (the "Class") have entered into settlement agreements with Defendants Champion Laboratories, Inc. ("Champion"), Honeywell International ("Honeywell"), Wix Filtration Corp. LLC and Affinia Group Inc. (collectively, "Affinia/Wix"), Cummins Filtration Inc. ("Cummins"), Donaldson Company, Inc. ("Donaldson") and Baldwin Filters, Inc. ("Baldwin") (collectively, "Settling Defendants"), which have been preliminarily approved by the Court. Defendants Baldwin, Cummins, and Donaldson each have agreed to pay $406,250; Affinia/Wix has agreed to pay $1,300,000; Honeywell has agreed to pay $2,112,500; and Champion has agreed to pay $5,037,500 (collectively, the "Settlements" or "Settlement Agreements"). In sum, these six Settlements total $9,668,750, all of which has been placed in escrow.[2]

The Settlements are the result of extensive arm's length, and sometimes contentious, negotiations by experienced and informed counsel on both sides, and are based on Co-Lead Counsel's review and analysis of the extensive amount of information produced, their consideration of the potential factual and legal risks and rewards, costs to the Class and delays from continued litigation, balancing the gains of the immediate and

---

[1] The term "Filters" includes oil, air and fuel filters sold in the aftermarket for light duty vehicles, *i.e.*, cars and light trucks.  It does not include products for sale to original equipment manufacturers, such as vehicle manufacturers.

[2] Direct Purchaser Plaintiffs have recently reached a settlement in principle with Defendants ArvinMeritor, Inc. (now known as Meritor, Inc.), Purolator Products NA, LLC, and Purolator Products Company, LLC (collectively, "Purolator Defendants") ("Purolator Settlement"). The Purolator Settlement is not part of Direct Purchaser Plaintiffs' Motion for Final Settlement Approval.

certain benefits to the Class from the Settlements. Based on the foregoing, Co-Lead Counsel believes the Settlements are fair, adequate, and reasonable and warrant the Court's final approval.

## II. BACKGROUND

### A. The Litigation

This litigation was commenced on March 31, 2008 with the filing of a number of class action lawsuits by purchasers of Filters from Settling Defendants. Eventually, sixty (60) cases were filed in five federal district courts. On August 18, 2008, the Judicial Panel for Multidistrict Litigation transferred the cases to this Court and the Court consolidated all actions under the above caption. By Order dated September 4, 2008, the Court appointed Freed Kanner London & Millen LLC, Labaton Sucharow LLP, Fine Kaplan & Black, R.P.C. and Susman Godfrey LLP[3] to serve as Interim Co-Lead Counsel. On November 26, 2008, Direct Purchaser Plaintiffs filed the Consolidated Amended Complaint ("CAC") against the Defendants.

Defendant Champion filed an answer to the CAC on February 2, 2009. The other Defendants moved to dismiss the CAC on February 2, 2009. Direct Purchaser Plaintiffs filed their memorandum of law in opposition to Defendants' joint motion to dismiss on March 16, 2009, and Defendants submitted reply memorandums of law on April 16, 2009. On November 5, 2009, this Court denied Defendants' joint motion to dismiss and denied Baldwin's separate motion to dismiss on November 9, 2009. Defendants individually answered the CAC on December 28, 2009.

---

[3] On October 12, 2011, Susman Godfrey LLP withdrew as Interim Co-Lead Counsel for the Direct Purchaser Plaintiffs. (Dkt. No. 839).

Direct Purchaser Plaintiffs brought their respective antitrust class actions against the largest manufacturers of Filters in the United States, alleging that from 1999 through the present, Defendants conspired to fix the prices of Filters. The Defendants denied these allegations.

Direct Purchaser Plaintiffs based their allegations, among other things, on an industry which was susceptible to price-fixing, information provided by a "whistleblower", William G. Burch[4] who was employed by the Purolator Defendants and Defendant Champion during most of the Class Period, and statements made under oath by other individuals with personal knowledge of the alleged conspiracy.

