**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: AFTERMARKET FILTERS ANTITRUST LITIGATION** | **Master Docket No. 08-cv-4883** **MDL Docket No. 1957** |
| **This Document Relates To: Direct Purchaser Actions** | **Judge Robert W. Gettleman** **Magistrate Geraldine Soat Brown** |

**DIRECT PURCHASER PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**MOTION FOR FINAL APPROVAL OF SETTLEMENT**

**Table of Contents**

I.   INTRODUCTION ................................................................................................ 1

II.  BACKGROUND ................................................................................................ 2

   A.   The Litigation ............................................................................................. 2

   B.   The Settlement ........................................................................................... 6

      1.   Negotiations and Terms of the Settlement Agreement ...................... 6

      2.   Attorneys' Fees and Expenses .......................................................... 7

      3.   Order Preliminarily Approving the Settlement ................................. 8

      4.   Notice of the Proposed Settlement ................................................... 8

III. ARGUMENT .................................................................................................... 9

   A.   The Proposed Settlement is Fair, Reasonable, and Adequate, and Should
        be Finally Approved by The Court ............................................................ 9

      1.   The Standard for Approval ............................................................... 9

      2.   The Settlement Recovery is Excellent in Light of the Merits of
           the Litigation .................................................................................. 12

      3.   Further Litigation in the Absence of the Settlement Would be Lengthy,
           Complex, and Expensive ................................................................ 14

      4.   There Were No Objections to Final Approval of the Settlement and
           Requests for Exclusion were Minimal ............................................. 14

      5.   The Settlement was Negotiated at Arm's-Length and is
           Not Collusive .................................................................................. 15

      6.   The Settlement was Negotiated by Experienced and Informed Counsel
           for the Class ................................................................................... 16

      7.   Co-Lead Counsel Developed Extensive Factual Information ......................... 17

IV.  Conclusion ..................................................................................................... 17

i

**Table of Authorities**

**Cases**

*Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee,* 616 F.2d 305 (7th Cir. 1980).... 9, 10, 11, 12

*Carson v. Am. Brands Inc.,* 450 U.S. 79 (1981) .......................................................... 10

*City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir. 1974)..................................... 10

*Cotton v. Hinton,* 559 F.2d 1326 (5th Cir. 1977)........................................................... 9

*Depoister v. Mary M. Holloway Found.,* 36 F.3d 582 (7th Cir. 1994)......................... 10

*E.E.O.C. v. Hiram Walker & Sons, Inc.,* 768 F.2d 884 (7th Cir. 1985) .................................. 9, 10

*Felzen v. Andreas,* 134 F.3d 873 (7th Cir. 1998)........................................................... 9

*Frank v. Eastman Kodak Co.,* 228 F.R.D. 174 (W.D.N.Y. 2005) ................................. 11

*Goldsmith v. Tech. Solutions Co.,* No. 92-C-4374, 1995 WL 17009594
    (N.D. Ill. Oct. 10, 1995)............................................................................................ 15

*Hanrahan v. Britt,* 174 F.R.D. 356 (E.D. Pa. 1997) .................................................... 15

*In re AT&T Mobility Wireless Data Services Sales Tax Litig.,* 789 F. Supp. 2d 935
    (7th Cir. 2006)............................................................................................................ 12

*In re Corrugated Containerboard Antitrust Litig. (II),* 659 F.2d 1233 (5th Cir. 1981) ............... 11

*In re Domestic Air Tranp. Antitrust Litig.,* 148 F.R.D. 297 (N.D. Ga. 1993) ............................. 13

*In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.,* 733 F. Supp. 2d
    997 (E.D. Wis. 2010) ................................................................................................ 12

*In re Linerboard Antitrust Litig.,* 292 F. Supp. 2d 631 (E.D. Pa. 2003)....................... 15

*In re Mid-Atlantic Toyota Antitrust Litig.,* 564 F. Supp. 1379 (D. Md. 1983) ............................ 15

*In re Newbridge Networks Sec. Litig.,* No. 94-1678-LFO, 1998 WL 765724
    (D.D.C. Oct. 22, 1998)............................................................................................... 13

*In re Ravisent Techs., Inc. Sec. Litig.,* No. 00-CV-1014, 2005 WL 906361
    (E.D. Pa. Apr. 18, 2005) ........................................................................................... 13

*Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors
    Corp.,* 497 F.3d 615 (6th Cir. 2007) ......................................................................... 10

*Isby v. Bayh,* 75 F.3d 1191 (7th Cir. 1996) ............................................................... 9, 10

*Lazy Oil Co. v. Witco Corp.,* 95 F. Supp. 2d 290 (W.D. Pa. 1997) ............................. 13

*Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277 (7th Cir. 2002) ................................ 12

*Schulte v. Fifth Third Bank,* 805 F. Supp. 2d 560 (N.D. Ill. 2011) ............................. 13

*Shy v. Navistar Int'l Corp.,* No. C-3-92-333, 1993 WL 1318607
(S.D. Ohio May 27, 1993) ............................................................................................ 11

*Synfuel Tech., Inc. v. DHL Express, Inc.,* 463 F.3d 646 (7th Cir. 2006) ..................... 12

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.,* 309 F.3d 978 (7th Cir. 2002) ............ 9

**Statutes**

28 U.S.C. § 1651 ............................................................................................................. 7

28 U.S.C. § 1715(b) ....................................................................................................... 9

**Other Authorities**

Newberg on Class Action, § 11.40 at 451 (2d ed. 1985) ......................................... 15

Moore's Fed. Prac. at § 23.164[2] ............................................................................. 11

Wright & Miller, Fed. Prac. & Proc. at § 1797.5 ..................................................... 10

Fed. R. Civ. P. 23(e) ..................................................................................................... 9

## I.    INTRODUCTION

Plaintiffs Central Warehouse Sales Corporation, Neptune Warehouse Distributors, Inc., William C. Bruene d/b/a Lone Star Lube, and A&L Systems Inc. ("Direct Purchaser Plaintiffs"), on behalf of themselves and a class of direct purchasers of Filters[1] (the "Class") have entered into a settlement agreement with Defendants ArvinMeritor, Inc. (now known as Meritor, Inc.), Purolator Products NA, LLC, and Purolator Products Company, LLC (collectively, "Settling Defendants" or "Purolator Defendants"),which has been preliminarily approved by the Court. The Settling Defendants agreed to pay $8,300,000.00 (the "Settlement") to settle this litigation, all of which has been placed into escrow and is earning interest.

The Settlement is the result of extensive arm's length, and sometimes contentious, negotiations by experienced and informed counsel on both sides, and is based on Co-Lead Counsel's review and analysis of the extensive amount of information produced in the case; their consideration of the potential factual and legal risks and rewards; the costs to the Class and delays from continued litigation; and consideration of the gains of the immediate and certain benefits to the Class from the Settlement. Based on the foregoing, Co-Lead Counsel believes the Settlement is fair, adequate, and reasonable and warrants the Court's final approval.

---

[1] The term "Filters" includes oil, air and fuel filters sold in the aftermarket for light duty vehicles, *i.e.*, cars and light trucks.  It does not include products for sale to original equipment manufacturers, such as vehicle manufacturers.

1

## II.    BACKGROUND

### A.    The Litigation

This litigation was commenced on March 31, 2008 with the filing of a number of

class action lawsuits by purchasers of Filters from Defendants[2]. Eventually, sixty (60)

cases were filed in five federal district courts. On August 18, 2008, the Judicial Panel for

Multidistrict Litigation transferred the cases to this Court and the Court consolidated all

actions under the above caption. By Order dated September 4, 2008, the Court appointed

Freed Kanner London & Millen LLC, Labaton Sucharow LLP, Fine Kaplan & Black,

R.P.C. and Susman Godfrey LLP[3] to serve as Interim Co-Lead Counsel.  On November

26, 2008, Direct Purchaser Plaintiffs filed the Consolidated Amended Complaint

("CAC") against the Defendants.

Defendant Champion filed an answer to the CAC on February 2, 2009. The other

Defendants moved to dismiss the CAC on February 2, 2009. Direct Purchaser Plaintiffs

filed their memorandum of law in opposition to Defendants' joint motion to dismiss on

March 16, 2009, and Defendants submitted reply memorandums of law on April 16,

2009. On November 5, 2009, this Court denied Defendants' joint motion to dismiss and

denied Baldwin's separate motion to dismiss on November 9, 2009. Defendants

individually answered the CAC on December 28, 2009.

