IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: AFTERMARKET FILTERS ANTITRUST LITIGATION <br> _____ <br><br> **This Document Relates to:** <br> **All Direct Purchaser Actions** | Master Docket No. 08-cv-4883 <br> MDL Docket No. 1957 <br><br> Honorable Robert W. Gettleman <br> Magistrate Geraldine Soat Brown |

**DIRECT PURCHASER PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION
FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT
OF LITIGATION EXPENSES, AND
<u>CLASS REPRESENTATIVES' SERVICE AWARDS</u>**

**INTRODUCTION**

Co-Lead Counsel for the Direct Purchaser Plaintiffs Class ("Co-Lead Counsel")[1] submit this Memorandum in Support of their Motion for an Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Class Representatives' Service Awards ("Motion").

Co-Lead Counsel respectfully request an award of attorneys' fees in the amount of $5,390,625.00, representing thirty percent (30%) of the Settling Defendants' settlement payments totaling $17,968,750,[2] plus accrued interest, and reimbursement of litigation expenses in the amount of $1,215,039.39. This fee request is unopposed by any class member[3] and amounts to less than 0.21% of the lodestar accrued in this litigation over the past five years of contingent-fee work by Co-Lead Counsel and their co-counsel (collectively, "Class Counsel"). In the view of Co-Lead Counsel, this fee request is fair and reasonable. Likewise, the unreimbursed expenses advanced by Class Counsel were reasonably expended in the prosecution of this action.

In addition, Co-Lead Counsel seek service awards in the amount of $5,000.00 each ($20,000.00 in total) for the Direct Purchaser Plaintiff class representatives: Central Warehouse Sales Corporation, Neptune Warehouse Distributors, Inc., William C. Bruene d/b/a Lone Star Lube, and A&L Systems Inc. (collectively, "Direct Purchaser Plaintiffs" or "Class Representatives").

---

[1] As used herein, the term "Co-Lead Counsel" refers to Fine Kaplan & Black R.P.C., Freed Kanner London & Millen, LLC, and Labaton Sucharow LLP, which were also appointed Co-Lead Counsel for the Direct Purchaser Plaintiffs Class in this action.

[2] The total Settlement Fund is $17,968,750.00, which comprises settlements with Baldwin ($406,250.00), Cummins ($406,250.00), Donaldson ($406,250.00), Wix, ($1,300,000.00), Honeywell ($2,112,500.00), Champion ($5,037,500.00) and Purolator ($8,300,000.00).

[3] The deadlines for objections to the Settlement Agreements have passed (whereby class members were notified in the respective Notices that Class Counsel would not seek more than 30% of the Settlement Funds for attorneys' fees and reimbursement of their expenses), and no objections to Class Counsels' potential fee or reimbursement of expenses were received by the deadlines nor to date. Freed Decl. ¶14.

This Motion is also supported by the Declaration of Michael J. Freed ("Freed Decl."), submitted herewith.

Class Counsel have litigated this matter on a fully contingent basis and have funded all litigation expenses and costs from inception of the litigation to date. When compared to Class Counsels' lodestar, the fee requested is a fraction of counsels' lodestar required to litigate the matter over the last five years. Led by Co-Lead Counsel, Class Counsel have succeeded in obtaining a substantial recovery in light of the provable damages and litigation risks, and now seek to be compensated for their efforts. All expenses were carefully and reasonably incurred and should be reimbursed. Further, the Class Representatives, among other things, fully responded to all of Defendants' discovery, including producing documents, monitored this litigation, and one Class Representative sat for deposition, and thus they should be awarded for the substantial benefit they have assisted on conferring on the Class.