Direct Purchaser Plaintiffs alleged that the conditions which made the industry susceptible to price-fixing included the following:

1.  During the Class Period the industry for Filters was ripe for collusion. Although the market is large in terms of dollars—encompassing approximately $1 billion in annual revenue—the industry is dominated by only four manufacturers: Champion, Purolator, Fram and Wix. These four manufacturers account for more than 80% of Filter sales in the United States.

2.  The Filters sold by these manufacturers are a commodity product, meaning that purchasers view Defendants' products as interchangeable.

3.  In addition to the Filters industry being ripe for collusion, many of the Defendants' employees spent their entire careers in the Filters industry and

---

[4] As this case progressed, Mr. Burch became problematical as a potential witness in the litigation. He was indicted and pleaded guilty to making a false statement to the government based on the fabrication of a document purporting to be evidence of price-fixing among certain Defendants. Mr. Burch was convicted and sentenced to 24 months in prison and fined $30,000.

key employees transferred between Defendants. This familiarity and comfort encouraged frequent and open communications between ostensible competitors at industry trade events and facilitated high-level pricing coordination.

4. Additionally, Defendants bought and sold Filters from each other and engaged in a variety of joint ventures. Defendants used these opportunities to communicate with each other about pricing.

After the denial of Defendants' motions to dismiss, the parties engaged in protracted discovery, which engendered many disputes resulting in extensive motion practice. (*See* Docket Nos. 527, 536, 706, 708). The parties briefed these disputes in great detail and after a number of hearings, the Court issued several discovery orders. (*See* Docket Nos. 553, 579, 652, 678, 696, 733). Subsequent to the entry of these orders, Defendants produced and Direct Purchaser Plaintiffs reviewed millions of pages of documents (excluding transactional data). Direct Purchaser Plaintiffs also conducted depositions. Likewise, Defendants reviewed Direct Purchaser Plaintiffs' documents, noticed and took depositions of Direct Purchaser Plaintiffs' class representatives, and subpoenaed third parties.

As a result of Mr. Burch's indictment, guilty plea and conviction, as referred to in fn. 4 above, Defendants filed a number of adversarial motions, including motions to exclude from any use in the case audio recordings made by Mr. Burch of conversations with various officers of Defendants. These recordings, in the view of Direct Purchaser Plaintiffs' counsel, corroborated the allegations of price fixing, and their potential exclusion represented a serious problem.

4

On September 26, 2011, based on information learned through discovery and on their own investigation, Direct Purchaser Plaintiffs filed a response to Defendants' various adversarial motions entitled "Omnibus Memorandum of Law in Opposition to Defendants' Motions: (1) To Exclude William G. Burch's Tape Recordings; (2) To Exclude William G. Burch's Testimony; and (3) For an Evidentiary Hearing." (Dkt. No. 813). That submission included a summary of key evidence supporting Direct Purchaser Plaintiffs' allegations in the matter. Shortly thereafter, Direct Purchaser Plaintiffs entered into settlements in principle with Defendants Baldwin, Cummins, and Donaldson. (Dkt. No. 827). On October 6, 2011, all Defendants which had not entered into settlements in principle filed a response to Direct Purchaser Plaintiffs' Omnibus Memorandum.

On January 19, 2012, a settlement mediation was held with Magistrate Judge Soat Brown among Direct Purchaser Plaintiffs and the non-settling Defendants, but the parties were unable to reach a settlement agreement. On January 20, 2012, the Court denied Defendants' motions (Dkt. Nos. 792, 795) to exclude William G. Burch's testimony and tapes and vacated the stay of discovery which had previously been entered into by agreement among the parties while the Department of Justice pursued its investigation of Mr. Burch.

On February 17, 2012, the Court entered orders preliminary approving the settlements with Baldwin, Cummins, and Donaldson.

On March 8, 2012, after further extensive arm's-length negotiations, Direct Purchaser Plaintiffs entered into a settlement agreement with Defendants Affinia/Wix, Champion, and Honeywell. On April 20, 2012, the Court entered orders preliminary approving the settlements with Affinia/Wix, Champion, and Honeywell.