Direct Purchaser Plaintiffs brought their respective antitrust class actions against

the largest manufacturers of Filters in the United States, alleging that from 1999 through

---

[2] Defendants includes the Settling Defendants and Defendants Champion Laboratories, Inc.
("Champion"), Honeywell International ("Honeywell"), Wix Filtration Corp. LLC and Affinia
Group Inc. (collectively, "Affinia/Wix"), Cummins Filtration Inc. ("Cummins"), Donaldson
Company, Inc. ("Donaldson") and Baldwin Filters, Inc. ("Baldwin").
[3] Susman Godfrey LLP withdrew as Interim Co-Lead Counsel for the Direct Purchaser Plaintiffs
(Dkt. No. 839) on October 12, 2011.

the present, Defendants conspired to fix the prices of Filters. The Defendants denied these allegations.

Direct Purchaser Plaintiffs based their allegations, among other things, on an industry which was susceptible to price-fixing, information provided by a "whistleblower", William G. Burch[4] who was employed by the Purolator Defendants and Defendant Champion during most of the Class Period, and statements made under oath by other individuals with personal knowledge of the alleged conspiracy.

Direct Purchaser Plaintiffs alleged that the conditions which made the industry susceptible to price-fixing included the following:

1.  During the Class Period the industry for Filters was ripe for collusion. Although the market is large in terms of dollars—encompassing approximately $1 billion in annual revenue—the industry is dominated by only four manufacturers: Champion, Purolator, Fram and Wix. These four manufacturers account for more than 80% of Filter sales in the United States.

2.  The Filters sold by these manufacturers are a commodity product, meaning that purchasers view Defendants' products as interchangeable.

3.  In addition to the Filters industry being ripe for collusion, many of the Defendants' employees spent their entire careers in the Filters industry and key employees transferred between Defendants. This familiarity and comfort encouraged frequent and open communications between

---

[4] As this case progressed, Mr. Burch became problematical as a potential witness in the litigation. He was indicted and pleaded guilty to making a false statement to the government based on the fabrication of a document purporting to be evidence of price-fixing among certain Defendants. Mr. Burch was convicted and sentenced to 24 months in prison and fined $30,000.

ostensible competitors at industry trade events and facilitated high-level

pricing coordination.

4.     Additionally, Defendants bought and sold Filters from each other and

engaged in a variety of joint ventures. Defendants used these opportunities

to communicate with each other about pricing.

After the denial of Defendants' motions to dismiss, the parties engaged in

protracted discovery, which engendered many disputes resulting in extensive motion

practice. (*See* Docket Nos. 527, 536, 706, 708). The parties briefed these disputes in great

detail and after a number of hearings, the Court issued several discovery orders. (*See*

Docket Nos. 553, 579, 652, 678, 696, 733). Subsequent to the entry of these orders,

Defendants produced and Direct Purchaser Plaintiffs reviewed millions of pages of

documents (excluding transactional data). Direct Purchaser Plaintiffs also conducted

depositions. Likewise, Defendants reviewed Direct Purchaser Plaintiffs' documents,

noticed and took depositions of Direct Purchaser Plaintiffs' class representatives, and

subpoenaed third parties.

As a result of Mr. Burch's indictment, guilty plea and conviction, as referred to in

fn. 4 above, Defendants filed a number of adversarial motions, including motions to

exclude from any use in the case audio recordings made by Mr. Burch of conversations

with various officers of Defendants. These recordings, in the view of Direct Purchaser

Plaintiffs' counsel, corroborated the allegations of price fixing, and their potential

exclusion represented a serious problem.

On September 26, 2011, based on information learned through discovery and on

their own investigation, Direct Purchaser Plaintiffs filed a response to Defendants'

various adversarial motions entitled "Omnibus Memorandum of Law in Opposition to Defendants' Motions: (1) To Exclude William G. Burch's Tape Recordings; (2) To Exclude William G. Burch's Testimony; and (3) For an Evidentiary Hearing." (Dkt. No. 813). That submission included a summary of key evidence supporting Direct Purchaser Plaintiffs' allegations in the matter. Shortly thereafter, Direct Purchaser Plaintiffs entered into settlements in principle with Defendants Baldwin, Cummins, and Donaldson. (Dkt. No. 827). On October 6, 2011, all Defendants which had not entered into settlements in principle filed a response to Direct Purchaser Plaintiffs' Omnibus Memorandum.