## I. BACKGROUND

### A. Procedural History of the Litigation

This litigation was commenced on March 31, 2008 with the filing of a class action lawsuit by a direct purchaser of Filters from Defendants. Eventually, sixty (60) cases were filed in five federal district courts. On August 18, 2008, the Judicial Panel for Multidistrict Litigation transferred the cases to this Court and the Court consolidated all actions under the above caption. By Order dated September 4, 2008, the Court appointed Freed Kanner London & Millen LLC, Labaton Sucharow LLP, Fine Kaplan & Black, R.P.C. and Susman Godfrey LLP[4] to serve as Interim Co-Lead Counsel for the Direct Purchaser Plaintiffs. On November 26, 2008, Direct Purchaser Plaintiffs filed the Consolidated Amended Complaint ("CAC").

---

[4] On October 12, 2011, Susman Godfrey LLP withdrew as Co-Lead Counsel. (Dkt. #839).

On February 2, 2009, Defendant Champion Laboratories, Inc. ("Champion") filed an answer to the CAC. The other Defendants moved to dismiss the CAC. Direct Purchaser Plaintiffs filed their response in opposition to Defendants' joint motion to dismiss on March 16, 2009, and Defendants submitted replies on April 16, 2009. On November 5, 2009, this Court denied Defendants' joint motion to dismiss and denied the separate motion of Defendant Baldwin Filters, Inc. ("Baldwin") to dismiss on November 9, 2009. Defendants individually answered the CAC on December 28, 2009.

### B. Summary of Plaintiffs' Allegations

Direct Purchaser Plaintiffs brought their respective antitrust class actions against the largest manufacturers of Filters[5] in the United States, alleging that from 1999 through the present, Defendants conspired to fix the prices of Filters. Defendants include Champion, Baldwin, Purolator Products NA, LLC, Purolator Products Company, LLC, ArvinMeritor, Inc. (together, "Purolator"), Honeywell International ("Honeywell"), Wix Filtration Corp. LLC, Affinia Group Inc. (together, "Wix"), Cummins Filtration Inc. ("Cummins"), and Donaldson Company, Inc. ("Donaldson") (collectively, "Defendants"). Defendants denied these allegations.

Direct Purchaser Plaintiffs based their allegations, among other things, on an industry which was susceptible to price-fixing, information provided by a "whistleblower" (William G. Burch, who was employed by Purolator and Champion during most of the Class Period),[6] and

---

[5] The term "Filters" includes oil, air and fuel filters sold in the aftermarket for light duty vehicles, *i.e.*, cars and light trucks. It does not include products for sale to original equipment manufacturers, such as vehicle manufacturers.

[6] As this case progressed, Mr. Burch became problematic as a potential witness in the litigation. He was indicted and pleaded guilty to making a false statement to the government based on the fabrication of a document purporting to be evidence of price-fixing among certain Defendants. Mr. Burch was convicted and sentenced to 24 months in prison and fined $30,000.

3

statements made under oath by other individuals with personal knowledge of the alleged conspiracy.

Direct Purchaser Plaintiffs allege that the conditions which made the industry susceptible to price-fixing included the following:

1. During the Class Period the industry for Filters was ripe for collusion. Although the market is large in terms of dollars, the industry is dominated by four manufacturers: Champion, Purolator, Honeywell and Wix. These four manufacturers account for more than 80% of Filter sales in the United States.

2. Filters sold by these manufacturers are a commodity product, meaning that purchasers view Defendants' products as interchangeable.

3. In addition to the Filters industry being ripe for collusion, many of Defendants' employees have spent their entire careers in the Filters industry and key employees transferred between Defendants. This fostered familiarity and comfort between ostensible competitors and facilitated high-level pricing coordination. That familiarity encouraged frequent and open communication between competitors, including at industry trade events.

4. Additionally, Defendants bought and sold Filters from each other and engaged in a variety of joint ventures. Defendants used these opportunities to communicate with each other about pricing.