The litigation continued against the Purolator Defendants and discovery proceeded, including the taking of a number of depositions of past and present employees of various Defendants. Later in August 2012, another mediation was held among Direct Purchaser Plaintiffs and the remaining non-settling Purolator Defendants and a settlement in principle was reached.

### B. The Settlements

#### 1. Negotiations and Terms of the Settlement Agreements

In settlement of the litigation against them, Defendants Baldwin, Cummins, and Donaldson each have paid $406,250, Defendants Affinia/Wix has paid $1,300,000, Defendant Honeywell has paid $2,112,500, and Defendant Champion has paid $5,037,500. All payments have been deposited into escrow accounts at the Huntington Bank, and all interest earned on the monies in escrow has been added to the Settlement Fund.

The Settlement Agreements provide for all Plaintiffs (and all "Releasing Parties" as defined in the Settlement Agreement at ¶ 10) to release and discharge Settling Defendants upon the "Effective Date"[5] of the Settlement Agreements. The release and discharge language in the Settlement Agreement is as follows:

---

[5] The "Effective Date" is defined in ¶ 8 of the Settlement Agreement: the first date by which all of the following events have occurred: (a) the Court has entered a final judgment order approving this Agreement under Rule 23(e) of the Federal Rules of Civil Procedure; (b) the Court has entered a final judgment dismissing the Actions against Settling Defendant with prejudice and without costs; and (c) the time for appeal or to seek permission to appeal the Court's approval of this Agreement and entry of a final judgment as described in clause (a) above has expired or, if appealed, approval of this Agreement and the final judgment has been affirmed in its entirety by the court of last resort to which such appeal has been taken and such affirmance has become no longer subject to further appeal or review. Neither the provisions of Rule 60 of the Federal Rules of Civil Procedure nor the All Writs Act, 28 U.S.C. § 1651 shall be taken into account in determining the above-stated times.

Upon the occurrence of the Effective Date, and in consideration of the Settlement Amount and other good and valuable consideration as provided for in this Agreement, Released Parties shall be completely released, acquitted, and forever discharged, to the extent permitted by law, from any and all claims, demands, actions, suits, and causes of action, damages, liabilities of any nature, including without limitation costs, expenses, penalties, and attorneys' fees, whether class, individual, or otherwise in nature, that Releasing Parties ever had, now have, or hereafter can, shall, or may have directly, representatively, derivatively or in any other capacity against the Released Parties, whether known or unknown, suspected or unsuspected, in law or equity, concerning the pricing, selling, discounting, or marketing of Filters in the United States, including the volume of production, which arise under and/or relate to any United States federal or state antitrust, business and professions, unfair competition, unfair practices, price discrimination, unitary pricing, trade practice, unjust enrichment, disgorgement, consumer protection or civil conspiracy law based in whole or in part on the facts, occurrences, transactions, or other matters alleged in, or that could have been alleged in the Actions (the "Released Claims"), provided, however, that nothing herein shall release: (1) claims involving any negligence, breach of contract (other than a claim of breach of contract based on any of the conduct alleged in the Actions), bailment, failure to deliver lost goods, damaged or delayed goods or similar claim relating to Filters; and (2) claims under laws other than those of the United States and/or of any individual state, territory, protectorate, enclave or district of the United States, or any political subdivision thereof.

(Settlement Agreement at ¶ 30.)

## 2. Cooperation

The Settlement Agreements also provided for extensive cooperation to Direct Purchaser Plaintiffs in the prosecution of these Actions, subject to certain limitations, all as specified in the Settlement Agreements. This cooperation provided Direct Purchaser Plaintiffs with important information needed to continue the litigation against the non-settling Defendants at the relevant times. The cooperation provisions of the Settlement Agreements were valuable consideration at the time the settlements were negotiated, and were valuable in achieving the subsequent settlement with the Purolator Defendants.