On January 19, 2012, a settlement mediation was held with Magistrate Judge Geraldine Soat Brown among Direct Purchaser Plaintiffs and the non-settling Defendants, but the parties were unable to reach a settlement agreement. On January 20, 2012, the Court denied Defendants' motions (Dkt. Nos. 792, 795) to exclude William G. Burch's testimony and tapes and vacated the stay of discovery which had previously been entered into by agreement among the parties while the Department of Justice pursued its investigation of Mr. Burch.

On February 17, 2012, the Court entered an order preliminarily approving the settlements with Baldwin, Cummins, and Donaldson. Defendants Baldwin, Cummins, and Donaldson each have paid $406,250 into the Settlement Fund.

On March 8, 2012, after further extensive arm's-length negotiations, Direct Purchaser Plaintiffs entered into a settlement agreement with Defendants Affinia/Wix, Champion, and Honeywell. On April 20, 2012, the Court entered an order preliminarily approving the settlements with Affinia/Wix, Champion, and Honeywell. Defendants

Affinia/Wix paid $1,300,000 into the Settlement Fund; Honeywell paid $2,112,500 into the Settlement Fund; and Champion paid $5,037,500 into the Settlement Fund.

The litigation continued against the Purolator Defendants and discovery proceeded, including the taking of a number of depositions of past and present employees of various Defendants. Later in August 2012, another mediation was held among Direct Purchaser Plaintiffs and the remaining Purolator Defendants and a settlement in principle was reached.

On November 8, 2012, the Court entered an order preliminary approving the settlement with the Purolator Defendants.

### B.       The Settlement

#### 1.       Negotiations and Terms of the Settlement Agreements

In settlement of the litigation against them, the Purolator Defendants paid $8,300,000. The payment has been deposited into an escrow account at the Huntington Bank, and all interest earned on the monies in escrow has been added to the Settlement Fund.

The Settlement Agreement provides for all Plaintiffs (and all "Releasing Parties" as defined in the Settlement Agreement at ¶ 10) to release and discharge Settling Defendants upon the "Effective Date"[5] of the Settlement Agreement. The release and discharge language in the Settlement Agreement is as follows:

---

[5] The "Effective Date" is defined in ¶ 8 of the Settlement Agreement: the first date by which all of the following events have occurred: (a) the Court has entered a final judgment order approving this Agreement under Rule 23(e) of the Federal Rules of Civil Procedure; (b) the Court has entered a final judgment dismissing the Actions against Settling Defendant with prejudice and without costs; and (c) the time for appeal or to seek permission to appeal the Court's approval of this Agreement and entry of a final judgment as described in clause (a) above has expired or, if appealed, approval of this Agreement and the final judgment has been affirmed in its entirety by the court of last resort to which such appeal has been taken and such affirmance has become no

6

Upon the occurrence of the Effective Date, and in consideration of the Settlement Amount and other good and valuable consideration as provided for in this Agreement, Released Parties shall be completely released, acquitted, and forever discharged, to the extent permitted by law, from any and all claims, demands, actions, suits, and causes of action, damages, liabilities of any nature, including without limitation costs, expenses, penalties, and attorneys' fees, whether class, individual, or otherwise in nature, that Releasing Parties ever had, now have, or hereafter can, shall, or may have directly, representatively, derivatively or in any other capacity against the Released Parties, whether known or unknown, suspected or unsuspected, in law or equity, concerning the pricing, selling, discounting, or marketing of Filters in the United States, including the volume of production, which arise under and/or relate to any United States federal or state antitrust, business and professions, unfair competition, unfair practices, price discrimination, unitary pricing, trade practice, unjust enrichment, disgorgement, consumer protection or civil conspiracy law based in whole or in part on the facts, occurrences, transactions, or other matters alleged in, or that could have been alleged in the Actions (the "Released Claims"), provided, however, that nothing herein shall release: (1) claims involving any negligence, breach of contract (other than a claim of breach of contract based on any of the conduct alleged in the Actions), bailment, failure to deliver lost goods, damaged or delayed goods or similar claim relating to Filters; and (2) claims under laws other than those of the United States and/or of any individual state, territory, protectorate, enclave or district of the United States, or any political subdivision thereof.