**C. Status of Litigation**

After the denial of Defendants' motions to dismiss, the parties engaged in protracted discovery, which engendered many disputes resulting in extensive motion practice. (*See* Dkt. ## 527, 536, 706, 708). The parties briefed these disputes in great detail and, after a number of

hearings, the Court issued several discovery orders. (*See* Dkt. ## 553, 579, 652, 678, 696, 733). Subsequent to the entry of these orders, Defendants produced and Direct Purchaser Plaintiffs reviewed millions of pages of documents (excluding transactional data). Direct Purchaser Plaintiffs also conducted several depositions of Defendant personnel. Likewise, Direct Purchaser Plaintiffs produced documents, and Defendants noticed and took depositions of Plaintiffs' Class Representatives, and also subpoenaed third-parties. Notably, Defendants subpoenaed the deposition of Mr. Burch, after which the parties deposed him for five days.

As a result of Mr. Burch's indictment, guilty plea and conviction, Defendants filed a number of adversarial motions, including motions to exclude from any use in the case audio recordings made by Mr. Burch of conversations with various officers of Defendants. These recordings, in the view of Direct Purchaser Plaintiffs' counsel, corroborated the allegations of price-fixing, and their potential exclusion represented a serious problem.

On September 26, 2011, based on information learned through discovery to date, and on their own investigation, Direct Purchaser Plaintiffs filed an omnibus response in opposition to Defendants' motions to exclude use of the Burch tape recordings and his testimony. (Dkt. #813). That submission included a summary of key evidence supporting Direct Purchaser Plaintiffs' allegations in this matter which, to avoid repetition, are incorporated herein by reference. Shortly thereafter, Direct Purchaser Plaintiffs entered into settlements in principle with Baldwin, Cummins, and Donaldson. On October 6, 2011, those Defendants that had not entered into settlement agreements at the time filed a reply to Direct Purchaser Plaintiffs' omnibus memorandum. On October 7, 2011, Plaintiffs executed settlement agreements with Baldwin, Cummins, and Donaldson. (Dkt. #827).

5

On January 19, 2012, a settlement mediation was held with Magistrate Judge Geraldine Soat Brown and Direct Purchaser Plaintiffs and the non-settling Defendants, but the parties were unable to reach a settlement agreement.

On January 20, 2012, the Court denied Defendants' motions (Dkt. ## 792, 795) to exclude Mr. Burch's testimony and tapes and vacated the stay of discovery which had previously been entered into by agreement among the parties while the Department of Justice pursued its investigation of Mr. Burch.

On February 17, 2012, the Court entered orders preliminarily approving the settlements with Baldwin, Cummins, and Donaldson.

On March 8, 2012, Direct Purchaser Plaintiffs entered into a settlement agreement with Defendants Wix, Champion, and Honeywell.

On April 20, 2012, the Court entered an Order preliminarily approving the settlements with Wix, Champion, and Honeywell. The litigation continued against Purolator and discovery proceeded, including the taking of a number of depositions of past and present employees of various Defendants.

On August 14, 2012, another mediation was held with Magistrate Judge Brown and Direct Purchaser Plaintiffs and Purolator. Shortly thereafter, Direct Purchaser Plaintiffs and Purolator reached a settlement in principle.

On October 10, 2012, the Court entered an order of final approval of the first six settlements.

On October 29, 2012, Co-Lead Counsel moved for preliminary approval of the Settlement Agreement reached with Purolator.

**D. Summary of Work Performed**

As described more fully in the Freed Declaration, Class Counsel, led by Co-Lead Counsel, performed the following work in this litigation:

### 1. Investigation, Pleadings and MDL

Class Counsel, among other things, (1) extensively investigated Defendants' involvement in the alleged conspiracy, including developing facts related to the alleged unlawful conduct, identifying potential defendants and witnesses, analyzing the industry, identifying the products involved, interviewing market participants, developing potential claims, and researching various legal and procedural issues; (2) drafted various pleadings; and (3) moved for transfer and consolidation/coordination of the related cases. (*See* Freed Decl. ¶¶ 27-31).