### 3. Attorneys' Fees and Expenses

As described more fully in ¶¶ 37, 41 of the Settlement Agreements, the agreements provide for Direct Purchaser Plaintiffs to receive payment of attorneys' fees, costs and expenses from the Settlement Funds, subject to Court approval. However, Direct Purchaser Plaintiffs' counsel are not seeking payment of attorneys' fee at this time in connection with these Settlements.

### 4. Orders Preliminarily Approving the Settlements

On February 16, 2012, this Court preliminarily approved the Settlements with Defendants Baldwin, Cummins, and Donaldson, conditionally certified the Direct Purchaser Settlement Class, appointed class counsel for the settlement classes, and approved the notice plan. (Dkt. No. 881).

On April 20, 2012, this Court preliminarily approved the Settlements with Defendants Affinia/Wix, Champion, and Honeywell conditionally certified the Direct Purchaser Settlement Class, appointed class counsel for the settlement classes, and approved the notice plan. (Dkt. No. 939).

### 5. Notice of the Proposed Settlements

Pursuant to the orders of preliminary approval described above, Direct Purchaser Plaintiffs' counsel agreed to provide the class with mail notice and publication notice relating to all six settlements. On or before June 19, 2012, the Settlement Administrator, Kurtzman Carson Consultants LLC, mailed the approved notice to direct purchasers of Filters derived from customer lists produced by Defendants. *See* Exhibit 1-A to the Freed Declaration. In addition, the summary notice approved by the Court was published in *The Wall Street Journal* on June 19, 2012. *See* Exhibit 2 to the Freed Declaration. Also, the

Settlement Administrator created a website, www.aftermarketfilterlitigation.com, where Class members could view the notice and other related documents. *See* Exhibit 2 to the Freed Declaration. Finally, the Settlement Administrator established an interactive voice response system, accessible through a toll-free number, to provide information to potential class members seeking information about the settlements. *See* Exhibit 1 to the Freed Declaration. Proof of the mailing and publication of class notice is contained in paragraphs two and three of the Freed Declaration.

Additionally, Settling Defendants have complied with 28 U.S.C. § 1715(b), by providing notice to the appropriate Federal and State officials regarding their respective Settlements.

## III.  ARGUMENT

### A. The Proposed Settlements are Fair, Reasonable, and Adequate, and Should be Finally Approved by The Court

#### 1.  The Standard for Approval

The standard for final approval of a class action settlement is whether the settlement is fair, reasonable, and adequate. Fed. R. Civ. P. 23(e); *see Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 986 (7th Cir. 2002); *Isby v. Bayh*, 75 F.3d 1191, 1198-99 (7th Cir. 1996). There is an overriding public interest in settling litigation, and this is particularly true in class actions. *See Isby*, 75 F.3d at 1196 ("Federal courts naturally favor the settlement of class action litigation."); *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 888-89 (7th Cir. 1985), *cert. denied*, 478 U.S. 1004 (1986) (noting that there is a general policy favoring voluntary settlements of class action disputes); *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 312 (7th Cir. 1980) ("It is axiomatic that the federal courts look with great favor upon the

voluntary resolution of litigation through settlement."), *overruled on other grounds*, *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). Class action settlements minimize the litigation expenses of the parties and reduce the strain such litigation imposes upon already scarce judicial resources. *Armstrong*, 616 F.2d at 313 (*citing Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)).

Evaluation and approval of the Settlements is committed to the sound discretion of the Court. The proper focus "is upon 'the general principles governing approval of class action settlements' and not upon the 'substantive law governing the claims asserted in the litigation.'" *Isby*, 75 F.3d at 1197, quoting *Armstrong*, 616 F.2d at 315. The Court has wide latitude in making this determination. There is "no requirement that an evidentiary hearing be conducted as a precondition to approving a settlement in a class action suit." *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994). Therefore, the Court "may limit the fairness hearing to whatever is necessary to aid it in reaching an informed, just and reasoned decision" and should not resort to a full-blown trial on the merits. *Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.,* 497 F.3d 615, 635 (6th Cir. 2007) (internal quotation marks and citation omitted).