(Settlement Agreement at ¶ 23.)

## 2. Attorneys' Fees and Expenses

As described more fully in ¶¶ 28-29 of the Settlement Agreement, the agreements provide for Direct Purchaser Plaintiffs to receive payment of attorneys' fees, costs and expenses from the Settlement Funds, subject to Court approval. Direct Purchaser Plaintiffs' counsel have contemporaneously filed their Motion and Memorandum for an Award of Attorney's Fees, Reimbursement of Litigation Expenses, and Class Representatives' Service Awards.

---

longer subject to further appeal or review. Neither the provisions of Rule 60 of the Federal Rules of Civil Procedure nor the All Writs Act, 28 U.S.C. § 1651 shall be taken into account in determining the above-stated times.

### 3.    Order Preliminarily Approving the Settlement

On November 8, 2012, this Court preliminarily approved the Settlement with the Purolator Defendants, conditionally certified the Direct Purchaser Settlement Class, appointed class counsel for the settlement classes, and approved the proposed plan to notify class members of the Purolator Settlement. (Dkt. No. 1036).

### 4.    Notice of the Proposed Settlement

Pursuant to the order of preliminary approval described above, Direct Purchaser Plaintiffs' counsel agreed to provide the class with mail notice and publication notice related to the Settlement on or before November 19, 2012. Proof of the mailing and publication of class notice is contained in paragraphs 2 and 3 of the Freed Declaration. More specifically, as contemplated, the Settlement Administrator, Kurtzman Carson Consultants LLC mailed the approved notice and claim form to direct purchasers of Filters on a timely basis. The list of direct purchasers was derived from customer lists produced by Defendants. *See* Exhibits 1-A and 1-B to the Freed Declaration. In addition, the summary notice approved by the Court was published in *The Wall Street Journal* on November 19, 2012. *See* Exhibit 2 to the Freed Declaration.  Also, the Settlement Administrator created a website, www.aftermarketfilterlitigation.com, where Class members could view the notice and other related documents. *See* Exhibit 2 to the Freed Declaration. Finally, the Settlement Administrator established an interactive voice response system, accessible through a toll-free number, to provide information to potential class members seeking information about the settlement. *See* Exhibit 1 to the Freed Declaration.

Additionally, Settling Defendants have advised class counsel that Settling

Defendants complied with 28 U.S.C. § 1715(b), by providing notice to the appropriate

Federal and State officials regarding the Settlement on a timely basis.

## III. ARGUMENT

### A. The Proposed Settlement is Fair, Reasonable, and Adequate, and Should be Finally Approved by The Court

#### 1. The Standard for Approval

The standard for final approval of a class action settlement is whether the

settlement is fair, reasonable, and adequate. Fed. R. Civ. P. 23(e); *see Uhl v.*

*Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 986 (7th Cir. 2002); *Isby v. Bayh*,

75 F.3d 1191, 1198-99 (7th Cir. 1996). There is an overriding public interest in settling

litigation, and this is particularly true in class actions. *See Isby*, 75 F.3d at 1196 ("Federal

courts naturally favor the settlement of class action litigation."); *E.E.O.C. v. Hiram*

*Walker & Sons, Inc.*, 768 F.2d 884, 888-89 (7th Cir. 1985), *cert. denied*, 478 U.S. 1004

(1986) (noting that there is a general policy favoring voluntary settlements of class action

disputes); *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 312 (7th

Cir. 1980) ("It is axiomatic that the federal courts look with great favor upon the

voluntary resolution of litigation through settlement."), *overruled on other grounds*,

*Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). Class action settlements minimize the

litigation expenses of the parties and reduce the strain such litigation imposes upon

already scarce judicial resources. *Armstrong*, 616 F.2d at 313 (*citing Cotton v. Hinton*,

559 F.2d 1326, 1331 (5th Cir. 1977)).

Evaluation and approval of the Settlement is committed to the sound discretion of

the Court. The proper focus "is upon 'the general principles governing approval of class

action settlements' and not upon the 'substantive law governing the claims asserted in the litigation.'" *Isby*, 75 F.3d at 1197, quoting *Armstrong*, 616 F.2d at 315. The Court has wide latitude in making this determination. There is "no requirement that an evidentiary hearing be conducted as a precondition to approving a settlement in a class action suit." *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994). Therefore, the Court "may limit the fairness hearing to whatever is necessary to aid it in reaching an informed, just and reasoned decision" and should not resort to a full-blown trial on the merits. *Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.,* 497 F.3d 615, 635 (6th Cir. 2007) (internal quotation marks and citation omitted).