### 2. Dispositive Motion Practice

Class Counsel, among other things, opposed and successfully defended Direct Purchaser Plaintiffs' claims against numerous motions to dismiss the complaint on various grounds, motions for reconsideration, a motion for summary judgment and a motion for judgment on the pleadings. (*Id*. ¶¶ 32-41).

### 3. Discovery Requests, Production and Review

Class Counsel engaged in protracted discovery, including for both merits and class certification. Class Counsel negotiated a protective order and stipulation involving ESI; drafted interrogatories and document requests; responded to Defendants' interrogatories and document requests to Direct Purchaser Plaintiffs, including the production of documents; developed a document review platform and process for online review, including the preparation of training materials and the organization and handling of training sessions; and oversaw and managed the entire document review process, including quality control efforts, on a day-to-day basis. (*Id*. ¶¶ 42-50).

7

### 4. Discovery Disputes

Class Counsel engaged in a number of discovery disputes, several of which required extensive briefing and argument before the Court, including opposing Defendants' motion to seek production of materials from Direct Purchaser Plaintiffs designated as privileged and Defendants' motions *in limine* to preclude the use of Mr. Burch's audio recordings and his testimony in discovery and at trial. (*Id*. ¶¶ 51-58).

### 5. Court Conferences

Co-Lead Counsel participated in numerous motion, scheduling and status conferences throughout the litigation, before both Judge Robert Gettleman and Magistrate Judge Brown. (*Id*. ¶¶ 59-60).

### 6. Deposition and Interviews

Class Counsel prepared and took numerous depositions of Defendants' current and former employees; prepared for, and participated in, the deposition of Mr. Burch, which took place over five days in Tulsa, Oklahoma; prepared for and defended the deposition of one of the Direct Purchaser Plaintiff Class Representatives; prepared for and conducted numerous witness interviews (of both current and former employees of various Settling Defendants); and prepared for and participated in fact proffers by Settling Defendants pursuant to the cooperation terms of their respective settlement agreements. (*Id*. ¶¶ 61-64).

### 7. Expert Discovery

Class Counsel worked extensively with their economic experts to get them needed transactional, cost and other information to inform their analysis as to class certification, liability, impact, and damages. Class Counsel expended significant investments of time and resources to

manage, organize and control the flow of information to the experts, including their tape authentication expert. (*Id*. ¶¶ 65-68).

### 8. Settlement Conferences/Mediations

Co-Lead Counsel participated in two settlement conferences before Magistrate Judge Brown, which involved preparing comprehensive mediation statements and other instructive documents, charts and expert analyses. (*Id*. ¶¶ 69-71).

### 9. Settlements

After several long periods of intense, arm's-length settlement negotiations, Co-Lead Counsel negotiated, prepared and executed settlement agreements with all of the Defendants in the litigation. Following execution of the Settlement Agreements, Co-Lead Counsel moved for preliminary approval of the settlements, prepared short and long form class notices, prepared a claim form, moved for final approval of the settlements, and administered settlement class member claims (ongoing). (*Id*. ¶¶ 72-86).

**ARGUMENT**

**I.    The Requested Attorneys' Fees are Reasonable Whether Calculated Under the Percentage of the Benefit Method or the Lodestar Method**

The prosecution of this case by the Direct Purchaser Plaintiffs resulted in a total Settlement Fund of $17,968,750.00.[7] Courts have long recognized that when, as in this case, a party successfully obtains benefits for a class, the costs of litigation, including an award of attorneys' fees, should be recovered from the fund created by the litigation. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 390 (1970); *see also In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 568 (7th Cir. 1992). This "equitable" or "common

---

[7] These funds have been paid by the Defendants and deposited in an escrow account at Huntington Bank and have been accruing some interest (although minimal) since being deposited.

9

fund" doctrine, established more than a century ago in *Trustees v. Greenough*, 105 U.S. 527 (1881), spreads the cost of the litigation, including attorneys' fees, among the fund's beneficiaries.