The Court's inquiry "is limited to the consideration of whether the proposed settlement is lawful, fair, reasonable, and adequate." *Isby*, 75 F.3d at 1196. Because the very point of compromise is to avoid determining unsettled issues and the waste and expense of litigation, the court does not "decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands Inc.*, 450 U.S. 79, 99 n.14 (1981). *See also E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d at 889 (the district court is to "refrain

from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights"), *cert. denied*, 478 U.S. 1004 (1986); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 456 (2d Cir. 1974) (the trial court does not "have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute"); 7B Wright & Miller, Fed. Prac. & Proc. at § 1797.5 ("the court may not try disputed issues in the case since the whole purpose behind a compromise is to avoid a trial . . . . Rather the judge is restricted to determining whether the terms proposed are fair and reasonable.").

There is not just one settlement that alone is reasonable in a case, but rather there is "a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 186 (W.D.N.Y. 2005) (internal quotation marks and citation omitted). "A just result is often no more that an arbitrary point between competing notions of reasonableness." *In re Corrugated Containerboard Antitrust Litig. (II)*, 659 F.2d 1233, 1325 (5th Cir. 1981). Thus, "[i]t is neither required, nor is it possible for a court to determine that the settlement is the fairest possible resolution of the claims of every individual class member; rather, the settlement, taken as a whole, must be fair, adequate and reasonable." *Shy v. Navistar Int'l Corp.*, No. C-3-92-333, 1993 WL 1318607, at *2 (S.D. Ohio May 27, 1993). *See also* 5 Moore's Fed. Prac. at § 23.164[2] "a proposed settlement may be fair and adequate even though it amounts to only a fraction of the potential recovery in a fully litigation case").

In evaluating whether a proposed settlement is fair, reasonable, adequate, and should be granted final approval, the Seventh Circuit has established the following as appropriate considerations: (1) the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement; (2) the defendants' ability to pay; (3) the complexity, length, and expense of further litigation; (4) the amount of opposition to the settlement; (5) the presence of collusion in reaching a settlement; (6) the reaction of class members to the settlement; (7) the opinion of competent counsel; and (8) the stage of the proceedings and the amount of discovery completed. *Armstrong*, 616 F.2d at 314. In this case, each of these factors supports final approval of the Settlements or in one instance is neutral.[6]

### 2. The Settlement Recovery is Excellent in Light of the Merits and Difficulties of the Litigation.

"The first and most important consideration is the strength of the plaintiffs' case compared to the value of the settlement." *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1005 (E.D. Wis. 2010). To evaluate the settlement's fairness, a court must make some effort "estimating the range of possible outcomes and ascribing a probability to each point on the range." *Id*. (*citing Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284-85 (7th Cir. 2002)). "The uncertain nature of the legal issues implicated by proceeding to trial makes it difficult to calculate a precise probability of success." *In re AT&T Mobility Wireless Data Services Sales Tax Litig.*, 789 F. Supp. 2d 935, 963 (N.D. Ill. 2011) (citing *Synfuel Tech., Inc. v. DHL Express, Inc.*, 463 F.3d 646, 653 (7th Cir. 2006)).

---

[6] Settling Defendants' abilities to fund the settlements are neutral, since Settling Defendants clearly have the ability to pay a judgment in this case.

12

As discussed *supra*, the fact that William Burch pleaded guilty to making a false statement to the government based on the fabrication of a document purporting to be evidence of price fixing among certain Defendants, created serious problems for Direct Purchaser Plaintiffs. Based on this conviction, Defendants attacked the merits of Direct Purchaser Plaintiffs' case, claiming that the conviction of Mr. Burch rendered both his testimony and his audio recordings inadmissible in the case. This development raised great uncertainty in the ultimate outcome of this case. Of course, there were other issues as well. Both summary judgment motions and class certification loomed as future obstacles.