The Court's inquiry "is limited to the consideration of whether the proposed settlement is lawful, fair, reasonable, and adequate." *Isby*, 75 F.3d at 1196. Because the very point of compromise is to avoid determining unsettled issues and the waste and expense of litigation, the court does not "decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands Inc.*, 450 U.S. 79, 99 n.14 (1981). *See also E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d at 889 (the district court is to "refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights"), *cert. denied*, 478 U.S. 1004 (1986); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 456 (2d Cir. 1974) (the trial court does not "have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute"); 7B Wright & Miller, Fed. Prac. & Proc. at § 1797.5 ("the court may not try disputed issues in the case since the whole purpose behind a

compromise is to avoid a trial . . . . Rather the judge is restricted to determining whether the terms proposed are fair and reasonable.").

There is not just one settlement that alone is reasonable in a case, but rather there is "a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 186 (W.D.N.Y. 2005) (internal quotation marks and citation omitted). "A just result is often no more than an arbitrary point between competing notions of reasonableness." *In re Corrugated Containerboard Antitrust Litig. (II)*, 659 F.2d 1233, 1325 (5th Cir. 1981). Thus, "[i]t is neither required, nor is it possible for a court to determine that the settlement is the fairest possible resolution of the claims of every individual class member; rather, the settlement, taken as a whole, must be fair, adequate and reasonable." *Shy v. Navistar Int'l Corp.*, No. C-3-92-333, 1993 WL 1318607, at *2 (S.D. Ohio May 27, 1993). *See also* 5 MOORE'S FED. PRAC. at § 23.164[2] "a proposed settlement may be fair and adequate even though it amounts to only a fraction of the potential recovery in a fully litigation case").

In evaluating whether a proposed settlement is fair, reasonable, adequate, and should be granted final approval, the Seventh Circuit has established the following as appropriate considerations: (1) the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement; (2) the defendants' ability to pay; (3) the complexity, length, and expense of further litigation; (4) the amount of opposition to the settlement; (5) the presence of collusion in reaching a settlement; (6) the reaction of class members to the settlement; (7) the opinion of competent counsel; and (8) the stage

11

of the proceedings and the amount of discovery completed. *Armstrong*, 616 F.2d at 314.

In this case, each of these factors supports final approval of the Settlement or in one

instance is neutral.[6]

**2.      The Settlement Recovery is Excellent in Light of the Merits of the Litigation.**

"The first and most important consideration is the strength of the plaintiffs' case

compared to the value of the settlement." *In re Lawnmower Engine Horsepower Mktg. &*

*Sales Practices Litig.*, 733 F. Supp. 2d 997, 1005 (E.D. Wis. 2010). To evaluate the

settlement's fairness, a court must make some effort "estimating the range of possible

outcomes and ascribing a probability to each point on the range." *Id.* (*citing Reynolds v.*

*Beneficial Nat'l Bank*, 288 F.3d 277, 284-85 (7th Cir. 2002)). "The uncertain nature of

the legal issues implicated by proceeding to trial makes it difficult to calculate a precise

probability of success." *In re AT&T Mobility Wireless Data Services Sales Tax Litig.*, 789

F. Supp. 2d 935, 963 (citing *Synfuel Tech., Inc. v. DHL Express, Inc.,* 463 F.3d 646, 653

(7th Cir. 2006)).

As discussed *supra*, the fact that William Burch pleaded guilty to making a false

statement to the government based on the fabrication of a document purporting to be

evidence of price fixing among certain Defendants, created serious problems for Direct

Purchaser Plaintiffs. Based on this conviction, Defendants attacked the merits of Direct

Purchaser Plaintiffs' case, claiming that the conviction of Mr. Burch rendered both his

testimony and his audio recordings as inadmissible in the case. This single development

raised great uncertainty in the ultimate outcome of this case. Of course, there were other

---

[6] Settling Defendants' abilities to fund the Settlement is neutral, since Settling Defendants clearly have the ability to pay a judgment in this case.

issues as well. Both summary judgment motions and class certification loomed as future obstacles.