In deciding an appropriate fee in common fund cases, a requested attorneys' fee is deemed reasonable if it complies with the market-value approach set out by the Seventh Circuit. *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("*Synthroid I*"). The Seventh Circuit has "consistently directed district courts to 'do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.'" *Sutton v. Bernard,* 504 F.3d 688, 692 (7th Cir. 2007) (quoting *Synthroid I* at 718); *see also Montgomery v. Aetna Plywood, Inc.,* 231 F.3d 399, 408 (7th Cir. 2000) (finding that in common fund cases, "the measure of what is reasonable [as an attorneys' fee] is what an attorney would receive from a paying client in a similar case"); *In re Trans Union Corp. Privacy Litig.,* No. 00 C 4729, 2009 WL 4799954, at *9 (N.D. Ill. Dec. 9, 2009) (Gettleman, J.) *order modified and remanded,* 629 F.3d 741 (7th Cir. 2011) ("The analysis should be determined from what an arms-length negotiation between the class and the lawyers at the beginning of the case would have likely produced.").

Accordingly, although awarding attorneys' fees based on a percentage of the recovery or Class Counsel's lodestar remains within the discretion of the district court, *In re Trans Union Corp.,* 2009 WL 4799954, at *9 (citing *Florin v. Nationsbank of Ga., N.A.,* 34 F.3d 560, 566 (7th Cir. 1994)), "[t]he approach favored in the Seventh Circuit is to compute attorney's fees as a percentage of the benefit conferred on the class", especially where the percentage accurately reflects the market. *Williams v. Gen. Elec. Capital Auto Lease,* No. 94 C 7410, 1995 WL 765266, at *9 (N.D. Ill. Dec. 26, 1995).

10

The contingent nature of the fees here supports an award based on the common benefit approach. It has been stated that in commercial, non-class litigation, attorneys regularly negotiate contingent fee arrangements, which result in a fee of between 33.3% and 40% of the recovery. *Retsky Family Ltd. P'ship v. Price Waterhouse LLP,* No. 97 C 7694, 2001 WL 1568856, at *4 (N.D. Ill. Dec. 10, 2001) (citing *Kirchoff v. Flynn,* 786 F.2d 320, 324 (7th Cir. 1986)); *see also* Richard Posner, ECONOMIC ANALYSIS OF LAW § 21.9, at 534–35 (3d ed. 1986) (explaining established practice to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases). That is the case here.

Additionally, Class Counsel assumed a substantial risk of non-payment given the complexity of the action (which has been pending since 2008) and the Defendants' vigorous defense of the lawsuit. In light of the significant likelihood that the recovery in this case could well have been zero, Co-Lead Counsel's request is reasonable.

II. **The Requested Fees Represent Thirty-Percent (30%) of the Common Benefit Provided to the Class—a Percentage Well Below Market and the Range that has Been Found Reasonable by the Courts**

The fee request in this case equals thirty-percent (30%) of the all-cash common fund created under the settlements. Such a figure is widely recognized as a reasonable percentage, arguably below the norm. *See Meyenburg v. Exxon Mobil Corp.,* No. 05-cv-15 DGW, 2006 WL 2191422, at *2 (S.D. Ill. July 31, 2006) ("33 1/3% to 40% (plus the cost of litigation) is the standard contingent fee percentages in this legal marketplace for comparable commercial litigation").[8] Indeed, using the market percentage method in the courts of the Seventh Circuit, as

---

[8] This Court recently awarded Class Counsel for the Indirect Purchaser Plaintiffs one-third (33.3%) of their settlement fund (Dkt. #1025), and Class Counsel for the Gas Retailer Plaintiffs one-third (33.3%) of