Notwithstanding these issues, Direct Purchaser Plaintiffs were able to achieve almost $10 million in settlements from the six settlements for which final approval is sought. And, should the settlement in principle with the Purolator Defendants lead to final approval by the Court, Direct purchaser Plaintiffs will recover substantially more for the Class. As disclosed in their mediation letters, Direct Purchaser Plaintiffs' counsel estimated their single damages from Defendants' conspiracy at $166 million. Direct Purchaser Plaintiffs' counsel now estimate that the settlements for which final approval is sought, together with the settlement in principle with the Purolator Defendants, will amount to a total recovery for the Class of more than 10% of single damages. *See e.g., Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 583 (N.D. Ill. 2011) (the $9.5 million settlement fund still represents approximately 10% of the $96.5 million); *Lazy Oil Co. v. Witco Corp.,* 95 F. Supp. 2d 290, 339 (W.D. Pa. 1997) (approving settlement amounting to 5.35% of damages for the entire class period); *In re Domestic Air Tranp. Antitrust Litig.,* 148 F.R.D. 297, 325 (N.D. Ga. 1993) (settlement in this action amounts to

13

approximately 12.7% to 15.3%); *In re Newbridge Networks Sec. Litig.*, No. 94-1678-LFO, 1998 WL 765724, at *2 (D.D.C. Oct. 22, 1998) (approving settlement and concluding that while "[c]ourts have not identified a precise numerical range within which a settlement must fall in order to be deemed reasonable; [ ] an agreement that secures roughly six to twelve percent of a *potential* trial recovery, while preventing further expenditures and delays and eliminating the risk that no recovery at all will be won, seems to be within the targeted range of reasonableness") (emphasis in original); *In re Ravisent Techs., Inc. Sec. Litig.*, No. 00-CV-1014, 2005 WL 906361, at *9 (E.D. Pa. Apr. 18, 2005) (approving settlement, which amounted to 12.2% of damages, and citing study by Columbia University Law School, which determined that "since 1995, class action settlements have typically recovered between 5.5% and 6.2% of the class members estimated losses.") (internal citations omitted).

### 3. Further Litigation in the Absence of the Settlements Would be Lengthy, Complex, and Expensive

In the absence of these Settlements, further litigation of this case would entail lengthy, intensive proceedings. While Co-Lead Counsel has already performed significant work on this case, it is probable that the future of the case before trial would be marked by complex, expensive, and contested additional discovery, detailed expert studies and related discovery, one or more motions for summary judgment or partial summary judgment, highly contested class certification issues, and *Daubert* motions. Should the case proceed to trial, the trial itself would likely be lengthy and complex, involving numerous motions *in limine*, extensive proposed jury instructions, voluminous trial exhibits, and comprehensive and expensive demonstrative presentations involving expensive presentation technologies. As with any litigation that is as hard fought as this

case, the losing party at trial most likely would pursue and appeal to the Seventh Circuit, which would involve further delay and expense.

These Settlements avoid all of these complexities, delays, and expenses, and of course the related uncertainty of any recovery for the Direct Purchaser Class.

### 4. There were No Objections to Preliminary Approval of the Settlements and Requests for Exclusion were Minimal

As of the time of the filing of these papers, there has not been a single objection to the Settlements and Co-Lead Counsel have received only five requests for exclusion. *See* Exhibit 1-B to the Freed Declaration. The exclusion requests were filed by small purchasers and therefore Settling Defendants' rights to withdraw from the Settlement Agreements were not a consideration.

### 5. The Settlements were Negotiated at Arm's-Length and are Not Collusive

The requirement that class action settlements be fair is designed to protect against collusion among the parties. *See In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1383 (D. Md. 1983) (on preliminary approval). When negotiated at arm's-length a proposed settlement is presumptively fair and reasonable. *See Goldsmith v. Tech. Solutions Co.*, No. 92-C-4374, 1995 WL 17009594, at *3 n.2 (N.D. Ill. Oct. 10, 1995) ("it may be presumed that the agreement is fair and adequate where, as here, a proposed settlement is the product of arm's-length negotiations"); 2 NEWBERG ON CLASS ACTION, § 11.40 at 451 (2d ed. 1985). Thus, settlements proposed by experienced counsel as the result of arm's-length negotiations are entitled to deference from the court. *See, e.g., Goldsmith*, 1995 WL 17009594, at *3 n.2; *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 640 (E.D. Pa. 2003) ("A presumption of correctness is said to attach to a class

15

settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery." (*quoting Hanrahan v. Britt*, 174 F.R.D. 356, 366 (E.D. Pa. 1997)). The initial presumption in favor of such settlements reflects courts' understanding that vigorous negotiations between seasoned counsel protect against collusion and advance the fairness concerns of Rule 23(e).