Notwithstanding these issues, Direct Purchaser Plaintiffs were able to achieve $8,300,000 in settlement from the Settling Defendants for which final approval is sought. As disclosed in their mediation letters, Direct Purchaser Plaintiffs' counsel estimated their single damages from Defendants' conspiracy at $166 million. Thus, Settlement for which final approval is sought, together with the previously settled Defendants' settlements will amount to a recovery for the Class of more than 10% of single damages. *See e.g., Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 583 (N.D. Ill. 2011) (the $9.5 million settlement fund still represents approximately 10% of the $96.5 million); *Lazy Oil Co. v. Witco Corp.,* 95 F. Supp. 2d 290, 339 (W.D. Pa. 1997) (approving settlement amounting to 5.35% of damages for the entire class period); *In re Domestic Air Tranp. Antitrust Litig.,* 148 F.R.D. 297, 325 (N.D. Ga. 1993) (settlement in this action amounts to approximately 12.7% to 15.3%); *In re Newbridge Networks Sec. Litig.,* No. 94-1678-LFO, 1998 WL 765724, at *2 (D.D.C. Oct. 22, 1998) (approving settlement and concluding that while "[c]ourts have not identified a precise numerical range within which a settlement must fall in order to be deemed reasonable; [ ] an agreement that secures roughly six to twelve percent of a *potential* trial recovery, while preventing further expenditures and delays and eliminating the risk that no recovery at all will be won, seems to be within the targeted range of reasonableness") (emphasis in original); *In re Ravisent Techs., Inc. Sec. Litig.,* No. 00-CV-1014, 2005 WL 906361, at *9 (E.D. Pa. Apr. 18, 2005) (approving settlement, which amounted to 12.2% of damages, and citing study by Columbia University Law School, which determined that "since 1995, class

13

action settlements have typically recovered between 5.5% and 6.2% of the class members

estimated losses.") (internal citations omitted).

### 3. Further Litigation in the Absence of the Settlement Would be Lengthy, Complex, and Expensive

In the absence of this Settlement, further litigation of this case would entail

lengthy, intensive proceedings. While Co-Lead Counsel has already performed

significant work on this case, it is probable that the future of the case before trial would

be marked by complex, expensive, and contested additional discovery, detailed expert

studies and related discovery, one or more motions for summary judgment or partial

summary judgment, highly contested class certification issues, and *Daubert* motions.

Should the case proceed to trial, the trial itself would likely be lengthy and complex,

involving numerous motions *in limine*, extensive proposed jury instructions, voluminous

trial exhibits, and comprehensive and expensive demonstrative presentations involving

expensive presentation technologies. As with any litigation that is as hard fought as this

case, the losing party at trial most likely would pursue and appeal to the Seventh Circuit,

which would involve further delay and expense.

This Settlement avoids all of these complexities, delays, and expenses, and of

course the related uncertainty of any recovery for the Direct Purchaser Class.

### 4. There Were No Objections to Final Approval of the Settlement and Requests for Exclusion were Minimal

As of the time of the filing of these papers, there has not been a single objection to

the Settlement and Co-Lead Counsel have received only ten requests for exclusion. *See*

Exhibit 1-C to the Freed Declaration. The exclusion requests were filed by small

purchasers and therefore Settling Defendants' rights to withdraw from the Settlement Agreement were not even a consideration.