11

one court has observed, results in awards of attorneys' fees "equal to approximately one-third or more of the recovery." *Teamsters Local Union No. 604 v. Inter–Rail Transp., Inc.,* No. 02-cv-1109-DRH, 2004 WL 768658, at *1 (S.D. Ill. Mar. 19, 2004) ("In this Circuit, a fee award of thirty-three and one-third (33 1/3%) in a class action in [sic] not uncommon"). Where the market for legal services in a class action is only for contingency fee agreements, and there is a substantial risk of nonpayment for the attorneys, "the normal rate of compensation in the market" is "33.33% of the common fund recovered." *Will v. Gen. Dynamics Corp.,* No. 06-cv-698-GPM, 2010 WL 4818174, at *2 (S.D. Ill. Nov. 22, 2010). Co-Lead Counsels' request in this matter is below the "normal rate."

Here, Class Counsel took on the responsibility of representing the Direct Purchaser Plaintiff Class and then proceeded to represent their interests zealously, just as Class Counsel does in all of their cases. Along the way, Class Counsel invested significant resources that included bringing their skill and expertise to bear to defeat numerous dispositive motions and a critical motion *in limine* to restrict Class Counsel's use of key evidence in discovery and at trial (the audiotape recordings). Of course, suffering defeat at any juncture would have resulted in no benefit to the Direct Purchaser Plaintiff Class at all, but Class Counsel stood as the Direct Purchaser Plaintiff Class guardian – at significant risk – and prevailed, setting the stage for approval of the multi-million dollar fund before the Court now. Moreover, the impact of Mr. Burch's conduct, guilty plea, and eventual conviction cannot be overstated as those developments raised significant uncertainty regarding the outcome of the case.

In light of these facts, and given that the going rate in the market for class action legal fees support a fee in excess of the fee requested here, the Court should approve Co-Lead

---

their settlement fund (Dkt. #1044). Co-Lead Counsels' fee request here is less than that awarded to Class Counsel for the other plaintiffs' groups.

Counsel's request for $5,390,625.00, plus accrued interest, which is thirty-percent (30%) of the common fund created. Defendants have agreed not to oppose or object to the motion and payment of attorneys' fees, costs and expenses.

### III. The Requested Fees are Equally Appropriate Under the Lodestar Method

If the Court chooses to cross-check the percentage-of-the-fund request against the lodestar, that cross-check would further show the reasonableness of the fee request. As a starting point, the Court must be aware that Class Counsel's lodestar is far in excess of the amount of fees requested. This should give the Court great comfort to conclude that the requested attorneys' fees are equally reasonable should the Court apply the lodestar method.

To determine the reasonableness of attorneys' fees under the lodestar method, the first step is to "[multiply] a reasonable hourly rate by the number of hours reasonably expended." *Gastineau v. Wright,* 592 F.3d 747, 748 (7th Cir. 2010) (*citing Hensley v. Eckerhart,* 461 U.S. 424, 433-37, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983)). A reasonable hourly rate should be in line with the prevailing rate in the "community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Jeffboat, LLC v. Director, Office of Workers' Comp. Programs,* 553 F.3d 487, 489 (7th Cir. 2009) (quoting *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984)); *see also Denius v. Dunlap,* 330 F.3d 919, 930 (7th Cir. 2003) (finding the attorney's actual billing rate for comparable work is presumptively appropriate).

The hourly rates utilized by Class Counsel and their legal staffs are comparable to rates charged by attorneys with similar experience, skill and reputation, for similar services in the Chicago legal market and comparable markets nationwide. Freed Decl. ¶ 16. Moreover, these rates are the actual billing rates for the respective attorneys that they charge clients in similar

13

contingent antitrust litigation, and, therefore, yield a presumption of appropriateness. *See, e.g., Denius,* 330 F.3d at 930.

The total lodestar submitted by Class Counsel as a cross-check is $25,906,590.95, which includes time incurred from inception of the case through November 30, 2012. *See* Exh. A to the Freed Decl. This means that Class Counsel stand to recover only 21% of their fees ($5,390,625.00 / $25,906,590.95). Another way of stating this is that the fee request will yield a negative multiplier of 0.21. The total hours worked by Class Counsel were 50,130, which amounts to an effective hourly rate of $107.53 (50,130.70 / $5,390,625.00).[9] Co-Lead Counsels' 30% fee request is therefore reasonable.