Throughout the negotiations, Counsel for Settling Defendants persistently sought to minimize the financial and other burdens and risks to be assumed by their clients in the Settlements, while Co-Lead Counsel equally persistently and forcefully pressed for the greatest achievable advantage for the Direct Purchaser Class at every turn. This factor strongly supports approval of the Settlements.

### 6. The Settlements were Negotiated by Experienced and Informed Counsel for the Class

The Co-Lead Counsel who negotiated the Settlements were highly experienced antitrust and class action lawyers.[7] These attorneys have served as lead or co-lead counsel in numerous other class cases around the country and as executive committee members in many more. They have achieved major settlement recoveries in the many cases they have led. Their credentials were known to the Court when they were appointed by the Court as Interim Co-Lead counsel for the Class.

As described above, in preparation of the case Co-Lead Counsel pursued an in-depth factual investigation, economic analysis, and legal evaluation related to the Direct Purchaser Class's claims. In addition, Co-Lead Counsel also took into account the numerous and significant legal issues presented by this case, as described above. In this process, they evaluated both the strengths and the various risks presented by each of these

---

[7] *See* the firm biographies of Co-Lead Counsel submitted in connection with the motion to appoint lead counsel (Dkt. No. 11).

issues. The Settlements were thus ultimately reached based on Co-Lead Counsel's highly informed judgment on the risk both Direct Purchaser Plaintiffs and Settling Defendants faced moving forward in this litigation.

Since Co-Lead Counsel were both experienced and well informed when negotiating the Settlements, this is another strong factor supporting approval of the Settlements.

### 7. Co-Lead Counsel Developed Extensive Factual Information

Although there was a lengthy stay of discovery in this case, Co-Lead Counsel successfully obtained extensive market and transaction information. Some of the information was obtained from Defendants, while Co-Lead Counsel's own research and investigation developed additional historical and market information. Still other information was developed by or with the assistance of Direct Purchaser Plaintiffs' experts.

The entire mass of information provided a meaningful basis for Co-Lead Counsel and their experts to evaluate sophisticated issues concerning the affected market and the damages resulting from Defendants' conduct. Thus, in negotiating and agreeing to the Settlements, Co-Lead Counsel were well informed and prepared in detail concerning factual, economic, and legal issues surrounding the Settlements and the Plans of Allocation. This factor, like the others already discussed, weighs heavily in favor of approval of the Settlements.

## IV. CONCLUSION

For all the foregoing reasons, the Court should finally approve the Settlements. Prior to the hearing on final approval, counsel for the Settling Defendants and Direct

Purchaser Plaintiffs will submit for the Court's consideration a form of Final Order and

Judgment.

Dated: September 4, 2012             Respectfully submitted,

/s/ Michael J. Freed             /s/ Roberta D. Liebenberg

Michael J. Freed               Roberta D. Liebenberg

Steven A. Kanner              Adam J. Pessin

FREED KANNER LONDON &      FINE KAPLAN & BLACK, R.P.C.

MILLEN, LLC               1835 Market Street –28th Floor

2201 Waukegan Rd. – Suite 130    Philadelphia, PA 19103

Bannockburn, IL 60015         Telephone: (215) 567-6565

Telephone: (224) 632-4500      Fax: (215) 568-5872

Fax: (224) 632-4521

/s/ Bernard Persky

Bernard Persky

Gregory Asciolla

LABATON SUCHAROW LLP

140 Broadway

New York, NY 10005

Telephone: (212) 907-0700

Fax: (212) 818-0477

*Co-Lead Counsel for Direct Purchaser Plaintiffs*

18