## 5. The Settlement was Negotiated at Arm's-Length and is Not Collusive

The requirement that class action settlements be fair is designed to protect against collusion among the parties. *See In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1383 (D. Md. 1983) (on preliminary approval). When negotiated at arm's-length a proposed settlement is presumptively fair and reasonable. *See Goldsmith v. Tech. Solutions Co.*, No. 92-C-4374, 1995 WL 17009594, at *3 n.2 (N.D. Ill. Oct. 10, 1995) ("it may be presumed that the agreement is fair and adequate where, as here, a proposed settlement is the product of arm's-length negotiations"); 2NEWBERG ON CLASS ACTION, § 11.40 at 451 (2d ed. 1985). Thus, a settlement proposed by experienced counsel as the result of arm's-length negotiations is entitled to deference by the court. *See, e.g., Goldsmith*, 1995 WL 17009594, at *3 n.2; *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 640 (E.D. Pa. 2003) ("A presumption of correctness is said to attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery." (*quoting Hanrahan v. Britt*, 174 F.R.D. 356, 366 (E.D. Pa. 1997)). The initial presumption in favor of such a settlement reflects courts' understanding that vigorous negotiations between seasoned counsel protect against collusion and advance the fairness concerns of Rule 23(e).

Through the negotiations in this case the parties remained adversarial, yet professional. Counsel for all parties are highly experienced litigators who have negotiated numerous class action and other antitrust settlements before the present Settlement was achieved. Counsel for Settling Defendants persistently sought to minimize the financial

and other burdens and risks to be assumed by their clients in the Settlement, while Co-Lead Counsel equally persistently and forcefully pressed for the greatest achievable advantage for the Direct Purchaser Class at every turn. This factor strongly supports approval of the Settlement.

6.    **The Settlement was Negotiated by Experienced and Informed Counsel for the Class**

The Co-Lead Counsel who negotiated the Settlement are highly experienced antitrust and class action lawyers.[7] These attorneys have served as lead or co-lead counsel in numerous other class cases around the country and as executive committee members in many more. They have achieved major settlement recoveries in the many cases they have led. Their credentials were known to the Court when they were appointed by the Court as Interim Co-Lead counsel for the Class.

As described above, in preparation of the case Co-Lead Counsel pursued an in-depth factual investigation, economic analysis, and legal evaluation related to the Direct Purchaser Class's claims.  In addition, Co-Lead Counsel also took into account the numerous and significant legal issues presented by this case, as described above.  In this process, they evaluated both the strengths and the various risks presented by each of these issues. The Settlement was thus ultimately reached based on Co-Lead Counsel's highly informed judgment on the risk both Direct Purchaser Plaintiffs and Settling Defendants faced moving forward in this litigation.

Since Co-Lead Counsel were both experienced and well informed when negotiating the Settlement, this is another strong factor supporting approval of the Settlement.

---

[7] *See* the firm biographies of Co-Lead Counsel submitted in connection with the motion to appoint lead counsel (Dkt. No. 11).

### 7. Co-Lead Counsel Developed Extensive Factual Information

Although there was a lengthy stay of discovery in this case, Co-Lead Counsel successfully obtained extensive market and transaction information. Some of the information was obtained from Defendants, while Co-Lead Counsel's own research and investigation developed additional historical and market information. Still other information was developed by or with the assistance of Direct Purchaser Plaintiffs' experts.

The entire mass of information provided a meaningful basis for Co-Lead Counsel and their experts to evaluate sophisticated issues concerning the affected market and the damages resulting from Defendants' conduct. Thus, in negotiating and agreeing to the Settlement, Co-Lead Counsel were well informed and prepared in detail concerning factual, economic, and legal issues surrounding the Settlement and the Plans of Allocation. This factor, like the others already discussed, weighs heavily in favor of approval of the Settlement.

## IV. Conclusion

For all the foregoing reasons, the Court should finally approve the Settlement. Prior to the hearing on final approval, counsel for the Settling Defendants and Direct Purchaser Plaintiffs will submit for the Court's consideration a form of Final Order and Judgment.

17

Dated: February 4, 2012

Respectfully submitted,

/s/ Michael J. Freed
Michael J. Freed
Steven A. Kanner
FREED KANNER LONDON &
MILLEN, LLC
2201 Waukegan Rd. – Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
Fax: (224) 632-4521

/s/ Roberta D. Liebenberg
Roberta D. Liebenberg
Adam J. Pessin
FINE KAPLAN & BLACK, R.P.C.
One South Broad St. – 23rd Floor
Philadelphia, PA 19107
Telephone: (215) 567-6565
Fax: (215) 568-5872

/s/ Bernard Persky
Bernard Persky
Gregory Asciolla
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Fax: (212) 818-0477

*Co-Lead Counsel for Direct Purchaser Plaintiffs*