### IV. Reimbursement of Reasonable Litigation Expenses Is Appropriate

Class Counsel have expended $1,215,039.39 in reimbursable expenses, such as filing fees, appearance fees, economic expert consulting charges, ESI database management, travel, copying, case administration, and deposition transcripts. *See* Exhs. B and C to the Freed Decl. These expenses were significantly minimized by resolving the case at this stage of the proceedings before more hefty expenses relating to expert reports, disclosures and a significant number of additional depositions commenced.

This Court is requested to order the reimbursement of the reasonable litigation expenses in the amount of $1,215,039.39.

### V. The Service Awards to the Class Representatives Are Reasonable

Because a named plaintiff is essential to any class action, "[i]ncentive awards are justified when necessary to induce individuals to become named representatives." *Synthroid I,* 264 F.3d at 722-23. In deciding whether an award is warranted, courts look to: (1) "the actions the plaintiff

---

[9] Class Counsel for the Indirect Purchasers fared better, recovering about 30% of their fees, or an effective hourly rate of $111.75. (Dkt. #1003).

14

has taken to protect the interests of the class"; (2) "the degree to which the class has benefitted from those actions"; and (3) "the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).

These factors are readily satisfied here because the Settlement Classes benefitted significantly from the Direct Purchaser Plaintiffs' involvement as Class Representatives. Were it not for their efforts and contributions to the litigation by assisting Class Counsel with their investigation and filing of the underlying suits in this MDL, their participation in responding to Defendants' discovery (both interrogatories and documents), and the giving of a deposition, then the substantial benefit to the class afforded under this Settlement Agreement would not have resulted. Freed Decl. ¶¶ 87-89. Further, courts have approved service awards in similar class action litigation consistent with and greater than the aggregate $20,000.00 award for the four Class Representatives requested here. An empirical study of service awards to class action plaintiffs has determined that the average aggregate award within a consumer class action case is $29,055.20, and that the average individual award is $6,358.80. Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study,* 53 UCLA L. Rev. 1303, 1333 (2006). The aggregate service award of $20,000.00 for the Class Representatives is below that average aggregate award, and $5,000.00 per Class Representative is less than the average individual awards.[10] Accordingly, the service award of $5,000.00 for each of the Class Representatives here is reasonable and should be approved.

## CONCLUSION

As stated above, Co-Lead Counsel respectfully request that the Court grant $5,390,625.00, plus accrued interest, as attorneys' fees, which represents thirty-percent (30%) of

---

[10] The Court awarded $5,000.00 each to the two class representatives in the gas retailers' indirect purchaser action. (Dkt. #1044).

15

the common fund established for the benefit of the Direct Purchasers Plaintiff Class, reimbursement of litigation expenses in the amount of $1,215,039.39, and Class Representative service awards for Central Warehouse Sales Corporation, Neptune Warehouse Distributors, Inc., William C. Bruene d/b/a Lone Star Lube, and A&L Systems Inc. in the amount of $5,000.00 each (for a total of $20,000.00).

Dated: February 4, 2013                                  Respectfully submitted,

/s/ Michael J. Freed
Michael J. Freed
Steven A. Kanner
FREED KANNER LONDON & MILLEN, LLC
2201 Waukegan Rd. – Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500

/s/ Gregory Asciolla
Gregory Asciolla
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Fax: (212) 818-0477

/s/ Roberta D. Liebenberg
Roberta D. Liebenberg
Adam J. Pessin
FINE KAPLAN & BLACK, R.P.C.
One South Broad St. – 23rd Floor
Philadelphia, PA 19107
Telephone: (215) 567-6565
Fax: (215) 568-5872

*Co-Lead Counsel for Direct Purchaser Plaintiffs*